**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. CCB-16-CR-0597** |
| | * | |
| **MONTANA BARRONETTE et al,** | * | |
| | * | |
| | * | |
| | * | |
| | ******* | |

## RESPONSE MOTION IN OPPOSITION

The United States of America, by and through its attorneys, hereby submits the following consolidated response in opposition to the defendants' various motions to suppress, to compel, severance, dismissal, and for a bill of particulars.

**1. Procedural History.**

On December 14, 2016, a federal grand jury in the District of Maryland returned a four-count Indictment, charging Montana Barronette, Terrell Sivells, Taurus Tillman, Hisaun Chatman, and James Woodfolk with conspiracy to possess with the intent to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). *See* ECF No. 1. The original indictment also charged Sivells, Chatman, and Tillman with distribution of a controlled substance, in violation of 21 U.S.C. § 841. On December 22, 2016, Tillman had his initial appearance in front of United States Magistrate Judge Beth Gesner, at which time Judge Gesner entered an order of detention. *See* ECF No. 7 and 9.

On January 6, 2017, Barronette had his initial appearance in front of United States Magistrate Judge Stephanie A. Gallagher, at which time Judge Gallagher entered an order of

1

detention.   *See* ECF No. 26 and 30.

On January 13, 2017, Sivells had his initial appearance in front of United States Magistrate Judge Mark J. Coulson, at which time Judge Coulson entered an order of detention.   *See* ECF No. 35 and 38.

On June 29, 2017, the grand jury returned a nine-count superseding indictment, charging Barronette, Sivells, John Harrison, Tillman, Linton Broughton, Dennis Pulley, Roger Taylor, Brandon Wilson, Brandon Bazemore, and Timothy Floyd with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d).   The superseding indictment also charges Barronette, Harrison, Bazemore, and Taylor with violent crime in aid of racketeering, in violation of 18 U.S.C. § 1959 (Count Two); all defendants with conspiracy to possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846 (Count Three); Sivells and Tillman with distribution of a controlled substance, in violation of 21 U.S.C. § 841 (Counts Four, Five, and Six); and Pulley and Wilson with possession of a firearm in furtherance of a drug trafficking crime and possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 924(c) and 922(g) (Counts Seven, Eight, Nine, and Ten).   *See* ECF No. 85.

On June 30, 2017, Harrison had his initial appearance in front of United States Magistrate Judge David A. Copperthite, at which time Judge Copperthite entered an order of detention.   *See* ECF No. 92 and 97.

On July 6, 2017, Broughton had his initial appearance in front of United States Magistrate Judge Mark J. Coulson, at which time Judge Coulson entered an order of detention.   *See* ECF No. 99 and 103.

On July 28, 2017, Floyd, Wilson, and Pulley all had their initial appearances in front of United States Magistrate Judge David A. Copperthite, at which time Judge Copperthite entered an

order of detention for each defendant.   *See* ECF No. 126, 128, and 130.

On August 25, 2017, Bazemore had his initial appearance in front of United States Magistrate Judge David A. Copperthite, at which time Judge Copperthite entered an order of detention.   *See* ECF No. 155.

To date, two defendants have pled guilty (Chatman and Woodfolk) and one defendant remains a fugitive (Taylor).   Of the remaining defendants, the following motions were filed:

a.  By defendant Montana Barronette:

    i.  Motion to enlarge time to file motions (ECF No. 224);

    ii.  Motion for leave to amend motions (ECF No. 242);

    iii.  Motion for severance and improper joinder (ECF No. 243);

    iv.  Motion to suppress statements (ECF No. 244);

    v.  Motion to suppress Title III wiretap evidence (ECF No. 245, 267);

    vi.  Motion for order for government to provide notice under Fed. R. Crim. Pro. 404(b) (ECF No. 246);

    vii.  Motion for order for government to provide notice in accordance with Fed. R. Crim. Pro. 609 convictions (ECF No. 247);

    viii.  Motion to dismiss Counts One and Two of the Superseding Indictment (ECF No. 248);

    ix.  Motion to preclude out of court identifications (ECF No. 250);

b.  By defendant Terrell Sivells:

    i.  Motion to preclude out-of-court identifications (ECF No. 252);

    ii.  Motion to suppress statements (ECF No. 253);

    iii.  Motion to sever (ECF No. 255);

    iv.  Motion to suppress warrantless arrests and searches (ECF No. 256, 268);

    v.  Motion to suppress Title III wiretap authorizations (ECF No. 257, 262);

    vi.  Motion to suppress searches (ECF No. 258);

    vii.  Motion to suppress tracking warrants (ECF No. 259);

c.  By defendant Taurus Tillman:

    i.  Motion to preclude out of court identifications (ECF No. 221);

d.  By defendant John Harrison:

    i.  Motion to suppress statements (ECF No. 232);

    ii.  Motion for leave to file additional motions (ECF No. 233);

    iii.  Motion to exclude MB statements (ECF No. 234);

    iv.  Motion to exclude cooperator testimony (ECF No. 235);

    v.  Motion to dismiss Counts One and Two of the Superseding Indictment (ECF No. 236);

    vi.  Motion to preclude cooperator statements (ECF No. 237);

    vii.  Motion for a bill of particulars (ECF No. 238);

    viii.  Motion to exclude out of court identifications (241);

e.  By defendant Linton Broughton:

    i.  Motion to suppress cell phone extraction evidence (ECF No. 230);

f.  By defendant Brandon Bazemore:

    i.  Motion for a bill of particulars (ECF No. 212);

    ii.  Motion to disclose information regarding a confidential informant (ECF No. 213);

    iii.  Motion for order for government to provide notice under Fed. R. Crim. Pro.

404(b) (ECF No. 214);

    iv.  Motion for an order to cut-off discovery (ECF No. 215);

    v.  Motion for an order regarding expert disclosure (ECF No. 216);

    vi.  Motion to preclude government's case agent from testifying as an expert (ECF No. 217);

    vii.  Motion to inspect government's charts (ECF No. 218);

    viii.  Motion for order for government to provide notice in accordance with Fed. R. Crim. Pro. 609 convictions (ECF No. 219);

    ix.  Motion to suppress statements (ECF No. 220);

g.  By defendant Dennis Pulley:

    i.  Motion to adopt motions of other defendants (ECF No. 249);

h.  By defendant Brandon Wilson:

    i.  Motion to suppress statements (ECF No. 228);

i.  By defendant Timothy Floyd:

    i.  Motion for notice of intent to introduce 404(b) evidence (ECF No. 266);

    ii.  Motion to suppress Title III wiretap authorizations (ECF No. 264);

In addition to defendant Pulley, several other defendants filed motions to adopt the motions of other counsel.

### 2. *Warrantless seizures involving Sivells were justified under the Fourth Amendment*

Defendant Sivells seeks to have the Court to suppress evidence stemming from several encounters between law enforcement and Sivells.   Sivells contends that officers lack sufficient authority under the Fourth Amendment to seize and/or search Sivells.   Specifically, Sivells seeks to suppress evidence from the following police-citizen encounters:   (1) on August 19, 2010,

members of the Baltimore City Police Department ("BPD") arrested Sivells and others after observing a drug transaction; (2) on August 11, 2015, officers arrested Sivells and Broughton and seized drugs; (3) on February 22, 2012, BPD officers arrested Sivells and others after observing a drug transaction; (4) on January 28, 2016, members of the Federal Bureau of Investigation ("FBI") Safe Streets Task Force recovered a firearm near the National Guard Armory in Baltimore; (4) on April 8, 2016, law enforcement officers conducted a warrantless search of 1315 Harlem Avenue, Baltimore, Maryland and seized a firearm and drugs; and (5) on October 28, 2016, law enforcement officers encountered Sivells during a car stop.[1]

    *a.  Relevant law*

The Fourth Amendment prohibits unreasonable searches and seizures.  The Supreme Court has identified three distinct types of police-citizen encounters, each requiring a different level of suspicion to be deemed reasonable under the Fourth Amendment: "(1) arrest, which must be supported by probable cause; (2) brief investigatory stops, which must be supported by reasonable articulable suspicion; and (3) brief encounters between police and citizens, which require no objective justification."  United States v. Brown, 401 F.3d 588, 592 (4th Cir. 2005).

    *b.  Arrest and search of Sivells on August 9, 2010 was supported by probable cause*

On August 19, 2010, BPD Detectives were conducting surveillance near the 1300 Block of Harlem Street.  During surveillance, officers observed Sivells, Broughton, and two others individuals engage in hand-to-hand drug transactions.  Specifically, officers observed Sivells meet with customers and then direct those individuals to his associate to conduct the transactions. During the third transaction, officers observed Sivells interact with a customer and then pass the

---

1 The government is unaware of the nature of this encounter and, as a result, did not include a response.

customer to his associate.   Officers then observed the hand-to-hand transaction and arrested the customer and Sivells.   Officers searched the customer and Sivells and recovered four gel caps of heroin from the customer and $469 from Sivells.

Although warrantless searches and seizures are presumed to violate the Fourth Amendment of the Constitution, a search incident to an arrest supported by probable cause is a well-established exception.   United States v. Chimel, 395 U.S. 752, 762 (1969).   A lawful arrest provides law enforcement officers authority to conduct a full search of the suspect.   United States v. Coleman, 100 Fed. Appx. 202, 2 (4th Cir. 2004).   The scope of such a search is broad.   "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons…[and] it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction."   United States v. Thornton, 325 F.3d 189, 192 (4th Cir. 2003).

Here, officers observed Sivells and several others engaged in conduct consistent with drug trafficking.   Officers specifically observed one of Sivells' associates retrieve gel caps from a stash location and provide it to the customer in exchange for money.   During surveillance, officers observed Sivells directing an associate and others to complete the transactions.   At that point, officers had probable cause to believe Sivells, Broughton and their two associates were involved in drug trafficking.

> c.  *Seizure of drugs from Sivells and Broughton on August 11, 2015 was supported by probable cause*

On August 11, 2015, members of the BPD conducted surveillance near the 1200 block of Riggs Avenue.   During surveillance, officers observed Sivells meet with two individuals, separately, and directed them to Broughton and another individual.   Officers then observed Broughton engage in hand-to-hand drug transactions with the two customers.   Broughton and the

other individual then returned to Sivells' location.   BPD officers arrested Broughton, Sivells, and

the third individual.   Officers conducted a search of all three individuals and recovered the

following:   (1) orange top vials of cocaine and a digital scale from the third individual, (2) $81

from Broughton, and (3) $7 from Sivells.   Officers also located additional orange top vials of

cocaine from the rear of 1200 Riggs Avenue, where Broughton conducted the transactions.

The arrest and search of Sivells and Broughton was supported by probable cause.   Based

on the observations of the surveillance team, officers established probable cause that Sivells was

coordinating   drug   transactions   and   directing   customers   to   Broughton   to   complete   those

transactions.   As such, officers were authorized to arrest and conduct a complete search of Sivells

and Broughton.

> **d.   *Seizure of drugs from Sivells and Tillman on February 22, 2016 was supported by probable cause***

On February 22, 2016, BPD officers conducted surveillance of Sivells and Tillman near

the 1300 block of Harlem Avenue.   During surveillance, officers observed Sivells moving back

and forth from a residence at 641 N. Calhoun Street to the 1300 block of Harlem.   Sivells met

with five individuals, each time running to the rear of 641 N. Calhoun, retrieve an object and then

run back to a drug customer at the 1300 block of Harlem.   Officers observed Sivells engage in

multiple hand-to-hand transactions.   As officers approached, Tillman pointed at the officers to

alert Sivells and Sivells began to walk away.   Officers arrested both individuals and conducted a

search of their person.   Officers recovered $981 from Sivells and $612 from Tillman.   During the

arrest, Sivells stated that if the officers found any "dope," it was Sivells.   At the rear of 641 N.

Calhoun, officers recovered several vials of cocaine, drug-packaging material, and a table with a

plate and razor on it.

Again, this arrest was supported by probable cause.   Officers observed Sivells engage in

multiple hand-to-hand drug transactions, utilizing a stash location at the rear of 641 N. Calhoun Street.   As such, officers were authorized to conduct a search of Sivells and Tillman.

> e.   _1315 Harlem Avenue is abandoned property and none of the defendants had a reasonable expectation of privacy in the contents of the residence_

On April 8, 2016, members of the FBI and BPD were conducting surveillance of a vacant residence at 1315 Harlem Avenue, Baltimore, MD.   During surveillance, officers observed Sivells entering and exiting the basement of the residence and interacting with Barronette, who was in a van.   Officers also intercepted communications with Sivells, in which he appeared to be arranging drug transactions.   After one intercepted call, officers observed Sivells exit the basement 1315 Harlem Avenue and conduct a drug transaction with the occupants of a Chrysler 200.   BPD officers subsequently conducted a traffic stop of the vehicle and seized packaged marijuana. During a warrantless search of 1315 Harlem Avenue, officers recovered drug-packaging material in the kitchen and, in the ceiling, packaged marijuana and a loaded handgun.

In order to challenge the warrantless search at 1315 Harlem Avenue, the defendants have the burden of proving that they had a reasonable expectation of privacy in 1315 Harlem Avenue. Gray, 491 F.3d at 144 (the "burden of showing a reasonable expectation of privacy in the area searched rests with the defendant").   The Fourth Amendment only protects against searches and seizures of property where the defendant has a "subjective expectation of privacy that society recognizes as reasonable."   Kyllo v. United States, 533 U.S. 27, 33 (2001).   That right is personal and cannot be transferred to others or asserted vicariously.   United States v. Gray, 491 F.3d 138, 146 (4th Cir. 2007).   Generally, the Fourth Amendment is limited to protecting people and their home, but, in some instances, the protections have been extended to overnight guests.   Minnesota v. Olson, 495 U.S. 91 (1990); Minnesota v. Carter, 525 U.S. 83, 90, 119 S. Ct. 469, 473, 142 L. Ed. 2d 373 (1998) ("an overnight guest in a home may claim the protection of the Fourth

Amendment, but one who is merely present with the consent of the householder may not").

The "overnight guest," however, is limited and the Fourth Amendment does not extend to individuals that are legitimately on the premises with the owner's consent, but who do not spend the night. Id. The nature or reason for being present at the residence is critical to the analysis. For example, individuals present at a residence for commercial purposes or are engaged in illegal conduct have less or no expectation of privacy. Id; Gray, 491 F.3d at 146. "Someone who hides illegal activity in a vacant field or abandoned warehouse, for example, takes his or her chances that law enforcement officials will happen upon incriminating evidence." Id.

1315 Harlem Avenue was a vacant residence and nothing more than a stash house that members of the criminal enterprise "Trained To Go" or "TTG" used to store, package, and distribute drugs. As such, none of the defendants have standing to challenge the warrantless search. *See e.g.* United States v. Renteria, 2 Fed. Appx. 855, 856 (9th Cir. 2001) ("[a] defendant who uses an apartment for a few hours to package cocaine and demonstrates no personal connection to the residence does not have a legitimate expectation of privacy there"); *see generally* United States v. Holland, 985 F. Supp. 587, 599 (D. Md. 1997) ("[a] person's claim that he was legitimately on the premises at the time of the search is an insufficient legal basis by itself for the court to initiate a review of the propriety of the search"). None of the defendants have an ownership interest in the residence, had authorization from the owner, or could be considered overnight guests. Nor was there any evidence that any of the defendants lived at the residence, with or without the consent of the owner. As such, Sivells' cannot challenge the warrantless search of the residence and seizure of drugs and a firearm.

### 3. *The affidavit in support of the search warrant for Broughton's cell phone establishes probable cause to search the phone, describes the item to be searched with particularity, and the property was abandoned*

a.  *Factual Background*

On January 22, 2016, members of the BPD encountered Linton Broughton and Montana Barronette near the 800 block of Bradish Street, Baltimore, Maryland.   Barronette and Broughton were involved in a one-car accident.   When officers approached the vehicle, Broughton fled. During the chase, Broughton discarded a firearm and was subsequently arrested.

After Broughton's arrest, members of the Federal Bureau of Investigation (FBI) Safe Streets Task Force reviewed Broughton's recorded calls over the jail system, including recorded calls between Broughton and Barronette.   During one of their conversations, Broughton indicated that, in addition to the firearm that BPD officers recovered, he also discarded a phone and another firearm.   Broughton also provided a description of where both items were located.   On January 29, 2016, based on Broughton's description, law enforcement officers seized an LG H343 cellular telephone from the 2600 block of Winchester Street, Baltimore, Maryland.   After seizing the phone, officers obtained a search warrant from the District Court of the State of Maryland in Baltimore City.   *See* Attachment A.[2]

Defendant Broughton seeks to suppress any evidence obtained from the cellular telephone, alleging that the search warrant lacked probable cause.   Specifically, Broughton argued that the affidavit incorrectly interpreted a jail call, improperly intimated that Broughton abandoned the property, and that there was no evidence that Broughton used the phone.

b.  *Relevant Law.*

The Fourth Amendment prohibition against unreasonable searches and seizures requires, in most instances, that searches be conducted pursuant to a warrant issued by an independent

---

2  For each of the attachments listed in this motion's response, the government is not filing the attachments electronically.   All attachments have been provided during discovery.   The government will provide the Court with a copy prior to the motions' hearing.

judicial officer and supported by probable cause.   *See* United States v. Hodge, 354 F.3d 305, 309 (4th Cir. 2004).   Evidence obtained in violation of the Fourth Amendment is subject to the exclusionary rule.   United States v. Harris, 215 Fed. Appx. 262, 269 (4th Cir. 2007).

In determining whether a judicially authorized search warrant is valid under the Fourth Amendment, the reviewing court must evaluate whether the magistrate had a substantial basis for concluding that probable cause existed.   *See* United States v. Blackwood, 913 F.2d 139, 142 (4th Cir. 1990); United States v. Williams, 974 F.2d 480, 481 (4th Cir. 1992).   Probable cause is a fluid concept that depends largely on the facts and circumstances of a particular case and is not easily reduced to a set of legal rules.   Blackwood, 913 F.2d at 142; Illinois v. Gates, 462 U.S. 213, 232 (1983).   "Affidavits are to be interpreted in a commonsense, not hypertechnical, manner." Harris, 215 Fed. Appx. at 270 (*quoting* Gates, 462 U.S. at 239).

As such, the reviewing Court should give "great deference to the to the magistrate's assessment of the facts presented."   Blackwood, 913 F.2d at 142.   "The magistrate is required simply to make a practical, commonsense decision whether, given all the circumstances in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."   Id.   Probable cause requires only that a person of "reasonable caution" believe that evidence of a crime will be found at a particular location. Williams, 974 F.2d at 481; *see also* Hodge, 354 F.3d at 309.

Finally, the warrant must describe the place to be search with particularity, so as to avoid "general, exploratory searches."   United States v. Owens, 848 F.2d 462, 463 (4th Cir. 1988). "The particularity requirement is satisfied when an officer in possession of a search warrant describing a particular place to be searched can reasonably ascertain and identify the intended

place to be searched."   United States v. Moore, 119 Fed. Appx. 438, 439 (4th Cir. 2004); United

States v. Owens, 848 F.2d 462, 463 (4th Cir.1988); United States v. Felder, 457 Fed. Appx. 316,

322 (4th Cir. 2011) ("[a] search warrant satisfies the particularity requirement if the description

enables an officer to ascertain and identify the place to be searched with reasonable effort").

       *c.   The search warrant.*

Here, the search warrant establishes probable cause to believe that evidence of distribution

of controlled substances and illegal possession of a firearm.   The warrant provides background

information on the drug investigation into Barronette and Broughton and describes the encounter

between BPD and Broughton on January 22, 2016, when Broughton discarded a firearm.   More

importantly, the warrant specifically describes the recorded call between Barronette and

Broughton, in which Broughton discussed controlled substances, a second firearm, and the cell

phone.   The fact that Broughton discarded two firearms and a cell phone, while fleeing from law

enforcement, is sufficient to establish probable cause.   Finally, the warrant describes, with

particularity, the item to be search (including the serial, SIM, and IMEI numbers).

       *d.   Good faith*

Assuming, arguendo, that the warrant was invalid, the exclusionary rule should not apply

because the officers acted in good faith reliance on the warrant.   United States v. Bynum, 293

F.3d 192, 195 (4th Cir. 2002) ("a court should not suppress the fruits of a search conducted under

the authority of a warrant, even a subsequently invalidated warrant, unless a reasonably well

trained officer would have known that the search was illegal despite the magistrate's

authorization").   Typically, when a warrant is authorized by a judge, law enforcement officers are

presumed to have acted in good faith.   United States v. Doyle, 650 F.3d 460, 467 (4th Cir. 2011).

There are, however, several exceptions:   "(1) if the magistrate or judge in issuing a warrant

was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) if the issuing magistrate wholly abandoned his judicial role…(3) if the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) if under the circumstances of the case the warrant is so facially deficient…that the executing officers cannot reasonably presume it to be valid."   United States v. DeQuasie, 373 F.3d 509, 519–20 (4th Cir. 2004).

Here, there is no evidence that the warrant contained false information, or that the judicial officer "wholly abandoned" his judicial role, or that the warrant was lacking in probable case.

> ### e.   _Broughton abandoned the property prior to BPD seizing it_

Additionally, defendant Broughton does not have standing to challenge the search of the cellular phone.   As stated above, the Fourth Amendment only protects against searches and seizures of property where the defendant has a "subjective expectation of privacy that society recognizes as reasonable."   Kyllo, 533 U.S. at 33.[3]   For example, the Fourth Amendment does not protect against government appropriation of abandoned property, because the property owner ceases to have an expectation of privacy.   United States v. Haynie, 637 F.2d 227, 237 (4th Cir. 1980) ("[w]hen a person voluntarily abandons his privacy interest in property, his subjective expectation of privacy becomes unreasonable, and he is precluded from seeking to suppress evidence seized from it"); United States v. Leshuk, 65 F.3d 1105, 1111 (4th Cir. 1995); United States v. Stevenson, 396 F.3d 538, 546 (4th Cir. 2005) ("[t]he law is well established that a person who voluntarily abandons property loses any reasonable expectation of privacy in the property").

---

[3] The Court must examine the facts of the case to determine whether the defendant retained a reasonable expectation of privacy in the property.   Leshuk, 65 F.3d at 1111.   A defendant cannot, however, voluntarily abandon property as a result of police misconduct.   Id.

In this case, Broughton discarded the cellular phone after fleeing from police.   More importantly, he discarded the phone in a place accessible to the public and for the specific purpose of disowning the property before law enforcement officers apprehended him.   Discarding a firearm in a publically accessible parking lot is akin to leaving trash on the curb.   United States v. Jackson, 728 F.3d 367, 371 (4th Cir. 2013) (holding that an individual does not have a reasonable expectation of privacy in trash left for collection in an area accessible to the public "explaining that what mattered was whether [the defendants] had exposed their garbage to the public").   As such, Broughton does not have a privacy interest in an item he voluntarily leaves in a public place and does not have standing to challenge the search.

### 4. *The Affidavits Submitted in Support of Search Warrants Related to Defendant Sivells were Supported by Probable Cause and Stated, with Particularity, the item or area to be Searched*

#### a.  *Relevant facts*

On October 27, 2016, law enforcement officers executed a search warrant for 2307 Avalon Avenue, Baltimore, Maryland, Sivells' residence.   On October 28, 2016, officers located defendant Sivells near the 1300 block of Harlem Avenue.   Sivells was inside a 2006 Honda Accord, bearing Maryland license plate number 951753T (hereinafter "the 2006 Honda Accord"). Officers arrested Sivells, pursuant to a federal arrest warrant, as he exited the 2006 Honda Accord. Officers conducted a search of Sivells and discovered two black and blue flip phones.   On November 10, 2016, officers obtained a search warrant for the 2006 Honda Accord.   On November 14, 2016, officers executed the search warrant and discovered a third cellular phone, a black Samsung flip phone.

#### b.  *Search of 2307 Avalon Avenue*

The affidavit for this warrant establishes that Sivells is involved in drug trafficking and

resides or otherwise occupies that residence as a stash house.   *See* Attachment O.   The affidavit details the following:   (1) a controlled purchase of heroin from Barronette and Sivells in January 2016; (2) an intercepted call between Sivells and another individual in March 2016 discussing obtaining additional drugs; (3) Sivells' utilizing a residence located at 1315 Harlem Avenue to distribute drugs; and (4) multiple intercepted calls in June and July 2016 in which Sivells discusses drug transactions and uses coded language like "hard" and "boy."   The affidavit clearly demonstrates probable cause to believe Sivells is engaged in drug trafficking.

The affidavit also establishes probable cause to believe Sivells is using 2307 Avalon Avenue as a residence or stash house.   The affidavit describes physical and electronic surveillance of Sivells at or near the residence and information from CS-4 that Sivells was recently in the residence.   The affiant also describes how drug traffickers commonly use residences to store and package drugs for sale.   Finally, the residence is described with particularity:   "The SUBJECT PREMISES is a blue two story row home with a white door and a clack security door located at 2307 Avalon Avenue, Baltimore, Maryland."

>            c.   *Search of the 2006 Honda Accord*

The affidavit for the warrant establishes that Sivells was a drug trafficker and utilized the 2006 Honda Accord in furtherance of drug trafficking.   *See* Attachment B.   The affidavit details part of the investigation of Sivells and specifically describes the following:   (1) a controlled purchase of heroin from Sivells in August 2016; (2) Sivells use of 1315 Harlem Avenue as a stash house; (3) and the search of 1315 Harlem Avenue on April 8, 2016 and subsequent seizure of marijuana, packaging material, and a loaded firearm.   The affiant also describes several instances in October 2016, in which officers observed Sivells utilizing the 2006 Honda Accord.

The affidavit describes the 2006 Honda Accord with particularity – by identifying the

license plate and vehicle identification number (VIN).

      d.   *Search of Three Cellular Telephones*:

The affidavit for the three cellular telephones also established that Sivells was a drug trafficker and that he was in possession of the three cellular telephones.   *See* Attachment C.   The affiant describes information received from a confidential source ("CS") that Sivells and Barronette were distributing drugs and that the CS conducted a controlled purchase of heroin from Sivells on January 7, 2016.   Next, the affiant describes an intercepted call between Sivells and a drug customer discussing a drug transaction.   The affiant also describes how drug traffickers use cellular telephones to facilitate drug trafficking.   Finally, the affidavit establishes that Sivells was physically in possession of two of the cellular phones and in constructive possession of the third.

The affidavit satisfies the particularity requirement by describing each cellular phone by one or more unique identifying information.

      e.   *Good faith*

Assuming, arguendo, that the affidavits were defective, the good faith exception should apply.

**5.   *The Affidavits Submitted in Support of the Wiretap Authorizations are More than Sufficient to Establish Probable Cause that the Target Telephones would be used to Facilitate Drug Trafficking Activities***

Defendant Barronette, Sivells, and Floyd moved to suppress evidence obtained from wiretaps during the government's investigation.   Defendants argued that the authorizations lacked probable cause, did not establish the reliability of informants, did not establish the necessity of the authorization, relied only on boilerplate language, and discounted the success of the investigation.

      a.   *Factual Background*

During the course of this investigation, law enforcement officers obtained authorization to

intercept wire and electronic communications over multiple cellular devices.   *See* Attachment D.[4] On January 20, 2016, United States District Court Judge James K. Bredar authorized the interception of wire and electronic communications of cellular telephone (443) 760-2775, utilized by Montana Barronette (hereinafter "Target Telephone #3" or "TT3").   On March 3, 2016, Judge Bredar signed an authorization to intercept wire communications over (443) 403-9160, utilized by Terrell Sivells (hereinafter "Target Telephone 4" or "TT4").   On April 5, 2016, Judge Bredar authorized the interception of wire communications over (443) 254-6202, utilized by Sivells (hereinafter "Target Telephone 5" or "TT5") and over (443) 410-2344, utilized by Barronette (hereinafter "Target Telephone 6" or "TT6").   On May 5, 2016, Judge Bredar authorized an additional 30 days of interception of wire and electronic communication over TT5.   On June 17, 2016, Judge Bredar authorized the interception of wire communications over TT4 and (443) 558-8833, utilized by Barronette (hereinafter "Target Telephone 7" or "TT7") and the interception of wire and electronic communications over (443) 924-8920 (hereinafter "Target Telephone 8" or "TT8").   On July 25, 2016, Judge Bredar authorized another 30 days of interception of wire and electronic communications over TT5 and TT8.

   b.   *Relevant law*

In analyzing the Defendant's motion, it should be noted at the outset that the burden is on the Defendant to show illegality.   United States v. Matlock, 415 U.S. 164, 177 (1974); *see also* Fishman and McKenna, *Wiretapping and Eavesdropping*, §23.5 (rule that party seeking suppression of evidence has burden of proof by preponderance that evidence was illegally seized should govern motion to suppress eavesdropping evidence).

---

[4] Attachment D contains the applications, orders, and affidavits for each of the wiretap authorizations obtained during the investigation.   It also includes authorizations for Target Telephones 1 and 2, which were utilized by Jamal Carter and Dymir Rhodes.   Carter and Rhodes were part of a related investigation into DeAndre Smith's drug trafficking organization.

18 U.S.C. § 2518(3)(b) authorizes a district court to enter an order permitting a wiretap if "there is probable cause for belief that particular communications concerning that offense will be obtained through such interception."   However, the "probable cause required for issuance of a wiretap order is the same as that which is necessary to obtain the issuance of a search warrant." United States v. Talbert, 706 F.2d 464, 467 (4th Cir. 1983); United States v. Brewer, 204 Fed. Appx. 205, 207 (4th Cir. 2006).   18 U.S.C. § 2518(3)(b) does not require proof beyond a reasonable doubt, rather a "fair probability" evidence of criminal conduct will be obtained through interception of communications.   Id.   Specifically, "a judge must determine, on the basis of the application for the wiretap, that probable cause exists to believe that (1) an individual is committing, has committed, or is about to commit an offense enumerated in 18 U.S.C. § 2516; (2) particular communications concerning that offense will be obtained by the wiretap; and (3) the target facilities will be used in connection with the offense."   *See* United States v. Sellers, 512 Fed. Appx. 319, 328 (4th Cir. 2013).

The court must also determine whether the wiretap was necessary.   Id.   The government satisfies the necessity requirement by showing either that normal investigative procedures have been tried and failed *or* reasonably appear unlikely to succeed.   United States v. Clerkley, 556 F.2d 709, 715 (4th Cir. 1977) ("the courts have made it clear that police need not exhaust every conceivable technique before making application for a wiretap").   "[T]he showing of "necessity" for the wiretap is not prodigious and "the Government 'need only present specific factual information sufficient to establish that it has encountered difficulties in penetrating the criminal enterprise or in gathering evidence such that wiretapping becomes reasonable."   Sellers, 512 Fed. Appx. at 329.   The burden on the government is "not great" and should be applied in a practical,

19

commonsense way so as not to unduly hamper law enforcement investigations.   United States v. Wilson, 484 F.3d 267, 281 (4th Cir. 2007).   Courts have recognized that wiretaps are important investigative tools and are necessary to successfully investigate and prosecute large-scale organizations.   United States v. Wilson, 484 F.3d 267, 281 (4th Cir. 2007).

### c.   Initial Interception of Sivells and Barronette – TT3

Here, the affidavit for TT3 clearly established all three elements of probable cause.   The affidavit describes information provided by CS-4, who stated that Barronette was actively selling heroin under the street name "sweet dreams," near the 1300 block of Lafayette Street and was a "hitman" for members of the "Black Guerilla Family."   Similarly, CS-5 provided information that Barronette was trafficking heroin in West Baltimore.   CS-4 and CS-5's information was corroborated through law enforcement's investigation of Barronette and others.   As described in the affidavit, law enforcement officers utilized CS-4 to do the following:   (1) conduct controlled calls to Barronette in August and September 2015 to discuss Barronette's heroin trafficking business, (2) conduct a controlled call to Barronette over TT3 to discuss conducting a drug transaction, (3) conduct two controlled purchases of heroin from Barronette in November 2015, in which CS-4 contacted Barronette over TT3 to arrange the transactions.   Additionally, law enforcement officers conducted surveillance of Barronette and his associates, including Sivells, Tillman, and Broughton, engaged in activity consistent with drug trafficking.

The affidavit also provides details of the investigation that demonstrated law enforcement officers attempted numerous investigative techniques, but had not been able to fully penetrate the Barronette criminal organization.   The affidavit described investigators' use of GPS tracking devices, physical location data for cellular phones, successful and unsuccessful attempts of physical surveillance, debriefings of multiple confidential informants, and consensually monitored

calls, most of which furthered the investigation, but fell short of achieving the overall goals of the investigation.   The affidavit also describes why other investigative techniques, such as trash pulls, search warrants, interviews, use of undercover officers and grand jury subpoenas, were not used. The wiretap authorization was the culmination of a deliberate, thorough investigation and was necessary to achieve the goals of the investigation.

Contrary to the defendant's argument, while law enforcement officers utilized a variety of techniques and were successful, the success was limited.   As the affidavit makes clear, officers suspected Barronette of managing a large-scale organization involving the distribution of large quantities of drugs and murder-for-hire schemes.   Barronette actively conducted counter surveillance, moved locations frequently, and managed a dispersed network of distributors.   Other than CS-4 and CS-5, law enforcement officers had little else to build their investigation and needed wiretaps to identify associates, modes of operation, stash houses, sources of supply, and TTG's connection to multiple homicides.

d.   _Subsequent authorizations for TT4, TT5, TT6, TT7 and TT8_

i.   _Probable Cause_

Officers subsequently obtained authorization for additional cellular telephones utilized by Barronette and Sivells (TT4, TT5, TT6, and TT7), as well as a cellular phone utilized by Pulley (TT8).   Those affidavits clearly establish probable cause as they focus on intercepted communications of Barronette, Sivells, Pulley, and their associates.   For example, in the March 2016 affidavit for TT4, the affiant describes numerous calls between Sivells and Barronette in which they discuss how Barronette and Broughton were in a car accident, Broughton fled from the police and discarded two firearms, and that law enforcement officers did not find the drugs Barronette and Broughton had hidden in the car.   The affidavit also references a call between

Barronette and Sivells over TT4.

In the April 2016 affidavit for TT5 (Sivells) and TT6 (Barronette), the affiant describes intercepted calls between Barronette over TT3 and Sivells over TT6, in which they discuss drug trafficking, and other intercepted communications of Sivells over TT4 discussing drug transactions with customers.  The affiant also describes a jail call between Broughton and Barronette over TT6, in which they discuss firearms seized by law enforcement.  Finally, the affiant establishes that Sivells was utilizing TT5 through several controlled calls from CS-4 to Sivells over TT5.

Officers then sought an extension of the order for TT5 in May 2016.  In addition to numerous drug related conversations intercepted in March 2016, the affidavit specifically describes communications between TT5 and other members of the conspiracy in April 2016. Sivells, utilizing TT5, used coded language to discuss drugs transactions, quantities, prices, police surveillance, and law enforcement's search of a residence and seizure of drugs and a firearm.

In the June 2016 affidavit for TT4, TT7, and TT8, the affiant again describes multiple intercepted communications in March, April and May 2016 between TT8 and other members of the conspiracy.   In those intercepted communications, Pulley and Barronette discussed numerous drug transactions and how Barronette robbed several individuals.  They specifically refer to "weed," how well the drugs were selling, and the prices for drugs.   In intercepted conversations over TT7 and TT4, Barronette and Sivells discussed law enforcement officer's search of a residence on Harlem as well as coordinating drug transactions.

Finally, in the July authorization for TT5 and TT8, the affiant established probable cause by, among other things, detailing several intercepted calls between TT5 and TT8 in July 2016. During those conversations, Pulley and Sivells discussed coordinating drug transactions, Barronette owing Pulley money for prior transactions, and whether Sivells was ready to purchase

22

additional drugs.

### ii. *Necessity*

The affidavits also continue to satisfy the exhaustion requirement and use specific examples from this investigation and do not simply rely on boilerplate language. For example, the March 2016 affidavit for TT4 describes the organization's use of counter surveillance and how the organization's interaction with law enforcement altered their mode of operation. Officers continued to use electronic surveillance to enhance the effectiveness of the intercepted communications. The affidavit also noted that Barronette stopped using TT3, which prevented officers from reaching the goals of the investigation.

In the April 2016 affidavit for TT5 and TT6, the affiant notes the difficulties of identifying stash houses for TTG and TTG's source of supply, Roger Taylor, the use of electronic surveillance of TT5 and TT6, and the limitations of CS-4 and CS-5.

In the June 2016 affidavit for TT4, TT7, and TT8, the affiant describes the continued use of CS-4 and CS-5, how another CS (CS-8) was shot and became unavailable, and how Barronette insulated himself from controlled purchases of heroin. The affidavits also make clear that Barronette and Sivells continue to use different phones to avoid law enforcement detection. This was also law enforcement officer's first attempt to intercept Pulley over TT8, a drug supplier for Barronette and Sivells.

Finally, in the July affidavit for TT5 and TT8, the affiant describes recent surveillance of Pulley and how it was enhanced by intercepted communications, recent attempts by CS-8 to introduce a UC officer into Barronette, the murder of a cooperating witness in April 2016, and officers' attempts to identify Barronette and Pulley's residences and/or stash locations.

Ultimately, the investigation was complex, multi-faceted, and thorough. Wiretap

authorizations were a critical part of the investigation and necessary to uncover the scope of Barronette's organization.

　　　　e.　*Good Faith.*

The affiants were entitled to rely on the facially valid wiretap orders that the resulting evidence would be admissible pursuant to the "good faith" exception of United States v. Leon, 468 U.S. 897 (1984).   Leon has been applied to admit electronic surveillance evidence.   *See* United States v. Brewer, 204 Fed. Appx. 205, 208 (4th Cir. 2006) (unreported) (even if affidavits did not set forth probable cause, or that the exhaustion requirements had not been met, affiants were entitled to rely on facially valid wiretap orders, pursuant to Leon); United States v. Moore, 41 F.3d 370 (8th Cir. 1994) (good faith doctrine required that suppression of wiretap evidence be denied, despite defect in order allowing electronic surveillance); United States v. Malekzadeh, 855 F.2d1492, 1497 (11th Cir. 1988) (Leon applied to wiretap affidavit that was devoid of deliberately false or recklessly false information); United States v. Baranek, 903 F.2d 1068, 1071- 72 (6th Cir.1990) (recognizing that Congress intended federal wiretap law to incorporate Fourth Amendment evidence suppression doctrines). Were the affidavits invalid, which the Government does not concede they were, the evidence may properly be received under the good faith exception to the exclusionary rule.

　　　　**6.　Law enforcement officers properly advised defendants of their Miranda rights, defendants voluntarily waived those rights, and officers conducted interviews in non-coercive environments**

Defendants Barronette, Harrison, Bazemore, Floyd, and Wilson have moved to suppress statements.    To offer statements made by a defendant during custodial interrogation, the government must show that law enforcement officers "(1) adequately informed the defendant of his *Miranda* rights and (2) obtained a waiver of those rights."   United States v. Cardwell, 433 F.3d

378, 389 (4th Cir. 2005).   While there is no rigid or "talismanic incantation" that must be recited, officers must inform a defendant of these basic rights: "a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."   United States v. Frankson, 83 F.3d 79, 81 (4th Cir. 1996).

A waiver of rights must be knowing, voluntary, and intelligent.   Burket v. Angelone, 208 F.3d 172, 199 (4th Cir. 2000).   A waiver depends on the totality of the circumstances, including the background and experience of the defendant.   Id.   The court should examine "whether the defendant had full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it and (2) whether the defendant's statement was 'the product of a free and deliberate choice or the result of intimidation coercion, or deception."   United States v. Mack, 442 Fed. Appx. 881, 883 (4th Cir. 2011) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).

The voluntariness of the statement is a separate issue.   A statement is involuntary if it is induced by conditions of duress or coercion, such that the subject's will is overborne and his capacity for self-determination is critically impaired.   United States v. Locklear, 829 F.2d 1314, 1317 (4th Cir.1987).   "Courts must consider the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." Walker, 607 F. Appx. at 255 (4th Cir. 2015).

   a.   *Interview of Sivells on October 27, 2016*

Defendant Sivells moves to suppress any statements by Sivells as a result of his arrest on October 27, 2016.   Sivells alleged in broad terms that his statement was the product of an illegal arrest, taken in violation of *Miranda*, and was involuntary.

On October 27, 2016, members of the FBI Safe Streets Task Force arrested Sivells based on a federal arrest warrant.   Officers transported Sivells to a BPD station.   Prior to conducting

any interview, Task Force Officer ("TFO") Mark Neptune informed Sivells that he needed to advise Sivells of his rights.   Using a standard BPD "Waiver and Explanation of Rights Form" (Form 069/05),[5] TFO Neptune advised Sivells to read each right and initial the form next to the right.   *See* Attachment E.   While reading each right, Sivells stated "I know all of this" and continued to read from the form.   After reading another line, Sivells stated "I can't use my phone to call my attorney?"   TFO Neptune then explained that if Sivells wanted to speak to an attorney, the interview would end and they would arrange for Sivells to speak to an attorney.   After reading through the rights, TFO Neptune advised Sivells that he was agreeing to speak to police officers without the presence of an attorney.   Sivells signed the waiver form indicating he understood his rights.[6]   The interview was audio and video recorded.

As described above, prior to any questioning, TFO Neptune properly advised Sivells of his *Miranda* rights, both verbally and in writing.   Sivells acknowledged his rights by signing the form and indicating that he knew his rights from prior arrests.   North Carolina v. Butler, 441 U.S. 369, 373 (1979) (holding that "[w]aiver need not be express, but may be implied from the defendant's actions and words").   Sivells made reference to an attorney, but never unequivocally requested an attorney or refused to answer questions.   Burket v. Angelone, 208 F.3d 172, 198 (4th Cir. 2000) ("to invoke the right to counsel and prevent further interrogation, a suspect must unambiguously request the assistance of counsel").

---

[5] Standard form 069/05 includes the following recitation of *Miranda* rights:   "you have the right to remain silent;" "anything you say or write may be used against you in a court of law;" "you have the right to talk with an attorney before any questioning or during any questioning;" "if you agree to answer questions, you may stop at any time and request an attorney and no further questions be asked of you" and "if you want an attorney and cannot afford one, an attorney will be appointed to represent you."

[6] Below the explanation of rights, Form 069/05 states:   "I have been advised of and understand my rights. I freely and voluntarily waive my rights and agree to talk with the police without having an attorney present."

Moreover, there was nothing coercive about the interview room or the nature of the interview.   More importantly, there is no evidence to suggest that Sivells was coerced or that his will was overborne in any way.

     *b.*   *Interview of John Harrison on April 11, 2016 and June 29, 2017*

Defendant Harrison moves to suppress statements made by Harrison to law enforcement because Harrison did not explicitly waive his rights and any waiver was not voluntary.   On April 11, 2016, BPD arrested Harrison on charges that he robbed DH of drugs and money.   He was subsequently transported to a BPD station.   Prior to entering the interview room, TFO Joseph Landsman completed BPD standard form 049/65 with Harrison and advised Harrison of his rights both verbally and in writing.   *See* Attachment F.   Upon entering the interview room, TFO Landsman informed Harrison of the charges against him and reminded Harrison that he had been advised of his rights.   While the interview was audio and video recorded, the advice of rights was not.

On June 29, 2017, members of the BPD arrested Harrison pursuant to a federal arrest warrant.   Officers transported Harrison to a BPD station and placed him in an interview room. Prior to the interview, a BPD officer asked several preliminary questions concerning Harrison's education level and current residence.   After indicating that he did not read and write well, the BPD officer offered to read Harrison his *Miranda* rights from a standard form.   The officer repeatedly asked Harrison whether he had any questions regarding his rights and Harrison repeatedly indicated that he did not have any questions.   Harrison then signed the waiver form indicating he understood his rights.   The interview was audio and video recorded.

Again, law enforcement officers properly advised Harrison of his *Miranda* rights prior to any substantive questioning.   With the assistance of a BPD officer, Harrison executed the waiver

form and specifically acknowledged that he understood each right explained on the form.   There was nothing coercive about either interview.   Indeed, during the second interview, officers took additional steps to ensure that Harrison understood his rights and was speaking with officers freely and voluntarily.

        *c.*   *Interview of Brandon Bazemore on June 2, 2016*

Defendant Bazemore moved to suppress his statements to law enforcement officers and argues that he asserted his right to remain silent and his statements were involuntary due to coercive tactics.   On June 2, 2016, law enforcement officers obtained a writ to transfer defendant Bazemore from state custody to the United States District Courthouse for purposes of conducting an interview and to determine whether Bazemore was interested in cooperating with law enforcement in their investigation of Barronette and his associates.   Prior to the interview, TFO Neptune again utilized BPD standard form 069/05 to advise Bazemore of his *Miranda* rights verbally and in writing.   Bazemore completed the form, acknowledged his rights by signing the form, and then spoke with officers.   Officers then conducted a brief interview in which Bazemore indicated that he did not want to cooperate with law enforcement because he feared reprisal. Bazemore acknowledged an on-going feud between Barronette and members of his family.   The interview was not recorded.

Bazemore argues that his refusal to cooperate in the investigation was an invocation of his right to remain silent.   An assertion of the right to remain silent, however, must be unequivocal. Simply stating that he did not want to provide inculpatory information about his associates is not an unequivocal assertion of rights.   *See e.g.* United States v. Moore, 484 F.2d 1284 (4th Cir.1973); United States v. McElveen, 129 Fed. Appx. 42, 44 (4th Cir. 2005) ("[a] refusal to answer some questions is not an invocation of the right to remain silent").   Moreover, Bazemore continued to

answer questions, which demonstrated that he had indeed waived his rights.   <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 385 (2010) ("the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford"); <u>Frankson</u>, 83 F.3d at 82 (defendant "need not, however, have uttered any particular words for waiver to occur").

Additionally, there was nothing coercive about the nature or location of interview that would render Bazemore's waiver involuntary.   The interview took place in the United States Courthouse and the purpose of the interview was routine.

> d.   <u>Interview of Barronette on May 6, 2014 and August 20, 2016</u>

Defendant Barronette moves to suppress any statements made by Barronette, because they made in violation of *Miranda*, his arrest lacked probable cause, and was involuntary.   On May 6, 2014, BPD officers questioned Barronette with regard to a recent homicide.   Although Barronette was not in custody, BPD officer Sebokos advised defendant Barronette of his rights utilizing BPD standard form 069/50. Barronette initialed the form and signed it, indicating that he understood his rights.  *See* Attachment I.

On August 20, 2016, officers arrested Barronette pursuant to a federal arrest warrant and transported him to a BPD station.   TFO Landsman interviewed Barronette in a BPD interview room.   Prior to conducting the interview, TFO Landsman utilized BPD standard form 069/05. TFO Landsman read each right from the form and asked Barronette if he understood each right. Barronette expressly stated that he understood his rights and signed the form.  *See* Attachment J. Both interviews were audio and video recorded.

In both interviews, defendant Barronette clearly understood his rights and expressly waived them.   There was nothing coercive about the nature of the interview or the interview room.

Barronette made a calculated decision that speaking with law enforcement officers would benefit his situation and waived his rights.

e.   _Interview of Brandon Wilson on February 2, 2017_

Defendant Wilson moved to suppress his statements to law enforcement because they were made in violation of _Miranda_ and were not voluntary.   On February 2, 2017, Wilson was arrested and was transported to the BPD homicide office to answer questions related to a recent homicide. Prior to conducting the interview, a BPD homicide detective informed Wilson that they wanted to discuss the homicide.   The BPD detective then advised Wilson of his _Miranda_ rights, both verbally and in writing, utilizing BPD standard form 069/05.   _See_ Attachment K.   The BPD detective then read each right listed on the form and, after each right, asked Wilson if he understood.   Wilson indicated that he understood each right, initialed after those rights, and signed the form.   Wilson also indicated that he could read and write the English language and was sober. The interview was audio and video recorded.

Like Barronette, Wilson was properly advised of his rights and he made a calculated decision to speak with law enforcement officers concerning drugs and a firearm found in his residence.   There was nothing coercive about the nature of the interview or the interview room

f.   _Interview of Timothy Floyd on August 8, 2016_

Defendant Floyd seeks suppression of his statement to law enforcement and alleges that law enforcement officers failed to adequately provide _Miranda_ warnings and that his statement was not voluntary.   On August 8, 2016, officers arrested defendant Floyd pursuant to a federal arrest warrant.   Officers transported Floyd to an FBI building in Baltimore and placed Floyd in an interview room.   Prior to conducting any questioning, TFO Neptune utilized the standard FBI

"Advice of Rights" form (form "FD-395").[7]   TFO Neptune explained each right to Floyd and expressly asked him if he understood his rights.   *See* Attachment P.   Floyd then expressly stated that he understood his rights and signed the form.

Again, there was nothing unusual about the nature or location of the interview and there is no evidence or indication that Floyd's will was overborne.   The officers calmly advised Floyd of his rights and he simply chose to speak with the officers.

### 7.   *Out-of-court identifications were not unduly suggestive and are admissible*

Defendant Tillman moves to preclude admission of an out-of-court identification on June 9, 2011 because the "confrontation procedure was suggestive" and the identification was therefore unreliable.   *See* Attachment L.   Defendant Harrison moves to preclude admission of an out-of-court identification on February 23, 2016 and alleged that the procedure used during the identification was impermissibly suggestive and likely to give rise to a substantial likelihood of misidentification.   *See* Attachment M.   Similarly, defendant Sivells moves to preclude admission of an out-of-court identifications of Sivells on June 9, 2016 because they were "suggestive and unreliable."   *See* Attachment N.

### a.   Factual Background

On June 9, 2011, February 23, 2016, and May 25, 2016 members of BPD homicide utilized standard BPD forms to conduct "line-ups" during the investigation of the homicides of BJ, DH, and AA, respectfully.   All three "line-ups" were conducted in a similar manner: a BPD detective explained that the interviewee would be shown a series of photographs and, that if the interviewee recognized any of the individuals shown, the interviewee should notify the BPD detective.   All

---

[7] FBI form FD-395 contains the following advice of rights:   "you have the right to remain silent;" "anything you say can be used against you in court;" "you have the right to talk to a lawyer for advice before we ask you any questions;" "you have the right to have a lawyer with you during questioning;" "if you cannot afford a lawyer, one will be appointed for you before any questioning if you wish."

three line-ups involved a series of six photographs of individuals with similar physical attributes. The line-ups were also conducted by an independent BPD detective, i.e. one that was not part of the homicide investigation.

Additionally, throughout this investigation, law enforcement officers have used a book of photographs to show witnesses and cooperators in an effort to identify members of TTG and its associates.   The book of photographs has been utilized during numerous interviews and as a part of grand jury presentations.   At present, the book has more than 70 photographs.   Law enforcement officers have shown the book of photographs to most, if not all, potential witnesses or cooperators.

> a.   _Relevant law_

The defendant has the burden of proof when challenging the admissibility of identification evidence.   United States v. Johnson, 114 F.3d 435, 441 (4th Cir. 1997).   "The government bears no burden to prove that a less suggestive means could have been utilized."   Porter, 338 F.3d at 305.   Suppression is only appropriate in limited circumstances.   In Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Supreme Court stated that an eyewitness identification at trial following a pretrial identification by photograph should only be suppressed when the photographic identification procedure is so impermissibly suggestive as to create a substantial likelihood of misidentification.

In determining whether an out-of-court identification is impermissibly suggestive, the court should apply a two-step analysis.   First, the court must determine whether the identification procedure was unnecessarily suggestive.   "A procedure is unnecessarily suggestive if a positive identification is likely to result from factors other than the witness's own recollection of the crime." United States v. Porter, 338 Fed. Appx. 300, 304 (4th Cir. 2009); _see e.g._ Johnson, 114 F.3d 435

(court concluded that procedure was unduly suggestive because co-defendant was shown a single photograph of defendant in courthouse, just prior to a court appearance and he was facing substantial time in prison).

If so, the court must then examine several factors to determine if the identification testimony is nevertheless reliable under the totality of the circumstances.   Manson v. Brathwaite, 432 U.S. 98, 110 (1977); Satcher v. Pruett, 126 F.3d 561, 566 (4th Cir. 1977); United States v. Mabine, 629 F. App'x 470, 472 (4th Cir. 2015) ("[w]e may uphold a district court's denial of a motion to suppress an out-of-court identification without determining whether the identification procedure was unduly suggestive if we find the identification reliable").   "The factors the court may consider in measuring reliability include: (1) the witness' opportunity to view the perpetrator at the time of the crime; (2) the witness' degree of attention at the time of the offense; (3) the accuracy of the witness' prior description of the perpetrator; (4) the witness' level of certainty when identifying the defendant as the perpetrator at the time of the confrontation; and (5) the length of time between the crime and the confrontation."   United States v. Greene, 704 F.3d 298, 305 (4th Cir. 2013).

### b.   *Identification procedures were not suggestive*

With regard to the identifications in this case, the procedures were not impermissibly suggestive.   To the contrary, the procedures were specifically designed to be impartial.   This is not a case where a witness was hastily shown one photograph and asked to confirm that the person in the photograph is the suspect.   Nor is this a case where the suspect photograph has markedly different physical attributes from the other photographs contained in the line-up.   Rather, an independent officer administered the line-up, using a standardized process, and showed photographs of individuals with similar physical attributes.

33

Since the line-ups were not impermissibly suggestive, there is no need to analyze the factors to determine the reliability of the identification. However, assuming arguendo, that the process was flawed, the identifications are nonetheless reliable.   The witnesses were familiar with the suspects prior to the identification and had sufficient time to view the perpetrators at the time of the offense.

With regard to the photo book, the government is unlikely to offer out-of-court identifications obtained from the book of photographs, but will instead rely on witnesses' ability to identify defendants in-court or from photographs.   Nevertheless, the government believes the identification process was not impermissibly suggestive.   To the contrary, witnesses were shown dozens of photographs, one at time, and asked if they recognized anyone and how, which is not suggestive at all.

### 8.   *The Superseding Indictment properly alleges a RICO conspiracy and VCAR, tracks the language of the statute, and the RICO statute is not void for vagueness*

Defendants Barronette and Harrison moved the Court to dismiss Counts One and Two of the Superseding Indictment for failing to properly allege and charge a RICO conspiracy and VCAR.   Harrison specifically alleges that the Superseding Indictment fails to allege a pattern of activity or an enterprise.[8]   Harrison also argues that RICO conspiracy is void for vagueness.

### a.   *RICO Statute*

When considering a motion to dismiss, this Court "must accept all allegations in the indictment as true and should regard the indictment in a 'practical' rather than 'purely technical,'

---

[8] To the extent defendant Harrison is requesting a pre-trial determination that an enterprise exists, the government opposes such a request.   The Fourth Circuit has explicitly held that a defendant is entitled to no such hearing.   United States v. Hines, 717 F.2d 1481, 1488 (4th Cir. 1983); *accord* United States v. Caudle, 758 F.2d 994, 998 (4th Cir. 1985) ("[T]his court has never required a pretrial determination of the existence of the conspiracy").   Indeed, such a hearing would be nothing more than a "mini-trial," wasting the resources of court and counsel.   *See e.g.* United States v. Blevins, 960 F.2d 1252, 1256 (4th Cir. 1992).

manner." United States v. Magalnik, 160 F. Supp. 3d 909, 914 (W.D. Va. 2015) (*quoting* United States v. Matzkin, 14 F.3d 1014, 1019 (4th Cir.1994)); *see also* United States v. Terry, 257 F.3d 366, 371 (4th Cir. 2001) (King, J., concurring) ("It is elementary that a motion to dismiss implicates only the legal sufficiency of [the indictment's] allegations, not the proof offered by the Government"). To warrant dismissal, the defendants must establish that the Superseding Indictment's allegations, "even if true, would not state an offense." United States v. Thomas, 367 F.3d 194, 197 (4th Cir. 2004).

In this case, the defendants are charged with RICO conspiracy, under 18 U.S.C. § 1962(d), which makes it unlawful, inter alia, to violate § 1962(c). Section 1962(c), in turn, provides that: It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. 18 U.S.C. § 1962(c). Thus, to prove a RICO conspiracy, the Government must establish:

> (1) A conspiracy or agreement existed between two or more persons to participate in the affairs of an enterprise that affected interstate commerce through a pattern of racketeering activity;
>
> (2) The defendant knowingly and intentionally agreed with another person to conduct or participate in the affairs of the enterprise; and
>
> (3) The defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two acts of racketeering of the types of racketeering activity set forth in the indictment.

United States v. Cornell, 780 F.3d 616, 620 (4th Cir. 2015).

### b. *Failure to allege a RICO conspiracy*

Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires that an indictment be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). The Fourth Circuit, in construing this rule, has held that in order for an indictment to be legally sufficient, it must only contain the elements of the offense charged, fairly inform the defendant of the charge, and contain enough information to enable the defendant to plead a double jeopardy defense in a future prosecution. United States v. Daniels, 973 F.2d 272, 274 (4th Cir. 1992).

Here, the Superseding Indictment alleges, among other things, at paragraph 3, that "TTG, including its membership and associates, constituted an 'enterprise,' as defined by Title 18, United States Code, Section .1961 ( 4 ), that is, a group of individuals associated in fact, although not a legal entity. The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise. At all times relevant to this Indictment, the Enterprise has engaged in, and its activities affected, interstate and foreign commerce. The defendants participated in the operation and management of the Enterprise, and participated in unlawful and other activities in furtherance of the conduct of the Enterprise's affairs."

The indictment also sets forth the purposes of the enterprise in paragraph 4: "Preserving and protecting the power of the Enterprise and its members and associates through murder, assault, other acts of violence, and the threat of violence…Promoting and enhancing the Enterprise and the activities of its members and associates…Enriching the members and associates of the Enterprise through, among other things, the distribution of controlled substances, including heroin, cocaine, and marijuana…Enriching the members and associates of the Enterprise through robbery and

kidnapping of rival drug dealers."

Finally, the indictment set out the manner and means by which the conspiracy operated, including the commission of murder, attempted murder, robbery, kidnaping, possession of firearms, drug trafficking, and assault (paragraphs 5a through 5g), and it describes some, but not all, of the overt acts committed by members in furtherance of the conspiracy. (paragraph 7(1) through 7(21)).

The Superseding Indictment therefore charges the defendant with each of the elements of the offenses set forth in 18 U.S.C. § 1962(d) and tracks the statutory language of the statute.  *See e.g.* United States v. Loayza, 107 F.3d 257, 260-61 (4th Cir. 1997) (finding that an indictment charging mail fraud adequately informed the defendant of the charge despite a failure to allege the identity of the victims, because identity is not an essential element of the crime); United States v. Rogers, 41 F.3d 25, 30 (1st Cir. 1994), cert. denied, 515 U.S. 1126 (1995) (finding that an indictment for firearm possession by a felon stating the date and location of the offense, make, type and serial number of the weapon, and the felony conviction underlying the charge, was sufficient under Rule 7(c)(1)); United States v. Schmidt, 947 F.2d 362, 369 (9th Cir. 1991) (finding that an indictment need only allege the essential facts, and need not explain the government's theory of the case); *see also* United States v. Jackson, 124 F.3d 607 (4th Cir. 1997), cert. denied, 118 S. Ct. 733 (1998) (setting forth the elements that the government must prove to establish a violation of 26 U.S.C. § 5861).

### c.   *Void for Vagueness*

While defendant Harrison has argued that the RICO statute is void for vagueness under the Due Process Clause of the Fifth Amendment, this is a well-settled area of the law.  "A statute is unconstitutionally vague if it fails to give a person of ordinary intelligence fair notice that his

contemplated conduct is forbidden by the statute."   United States v. Bennett, 984 F.2d 597, 605 (4th Cir. 1993).   A statute is not unconstitutionally vague simply because the hypothetical reach of the statute is unclear.   Id.   The Fourth Circuit, however, has rejected void for vagueness challenges to the RICO statute – as have other Circuits.   Id; United States v. Gross, 199 F. App'x 219, n4 (4th Cir. 2006); United States v. Abed, 203 F.3d 822, n5 (4th Cir. 2000).[9]

### 9.   A bill of particulars is not required as the Superseding Indictment alleges the essential elements of the offense and is sufficiently detailed to avoid surprise.

Defendant Harrison and Bazemore have moved for a bill of particulars, arguing that the Superseding Indictment does not adequately apprise the defendant of the charges and fails to articulate the relationships between the defendants, their roles in the conspiracy, and their roles in specific overt acts.

An indictment must allege the essential elements of the crime charged in a manner that allows the defendant to prepare for trial and avoid any double jeopardy concerns.   United States v. Hooker, 841 F.2d 1225, 1227 (4th Cir. 1988).   "The purpose of a bill of particulars is to inform the defendant of the nature of the charges against him to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense."   United States v. Workman, WL 3693289, at *2 (NDWV 2015) (quoting United States v. Addonizio, 451 F.2d 49, 63–64 (3d Cir.1971).   The purpose of a bill of particulars is not, however, to provide a detailed disclosure of the government's evidence and is only necessary to supply any essential details which may have been omitted in the indictment.   United States v. Anderson, 481 F.2d 685, 690 (4th Cir.1973).

Here, the Superseding Indictment fulfills its primary purposes of alleging the essential

---

[9] Defendant Harrison essentially concedes that Courts have declined to apply the void for vagueness doctrine to RICO conspiracy.

elements and doing so in a manner that avoids any concerns of double jeopardy.   Moreover, the indictment is a speaking indictment and includes numerous overt acts that describe specific criminal activities perpetrated by TTG and its associates.   The overt acts describe, to some extent, who perpetrated those acts and provide some detail as to the manner and motivation for the act.

Furthermore, a bill of particulars is even more inappropriate when the Government supplements an indictment with extensive discovery.   In this case, the United States has provided the defendants with extensive discovery including wiretap affidavits, CDs of intercepted calls, police reports, copies of the search warrant affidavits, detailed reports documenting the execution of the search warrants and a list of physical evidence seized during the investigation. Additionally, any tangible items seized during the investigation will be available for defense counsel to review whenever they choose to schedule an appointment with the case agent.   As the Fourth Circuit held in United States v. SIGMA, 624 F.2d 461, 466 (4th Cir. 1979), such "extensive disclosure by the Government" renders a bill of particulars inappropriate.

The defendants appear to be requesting a bill of particulars to supplement discovery, obtain Jencks material and the identity of cooperating witnesses, which is not the purpose of a bill of particulars.   United States v. Automated Med. Labs., Inc., 770 F.2d 399, 405 (4th Cir. 1985) ("[a] bill of particulars is not to be used to provide detailed disclosure of the government's evidence in advance of trial").   As such, the defendant's motions should be denied.

### 10. Motion for disclosure of Rule 404(b) evidence and intent to offer convictions under Rule 609

Defendants Bazemore and Floyd have moved the Court to compel the government to provide notice of its intention to admit any evidence under Fed. R. Crim. P. 404(b) and 609. Pursuant to Rule 404(b), "the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the

general nature of any such evidence it intends to introduce at trial."   Under Rule 609, the government is required to provide "reasonable written notice" of its intention to introduce a conviction greater than ten years old.

The government recognizes its duty to provide notice under Rule 404(b) and 609. However, at this time, disclosure of the government's intention to introduce 404(b) evidence is not required and notice under 609 is premature.   *See e.g.* United States v. Armstrong, 257 Fed. Appx. 682, 686 (4th Cir. 2007) (court found that "the government's notice given a week in advance of trial was not untimely").   The government has and will continue to disclose evidence that may form the basis for a 404(b) notice.   Similarly, prior to trial, the government will identify convictions related to each defendant that it intends to offer if the defendant testifies.

### 11. The Defendants were properly joined under Fed. R. Crim. P. 8 and none of the defendants have identified a proper basis for severance.

Defendant Sivells has argued that severance is appropriate in this case because prejudice will result from the following:   (1) co-defendant statements to law enforcement may implicate Sivells and (2) joint trials result in complicated evidentiary rulings, differing trial strategies, and potential issues if co-defendants testify.   Defendant Barronette also moved for severance because of the markedly different degrees of culpability, the potential for prejudicial spillover, and confusion of evidence.

#### a.   *Defendants were properly joinder under Rule 8*

In accordance with Federal Rules of Criminal Procedure 8, the government may "charge a defendant in separate counts with [two] or more offenses if the offenses charged ... are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a).   While not "infinitely elastic," the court should apply Rule 8(a) in a flexible manner and joinder of offenses is appropriate so long as

the offenses have a "logical relationship to one another."   *See e.g.* United States v. Mouzone, 687 F.3d 207, 219 (4th Cir. 2012) ("joinder of RICO conspiracy and drug distribution counts were proper because drug distribution was an activity of the RICO conspiracy").   Similarly, the government may charge two or more defendants in the same indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions."   Fed. R. Crim. P. 8(b).   The Government has broad discretion in initiating and structuring a prosecution, including the joinder of counts and defendants that qualify under Fed. R. Crim. P. 8.   United States v. Smith, 44 F.3d 1259, 1266 (4th Cir. 1995).

Here, joinder of charges and defendants was proper.  The indictment alleges that the defendants engaged in a racketeering conspiracy, involving the distribution of drugs, murder-for-hire, possession of firearms in furtherance of drug trafficking, and witness tampering.  The defendants argue that joinder was improper because the Superseding Indictment is a collection of unrelated events and there is no common scheme or enterprise.  The Superseding Indictment, however, clearly describes an enterprise, led by Barronette, and a series of criminal acts perpetrated on behalf of or for the benefit of the enterprise.

Finally, the government anticipates that the evidence, both direct and circumstantial, will demonstrate direct connections between each of the defendants and their relationship to TTG.

> b. *Severance of any Defendant will defeat the purpose of conducting joint trials and only serve to waste government and judicial resources*

Severance is also not appropriate for any of the defendants.   There is a strong preference for joint trials as they promote efficiency, avoid inconsistent verdicts, and "play a vital role in the criminal justice system."   Zafiro v. United States, 506 U.S. 534, 537–38 (1993); United States v. Medford, 661 F.3d 746, 753 (4th Cir. 2011) ("there is a presumption in favor of joint trials in cases in which defendants have been indicted together"); United States v. Medford, 661 F.3d 746, 753

(4th Cir. 2011) ("there is a presumption in favor of joint trials in cases in which defendants have been indicted together").   "When defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."   Zafiro, 506 at 539.

Moreover, the defendants must demonstrate that actual prejudice, not potential prejudice based on speculation, would result from a joint trial.   United States v. Shealey, 641 F.3d 627, 632-33 (4th Cir. 2011) ("[a] defendant must establish that actual prejudice would result from a joint trial and not merely that a separate trial would offer a better chance of acquittal"); United States v. Lighty, 616 F.3d 321, 348 (4th Cir. 2010).   Indeed, severance is not appropriate simply because there are differing levels of culpability or that evidence against one defendant is stronger than another.   Brooks, 957 F.2d at 1145 ("[t]he fact that the evidence against one defendant is stronger than the evidence against other defendants does not in itself justify severance").

In this case, none of the defendants have articulated any actual prejudice that would result from a joint trial and simply pointed to the potential for prejudice based on differing levels of culpability.   While differing levels of culpability can lead to prejudicial "spillover" evidence – inflammatory or sensational evidence admitted against one defendant, but not relevant to another – spillover typically occurs only in cases involving a complex set of facts or circumstances where there is "markedly different degrees of culpability."   United States v. Dinkins, 691 F.3d 358, 368 (4th Cir. 2012).

Here, there is little danger of prejudicial spillover evidence.   While some defendants, like Barronette, were involved in multiple murders and acts of violence, each defendant was involved in planning, executing, and/or aiding and abetting in at least one murder and all directly

42

participated in the distribution of drugs.   This is not a case where one of the defendants was involved in fraud and another murder.

Moreover, the thrust of the government's case is Count One of the Superseding Indictment, which alleges a RICO conspiracy.   Ordinarily, defendants charged in a conspiracy should be tried together and severing defendants charged in the same conspiracy is granted in only rare circumstances.   United States v. Brooks, 957 F.2d 1138, 1145 (4th Cir. 1992); United States v. Nelson, 2 Fed. Appx. 236, 238 (4th Cir. 2001) ("[g]enerally, defendants who are indicted together should be tried together, particularly when they have been charged with conspiracy").   Each defendant charged in the Superseding Indictment is charged in the RICO conspiracy.   Indeed, even if one or several defendants were severed and tried separately, the government's presentation of evidence would likely be the same.   The government is required to prove the existence of the enterprise and acts perpetrated by one member of the enterprise would be admissible against the others, regardless of whether a defendant was tried separately.

Ultimately, the defendants have not demonstrated any actual prejudice and this is precisely the type of case that defendants charged together should be tried together.

### 12. Co-conspirator statements made during and in furtherance of the conspiracy are not hearsay and do not violate the confrontation clause

Defendant Harrison moves to exclude evidence of statements made by "non-testifying co-conspirators" because such statements "are obtained by the government through questioning of the witness after arrest and prior to trial for the purpose of litigation."   Harrison alleged that those statements are hearsay and violate the Confrontation Clause of the Sixth Amendment.

The government intends to present several witnesses that were members of the charged conspiracy or related conspiracies.   The government also anticipates that those witnesses will testify extensively about conversations between members of the conspiracy concerning events and

acts committed by other members of the conspiracy.   Although the government will offer such statements for the truth of the matter asserted, they are expressly not hearsay.   Under Fed. R. Crim. Pro. 801(d)(2)(E), co-conspirator statements are not included in the hearsay definition if the statement is made "during the course of and in furtherance of the conspiracy."   The government must demonstrate that "(i) that the defendant and the declarant were involved in a conspiracy with each other at the time the statement was made; and (ii) that the statement was made in furtherance of that conspiracy."   United States v. Shores, 33 F.3d 438, 442 (4th Cir. 1994).

Under the Bruton rule, the government may not offer out-of-court statements of a non-testifying co-defendant during a joint trial, when those statements incriminate the defendant. Bruton v. United States, 391 U.S. 123, (1968); United States v. Shores, 33 F.3d 438, 442 (4th Cir. 1994).   Such statements violate the defendant's Sixth Amendment right to confront witnesses against him.   Id.   The Bruton rule, however, does not apply when the statements are offered under the co-conspirator exception to the hearsay rule.   Id.   ("[w]e have held, however, that the *Bruton* rule does not apply if the nontestifying co-defendant's statement is admissible against the defendant under the co-conspirator exception to the hearsay rule"); United States v. Como, 108 F.3d 1373 (4th Cir. 1997) ("*Bruton* does not apply if the non-testifying codefendant's statement is admissible under the co-conspirator exception to the hearsay rule").

### 13. *Potential biases of cooperating witnesses is a matter for cross-examination, not exclusion*

Defendant Harrison also seeks to exclude the testimony of cooperating witnesses under Fed. R. Evid. 403, because they are unreliable and the probative value of their testimony is substantially outweighed by the prejudice of allowing their testimony.   Specifically, Harrison alleges that all of the government's cooperating witnesses have benefitted from their cooperation and their reliability as witnesses has been irrevocably compromised.

The defendant is seeking to exclude evidence because it may have credibility concerns. The jury, however, assess the credibility of all witnesses and has the authority to credit some, all, or none of a witness' testimony.   United States v. Rockwell, 38 F. App'x 859, 860 (4th Cir. 2002) ("[i]t was within the sole province of the jury to assess the credibility of these witnesses").   The jury is certainly entitled to hear evidence of potential biases of government's witnesses, like compensation and cooperation agreements, but it is the jury's province to assess how those biases affect their testimony.   Ultimately, Harrison's 403 argument is misplaced.   A robust cross-examination, rather than exclusion of a witness, is not the proper remedy.

### 14. *The grand jury testimony of MB is admissible hearsay under the forfeiture-by-wrongdoing exception because Harrison and TTG should not benefit from the murder of a witness*

The government intends to offer the testimony of a grand jury witness (hereinafter "MB") during its case-in-chief.   MB testified in the federal grand jury on April 24, 2016 and was shot and killed several days later.   During his testimony, MB identified defendant Harrison as the individual that robbed MB and DH of drugs and drug proceeds and then shot and killed DH on December 28, 2015.   Although MB's testimony is an out-of-court statement offered for the truth of the matter asserted, it is admissible under the forfeiture-by-wrongdoing exception to the hearsay rule.

The forfeiture-by-wrongdoing exception is designed to thwart "abhorrent behavior" that undermines the criminal justice system.   United States v. Dinkins, 691 F.3d 358, 383 (4th Cir. 2012).   Under Fed. R. Crim. P. 804(b)(6), if the declarant is unavailable to testify, the government may offer statements against a party "that wrongfully caused--or acquiesced in wrongfully causing--the declarant's unavailability as a witness, and did so intending that result."   Specifically, the Court must find, by a preponderance of the evidence that "(1) the defendant engaged or

acquiesced in wrongdoing (2) that was intended to render the declarant unavailable as a witness and (3) that did, in fact, render the declarant unavailable as a witness."   United States v. Gray, 405 F.3d 227, 241 (4th Cir. 2005).   Moreover, the principles of conspiratorial liability apply to the forfeiture-by-wrongdoing exception.   Dinkins, 691 F.3d at 383.

There is strong circumstantial evidence that TTG members murdered MB to prevent the prosecution of Harrison.   After DH was murdered, MB cooperated with law enforcement and provided a statement and grand jury testimony that Harrison robbed DH and MB of drugs and money and then shot and killed DH.   Based on MB's cooperation, Harrison was charged by criminal complaint with robbing DH.   The State complaint identified a victim that was present during the robbery and observed the murder, which only could have been MB.   The government anticipates testimony that members of TTG shot MB and then set his body on fire.   After the murder, Barronette informed members of TTG that Harrison was "coming home."

### 15. Motions to set discovery deadline, production of summary charts, CI information

Defendant Bazemore requested that the Court set a deadline for discovery, require the government to produce summary charts prior to trial in accordance with Fed. R. Evid. 1006, and information related to benefits and payments to confidential informants.   The government does not object to setting reasonable deadlines.

### 16. Conclusion.

For the above stated reasons the government submits that the defendants' motions to

suppress, compel, and for a bill of particulars should be denied.

                              Respectfully submitted,

                              Robert K. Hur
                              United States Attorney
                              District of Maryland

                    By:_____/s/_____
                              Daniel C. Gardner
                              Christopher Romano
                              Assistant United States Attorneys
                              United States Attorney's Office
                              District of Maryland

                              John Hanley
                              Trial Attorney
                              Organized Crime and Gang Section