```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
 2                        NORTHERN DIVISION

 3   _____ )

     UNITED STATES OF AMERICA       )
 4                                   )
          v.                        ) Criminal Docket No. CCB-16-0597
 5                                   ) Volume V (AFTERNOON SESSION)
     MONTANA BARRONETTE, et al.,     )
 6            Defendants             )
     _____ )
 7                                        Baltimore, Maryland
                                          September 26, 2018
 8                                        2:14 PM to 5:09 PM

 9

10            THE ABOVE-ENTITLED MATTER CONTINUED ON FOR
                              JURY TRIAL
11             BEFORE THE HONORABLE CATHERINE C. BLAKE

                     A P P E A R A N C E S
12
     On behalf of the Government:
13
              Daniel Gardner, Assistant U.S. Attorney
14            Christopher J. Romano, Assistant U.S. Attorney
              John Hanley, Trial Attorney, U.S. DOJ
15
     On behalf of Defendant Barronette:
16
              Alan Bussard, Esquire
17            Michael Lawlor, Esquire

18   On behalf of Defendant Sivells:

19            Joseph A. Balter, Assistant Federal Public Defender

20   On behalf of Defendant Tillman:

21            Richard B. Bardos, Esquire

22   On behalf of Defendant Harrison:

23            Gary Proctor, Esquire
              Jenifer Wicks, Esquire
24

25
```

```
 1                     A P P E A R A N C E S (CONT.)

 2      On behalf of Defendant Broughton:

 3              Alfred Guillaume, Esquire

 4      On behalf of Defendant Pulley:

 5              Charles Burnham, Esquire

 6      On behalf of Defendant Wilson:

 7              Christopher Carlos Nieto, Esquire

 8      On behalf of Defendant Floyd:

 9              Harry J. Trainor, Jr., Esquire

10      Also present:

11              FBI Special Agent Mark Neptune
                Krystal Panas, Paralegal
12

13

14

15

16

17

18

19

20

21          Proceedings recorded by mechanical stenography,
        transcript produced by computer.
22      _____

23                   MARTIN J. GIORDANO, RMR, CRR, FOCR
                       U.S. Courthouse, Fourth Floor
24                        101 West Lombard Street
                          Baltimore, Maryland 21201
25                            410-962-4504
```

<u>**PROCEEDINGS OF SEPTEMBER 26, 2018**</u>

1

2          **THE CLERK:**  This Honorable Court now resumes in

3    session, The Honorable Catherine C. Blake presiding.

4          **THE COURT:**  All right.  Do you want to bring in -- do

5    we have the next witness?

6          **MR. HANLEY:**  Your Honor, I believe we're going to

7    bring the jury in first due to security concerns, and then

8    bring him around the back, so if that's okay with the Court.

9          **THE COURT:**  Okay.

10          **MR. HANLEY:**  That's what the CSOs worked out.

11          **THE COURT:**  That's fine.

12       (Jury enters.)

13          **THE COURT:**  All right.  Is the Government ready to

14    call a witness?

15          **MR. HANLEY:**  We are, Your Honor.  The Government

16    would call Courtney Dunn.

17       (Pause.)

18          **MR. HANLEY:**  With the Court's indulgence, he is being

19    brought in through a different door, Your Honor, to explain the

20    delay.

21          **THE COURT:**  Sure, that's fine.

22          **THE CLERK:**  Mr. Dunn, right there.  Please raise your

23    right hand.  Stand up, please.

24       **COURTNEY DUNN, GOVERNMENT'S WITNESS, SWORN**

25          **THE CLERK:**  Please be seated.

| | |
|---|---|
| 1 | Please speak directly into the microphone.  Move your |
| 2 | chair closer. |
| 3 | State and spell your full name for the record, |
| 4 | please. |
| 5 | **THE WITNESS:**  C-O-U-R-T-N-E-Y, D-U-N-N. |
| 6 | **THE CLERK:**  Thank you. |
| 7 | **<u>DIRECT EXAMINATION</u>** |
| 8 | **<u>BY MR. HANLEY</u>:** |
| 9 | Q.  Mr. Dunn, you can move the microphone a little closer to |
| 10 | your mouth.  It's a big courtroom.  It will help for everyone |
| 11 | to hear, okay? |
| 12 | Mr. Dunn, do you understand? |
| 13 | A.  Yeah. |
| 14 | Q.  Okay.  How old are you, sir? |
| 15 | A.  Twenty-seven. |
| 16 | Q.  Sir, you have a felony conviction for possession with |
| 17 | intent to distribute marijuana from 2010; is that correct? |
| 18 | A.  Yeah. |
| 19 | Q.  Okay.  And you were charged in 2014 with possession with |
| 20 | intent to distribute marijuana and also firearm in a drug- |
| 21 | trafficking crime, correct? |
| 22 | A.  Yeah. |
| 23 | Q.  And, at that time, you cooperated with law enforcement, |
| 24 | and, because of your cooperation with law enforcement, you were |
| 25 | not convicted of that; is that correct? |

1      **MR. LAWLOR:**  Your Honor, can I object to the leading,

2      please?

3            **THE COURT:**  It's preliminary, but try to be a little

4      more direct.

5            **MR. HANLEY:**  Thank you, Your Honor.

6      **BY MR. HANLEY:**

7      Q.  Sir, were you charged with a crime in 2014?  Charged.  Not

8      convicted, but charged.

9      A.  Yeah.

10     Q.  Okay.  And what was that?

11     A.  Drugs, gun.

12     Q.  Okay.  And were you convicted of those crimes?

13     A.  No.

14     Q.  Okay.  And is that because you cooperated with law

15     enforcement?

16     A.  Yeah.

17     Q.  Okay.  I want to also ask you directly:  Were you paid by

18     law enforcement for work you did as a cooperator?

19     A.  No.

20     Q.  Were you given money for relocation by law enforcement?

21     A.  Yeah.

22     Q.  How much money were you provided?

23     A.  Altogether, like 7,200, something like that.

24     Q.  Okay.  Was that paid to you directly, or paid to a landlord

25     or leasing agent?

Direct Examination of Courtney Dunn

1    A.   Some was paid directly to me.   Some was paid to the

2    landlord.

3    Q.   Okay.   And I want to direct your attention now to

4    January 7, 2016.   At that time, were you cooperating with law

5    enforcement?

6    A.   Yeah.

7    Q.   And were you referred to someone within the FBI?

8    A.   Yeah.

9    Q.   Do you remember who specifically?

10   A.   I don't know his name.

11   Q.   Do you remember a first name or a last name?

12   A.   First name, Kevin.

13   Q.   Okay.   So someone named Kevin with the FBI.   And did you

14   agree to participate in a controlled purchase of narcotics?

15   A.   Yeah.

16   Q.   Okay.   I want to ask you about January 7th specifically,

17   2016.   Did you meet with law enforcement somewhere?

18   A.   Yeah.

19   Q.   Where did you meet with law enforcement?

20   A.   At the ShopRite on Liberty Heights.

21   Q.   Okay.   Did you get picked up, or did you drive yourself?

22   A.   I drove myself.

23   Q.   What kind of car did you have at that time?

24   A.   A Lincoln LS.

25   Q.   And do you remember how many members of law enforcement,

```
 1    either FBI or Baltimore Police, were at that location?

 2    A.  Two.

 3    Q.  Two?  Okay.  Do you remember their names?

 4    A.  Just one:  Kevin.

 5    Q.  Okay.  Was anyone else there other than law enforcement?

 6    A.  When I got there?  No.

 7    Q.  Did someone else show up?

 8    A.  Yeah.

 9    Q.  Who was that?

10    A.  I don't know his name.

11    Q.  Can you describe him for the jury?

12    A.  A dark-skinned, fat dude.

13    Q.  Was he -- so you said a dark-skinned, fat dude.

14        Was he tall, or short?

15    A.  Short.

16    Q.  Shorter than you?

17    A.  Yeah.

18    Q.  Okay.

19            MR. HANLEY:  Your Honor, may I approach?

20            THE COURT:  Yes.

21        (Document tendered to the witness.)

22    BY MR. HANLEY:

23    Q.  Handing you what's been marked for identification purposes

24    as P43 for identification only.  Do you recognize this person?

25    A.  Yeah, I think that's the fat dude.
```

Direct Examination of Courtney Dunn                    T-V-8

1    Q.   Okay.   The fat dude that you met with?

2    A.   Yeah.

3    Q.   Okay.

4         (Document tendered to the Clerk.)

5              **THE CLERK:**   Thank you.

6    **BY MR. HANLEY**:

7    Q.   So there is a couple members of law enforcement, and then

8    the fat dude.

9         So do you discuss the plan of how that day is going to go?

10   A.   Yeah.

11   Q.   What was the plan?

12   A.   Basically, the fat dude was going to call up the dudes, and

13   we would meet him at the mall and do the transaction and come

14   back.

15   Q.   Who specifically was the fat dude going to call?

16   A.   I don't know his name.   Like Montana something.

17   Q.   Were you there, or, first of all, in your presence, did the

18   fat dude call someone?

19   A.   I -- I'm not sure.   I don't know if he called him in my

20   presence or not.

21   Q.   Okay.   But the plan was for him to call someone named

22   Montana?

23   A.   Yeah.

24   Q.   Okay.   At some point, do you leave that location where you

25   met with law enforcement and the fat dude?

Direct Examination of Courtney Dunn                          T-V-9

```
 1    A.   Yeah.

 2    Q.   Where did you go?

 3    A.   To Mondawmin Mall.

 4    Q.   And, when you went to Mondawmin Mall, are you driving the

 5    same car that you arrived in?

 6    A.   Yeah.

 7    Q.   Okay.  Was anyone with you?

 8    A.   The fat dude.

 9    Q.   Before you got in your car and left, did law enforcement

10    search you?

11    A.   Yeah.

12    Q.   Did they search your car?

13    A.   Yeah.

14    Q.   Did they search the fat guy?

15    A.   I don't know.

16    Q.   Okay.  But you know they searched you?

17    A.   Yeah.

18    Q.   Okay.  And, from that location to Mondawmin Mall, it's you

19    now and the fat guy driving together.  You are driving?

20    A.   Yeah.

21    Q.   And how long did it take to get to Mondawmin Mall?

22    A.   Like ten minutes.

23    Q.   What happened when you got to Mondawmin Mall?

24    A.   We went inside.  We was waiting for them to get there.

25    They got there.  We went -- we went to the Downtown Locker
```

1    Room, did a transaction, and then left.

2    Q.  All right.  I'm going to walk you back a little bit.

3        So you got there.  Does anyone make a phone call?

4    A.  Yeah, the fat dude.

5    Q.  Okay.  And how long after the fat dude made a phone call

6    did you see anybody or did anything happen?

7    A.  Probably like ten -- ten, fifteen minutes.

8    Q.  Okay.  Who showed up?

9    A.  I don't know.  It was like five or six dudes.

10   Q.  Okay.  What did they look like?

11   A.  I don't know.  I ain't look at them.  Like, I could just

12   see them through my rear view.  Like I ain't really look at

13   them.

14   Q.  Okay.  So, just for the time line, the fat guy makes a

15   phone call.  About ten minutes later, five or six dudes show

16   up?

17   A.  Yeah.

18   Q.  Okay.  Did you go to any specific location when those

19   people showed up?

20   A.  Downtown Locker Room.

21   Q.  Okay.  And that's a store in the mall?

22   A.  Yeah.

23   Q.  And who went to the Downtown Locker Room?

24   A.  The fat dude went in there, and some other dude.

25   Q.  When you say "some other dude," was he part of that group

Direct Examination of Courtney Dunn                    T-V-11

```
 1    of the five or six people that showed up?

 2    A.  Yeah.

 3    Q.  Okay.  What about the remaining members of that group?

 4    Where did they go?

 5    A.  I don't know.  They just was walking.

 6    Q.  Did they keep walking, or did they --

 7    A.  Yeah.

 8    Q.  -- stay outside the store with you?

 9    A.  Like, they kept walking.  They weren't with me like.

10    Q.  Okay.  So the fat guy and this other person go in the

11    store, right?

12    A.  Right.

13    Q.  You're still outside in the mall area?

14    A.  Right.

15    Q.  Okay.  How long are you outside in the mall area?

16    A.  Just for like a minute or two.

17    Q.  Okay.  And what makes you go in the store?

18    A.  The fat dude said for me to come in there.

19    Q.  How did he say it?

20    A.  He just was like -- just a hand gesture.

21    Q.  So he waved you in?

22    A.  Yeah.

23    Q.  Okay.  And what happened when you went inside the store?

24    A.  Went in there, did the transaction, and came out.

25    Q.  Now, describe -- when you say you did the transaction,
```

Direct Examination of Courtney Dunn                    T-V-12

```
 1      describe what you mean.

 2      A.  I don't remember who I gave the money to.  I gave the money

 3      to one of the dudes, either the fat dude or the short dude, and

 4      one of them gave me some stuff.  I don't remember which one I

 5      gave it to.

 6      Q.  So you gave the money -- you don't know for sure, but you

 7      gave it either to the fat dude or the short dude?

 8      A.  Yeah.  I don't remember, but I definitely gave it to one of

 9      them.

10      Q.  How much money did you have?

11      A.  It was like 4,500.

12      Q.  $4,500.  And was that provided by law enforcement?

13      A.  Yeah.

14      Q.  When you were searched, did they check to see if you had

15      any of your own money on you?

16      A.  Yeah.

17      Q.  Okay.  So law enforcement provided you with $4,500.  You

18      gave it to either the fat guy or the short guy inside the

19      Downtown Locker Room store?

20      A.  Yeah.

21      Q.  Okay.  And then who handed you the drugs?

22      A.  I don't remember.  It was one of those two.

23      Q.  Okay.  Describe the drugs that you were handed.

24      A.  It was like a -- like a little white little ball shape,

25      like this big (indicating).
```

```
 1    Q.  And so we have a court reporter typing, and they can't type
 2    your hand --
 3    A.  It was like --
 4    Q.  -- gesture, so how would you describe that?
 5    A.  It was like -- it was like -- like bigger than a golf ball,
 6    like smaller than like a tennis ball.
 7    Q.  Okay.  And so what color was it?
 8    A.  White.
 9    Q.  So bigger than a golf ball, smaller than a tennis ball.
10    What did you do with it when you took possession of it?
11    A.  Put it in my pocket.
12    Q.  Okay.  Now, after you got the drugs, what did you do next?
13    A.  I left.
14    Q.  And, when you say you left, where did you go?
15    A.  To my car.
16    Q.  Okay.  Was anyone else with you?
17    A.  No.
18    Q.  This is the same car that you arrived to meet law
19    enforcement in and drove to the mall in?
20    A.  Yeah.
21    Q.  Okay.  Did you notify law enforcement?
22    A.  Notify them what?
23    Q.  That a transaction had taken place?
24    A.  Yeah.
25    Q.  How did you do that?
```

Direct Examination of Courtney Dunn

```
 1    A.   By phone.
 2    Q.   Okay.  And then did you go meet with them?
 3    A.   Yeah.
 4    Q.   And, where you met with them, was that the same location
 5    you met with them before you went to the mall?
 6    A.   Yeah.
 7    Q.   Okay.  And what did you do when you got there?
 8    A.   I gave it to them.
 9    Q.   Okay.  After you gave them -- now, did you give them all
10    the drugs?
11    A.   Yeah.
12    Q.   In the same packaging that you picked it up in?
13    A.   Yeah.
14    Q.   Did you have any further involvement with them after that
15    buy?
16    A.   No.
17    Q.   Okay.  And are you currently on probation, parole, or any
18    sort of community control?
19    A.   No.  No.
20    Q.   And, the payment that you received, this is a few years
21    ago?
22    A.   Yeah.
23    Q.   Okay.  Was that payment for relocation?
24    A.   Yeah.
25    Q.   Okay.
```

1                  **MR. HANLEY:**  One moment, Your Honor.

2                  Nothing further, Your Honor.

3                  **THE COURT:**  All right.  Thank you.

4                  Mr. Lawlor?

5                          **CROSS-EXAMINATION**

6        **BY MR. LAWLOR:**

7        Q.  Mr. Dunn, how are you today?

8        A.  I'm all right.

9        Q.  All right.  So let me -- let's back up to 2010.

10            You caught a charge; is that right?

11       A.  Yeah.

12       Q.  And was that possession with intent to distribute

13       marijuana?

14       A.  Yeah.

15       Q.  Where did you get that charge?  In what jurisdiction?

16       A.  Owings Mills or something.

17       Q.  Baltimore County?

18       A.  Yeah.

19       Q.  Did you ultimately plead guilty in that case?

20       A.  Yeah.

21       Q.  Did you get a sentence?

22       A.  I got time served.

23       Q.  How much time was that?

24       A.  Four months.

25       Q.  So, while you were pending that case, you were in jail?

Cross-Examination of Courtney Dunn (Mr. Lawlor)          T-V-16

```
 1    A.  Yeah.

 2    Q.  Okay.  Did you get put on probation?

 3    A.  Yeah, I think so.

 4    Q.  All right.  So, in 2014, you get arrested again, right?

 5    A.  Yeah.

 6    Q.  Were you still on probation?

 7    A.  No.  No, I don't think so.

 8    Q.  You don't think so, or you weren't?

 9    A.  No.

10    Q.  All right.  But, this time, a couple things are different

11    in 2014 than 2010, right?  Number one, you already have a

12    felony conviction on your record, right?

13    A.  Right.

14    Q.  Number two, you're not just charged with possessing

15    marijuana with the intent to distribute it; you're also charged

16    with possessing a gun during a drug-trafficking crime, right?

17    A.  Right.

18    Q.  And so you now must understand that you're not looking at

19    four months anymore, right?

20    A.  Right.

21    Q.  So you offer to cooperate with authorities; is that fair?

22    A.  Yeah.

23    Q.  Who did you offer to cooperate with?

24    A.  The officers.  Whoever was arresting me.

25    Q.  Okay.  Were those Baltimore County, or were they task
```

1    force, or FBI?

2    A.  I don't know.

3    Q.  Who were they?

4    A.  I don't know.

5    Q.  Huh?

6    A.  I don't know what they was.

7    Q.  You don't know?  All right.

8        But, as a result of your gesture of cooperation, you don't

9    go to prison, right?

10   A.  Right.

11   Q.  Not only do you not go to prison, but, because you agree to

12   cooperate, you don't even get stuck with a charge, right?

13   A.  Right.

14   Q.  All right.  In addition to the generosity of the Government

15   in not making you face a charge or go to jail, for your

16   generosity of cooperation, they give you $7,000, right?

17   A.  No.  What's your question again?

18   Q.  Sure.  You didn't go to jail, number one, right?

19   A.  Right.

20   Q.  Number two, no second conviction, right?

21   A.  Right.

22   Q.  Number three, you get seven grand, right?

23   A.  Yeah, for relocation.

24   Q.  Okay.  Some of which was given to you, and some of which

25   was given to your landlord, right?

Cross-Examination of Courtney Dunn (Mr. Lawlor)          T-V-18

1    A.  Right.

2    Q.  Either way, you've got money in your pocket and free rent

3    for your trouble; is that fair to say?

4    A.  Right.

5    Q.  All right.  Now, let's go to January the 7th of 2016, when

6    you go to the mall to purchase heroin.  Do you recall that day?

7    A.  Yeah.

8    Q.  All right.  So you meet with law enforcement before you go

9    to the mall, right?

10   A.  Right.

11   Q.  Now, these aren't the people that you normally work with,

12   right?  They're sort of leasing you out for the day to assist

13   with this project; is that fair?

14   A.  No.

15   Q.  No?  Had you worked with these particular law enforcement

16   officers before this particular occasion?

17   A.  Yeah.

18   Q.  You have?  Okay.

19       So they call you and say, "We need your services today,"

20   right?

21   A.  Right.

22   Q.  All right.  Now, you met with them ahead of time, right?

23   A.  I met with them to go to meet.  Like, I met with them that

24   time, like -- if you mean at the time --

25   Q.  Earlier that day, before you went to the mall, you met with

Cross-Examination of Courtney Dunn (Mr. Lawlor)        T-V-19

```
 1    them and conversed with them; is that right?
 2    A.  Yeah.
 3    Q.  Okay.  In addition, there was another individual with you,
 4    this person you're referring to as the fat guy, right?
 5    A.  Right.
 6    Q.  Okay.  So, now, they searched your person, right?
 7    A.  Right.
 8    Q.  They searched your car, right?
 9    A.  Right.
10    Q.  Did they give you any kind of a recording device so that,
11    during this exchange that the ladies and gentlemen of the jury
12    will see not one second of or hear one second of -- they give
13    you anything to record this?
14    A.  No.
15    Q.  Okay.  Is that something, had they said, "Take this
16    recording device and record the incident that you're about to
17    embark upon," you would have done had they asked?
18    A.  I don't know.
19    Q.  What do you mean, you don't know?
20    A.  I don't know if I'd have did it or not.
21    Q.  So you might have said, "No.  I refuse to wear a recording
22    device"?
23    A.  Maybe.
24    Q.  Were there other occasions where you were asked to do
25    things and you had the election of whether or not you would do
```

Cross-Examination of Courtney Dunn (Mr. Lawlor)          T-V-20

```
 1    them or not?

 2    A.  Yeah.

 3    Q.  Okay.  So, in addition to not going to jail, not getting a

 4    conviction, and getting $7,000, you get to decide the nature of

 5    your cooperation; is that fair?

 6    A.  Yeah.

 7    Q.  So when you want to participate and when you don't want to

 8    participate are things that you control based on how you feel

 9    that day?

10    A.  Yeah.

11    Q.  All right.  So let me direct your attention back to January

12    the 7th.  Did they ask you to wear a recording device or

13    something that would record the video of this encounter?

14    A.  No.

15    Q.  Okay.  Had they -- can you bring your mind's eye back to

16    the 7th?  Do you feel like that's something you would have

17    permitted, or not permitted?

18    A.  I don't know.

19    Q.  Okay.  All right.  But, nonetheless, the request was not

20    made of you; is that right?

21    A.  Right.

22    Q.  Now, this meeting occurred at the mall, right?

23    A.  Right.

24    Q.  All right.  And this is a big mall, right, like most malls?

25    Lots of stores, lots of people milling about and shopping; is
```

Cross-Examination of Courtney Dunn (Mr. Lawlor)       T-V-21

```
 1      that right?

 2      A.  Right.

 3      Q.  All right.  And you went into a store, right?

 4      A.  Right.

 5      Q.  And this entire encounter that you've described took place

 6      in the store, right?

 7      A.  Right.

 8      Q.  Do you happen to know whether or not the mall itself or

 9      that particular store had recording devices?

10      A.  I don't know.

11      Q.  Were you directed by law enforcement to ensure that the

12      meeting occurred in that store?

13      A.  No.

14      Q.  It just so happened that it ended up in that store; is that

15      right?

16      A.  Right.

17      Q.  Okay.  Now, you were shown a picture today of this

18      gentleman that you referred to as the fat guy.  Since January

19      the 7th, 2016, have you been shown any other photographs?

20      A.  No.

21      Q.  Okay.  So no one asked you from the prosecution or the case

22      agents to look at photographs and say, "Was this one of the

23      five or six people you encountered that day;" is that right?

24      A.  Right.

25      Q.  All right.  So, those five or six people that you saw that
```

1    day, did you ever see them before?

2    A.  No.

3    Q.  Ever seen them since?

4    A.  I don't know, because I ain't really look at them.

5    Q.  All right.

6    A.  I don't know what they looked like.

7              **MR. LAWLOR:**  Got it.  Thank you.

8              **THE COURT:**  All right.  Anybody else?

9              **MR. BALTER:**  No questions, Your Honor.

10             **MR. BURNHAM:**  Briefly, Your Honor.

11             **THE COURT:**  All right.  Mr. Burnham?

12                        **CROSS-EXAMINATION**

13   **BY MR. BURNHAM:**

14   Q.  Good afternoon, Mr. Dunn.  I'm Charles Burnham.

15       You testified on direct examination and repeated on cross

16   that you were paid $7,200 for relocation from the Government.

17       You recall that, right?

18   A.  Right.

19   Q.  How much of that money was given directly to you versus

20   paid to a third party, such as a landlord?

21   A.  5,000.

22   Q.  So, in other words, that leaves 2,200 that was paid to

23   someone else on your behalf --

24   A.  Right.

25   Q.  -- correct?

1      Who made that payment?  Do you know?

2  A.  I don't know.

3  Q.  Was all 2,200 to a landlord, or were there other people

4  that needed to get paid on your behalf?

5  A.  The landlord.

6          **MR. BURNHAM:**  Thank you.  No further questions.

7          **MR. PROCTOR:**  Your Honor, may we approach?

8          **THE COURT:**  Sure.

9      (Whereupon, the following discussion occurred at the

10  bench.)

11          **MR. PROCTOR:**  Your Honor, I would like to ask this

12  witness on cross -- to have my client stand up and ask if he's

13  seen him before, but I'm unable to do that because --

14          **MR. ROMANO:**  Can you wait until we get up here?

15          **MR. PROCTOR:**  Sorry.

16          **THE COURT:**  It's my fault.  My fault.  I'm sorry.  We

17  had one Government counsel here, so I went ahead.

18          **MR. PROCTOR:**  I would like to ask this witness -- to

19  have my client stand up and ask him if he's ever seen him

20  before in his life, because I think the answer is, "No," but

21  I'm unable to because of three-point restraints.  And my

22  request would be we take a recess, we remove the three-point

23  restraints, we bring them back in, and I ask that question.

24          **MR. HANLEY:**  Your Honor, I specifically didn't ask

25  any identifying questions because he said he can't identify

1    anyone.

2            THE COURT:  Exactly.  The witness said at least a

3    couple of times that he couldn't identify any of the five or

4    six people because he didn't look at them.  So you don't have

5    anything better on the record, Mr. Proctor.

6            Your request is denied.

7        MR. HANLEY:  While we're up here, Mr. Lawlor, I will

8    say you're probably referring to the second report about

9    pictures.

10           MR. LAWLOR:  I wasn't referring to any report.  I was

11   just asking questions.

12           MR. HANLEY:  Okay.  Because, when we prepped him, we

13   showed him pictures, and he said, "No."  So I can -- I mean, he

14   already --

15           MR. LAWLOR:  You try your case; I'll try mine.

16           MR. HANLEY:  Just so we're all on the same page.

17           MR. LAWLOR:  No.  I wasn't referring to any report.

18           MR. HANLEY:  Okay.

19           THE COURT:  Thank you, Mr. Lawlor.

20           Thank you, Mr. Hanley.

21           MR. BURNHAM:  Your Honor, can I address something?  I

22   just want to take this opportunity since we're at the bench --

23           THE REPORTER:  Who is speaking?

24           MR. BURNHAM:  Charles Burnham.  Apropos of my brief

25   cross-examination of Mr. Dunn, I received -- we all received a

Cross-Examination of Courtney Dunn (Mr. Burnham)                    T-V-25

1    letter from the Government stating in writing that Mr. Dunn had

2    received $5,000, to the penny, for his relocation and

3    cooperation compensation.  He just testified that he, in fact,

4    did receive $5,000, but that an additional 2,200 was paid on

5    his behalf to a third party -- in this case, a landlord --

6    which gives me great concern that the Government is not

7    reporting to us money -- expenses paid for the cooperators,

8    which is every bit as much *Giglio* impeachment information as

9    money given directly to them.  So I want to put on the record

10   that I expect them to have already turned that information

11   over.

12          Apparently they have failed, so I'd ask now that they

13   go back, check, and tell us all the expenses that were paid on

14   behalf of Mr. Dunn and all the rest of the cooperators, and

15   I've asked for this, you know, in writing even before we got

16   this letter.

17          **MR. HANLEY:**  I can tell you, Your Honor, he actually

18   wasn't paid on this case at all.  He cooperated with something

19   in Baltimore County.  The money that we referred to was what we

20   got from -- when we asked law enforcement what he was paid.

21   Today, he mentioned the other $2,200, none of which, the 2,200

22   or the 5,000, was from any work he did on this case.  It was

23   work he did cooperating on a separate case.  We disclosed it in

24   the abundance of caution, but the $2,200 had nothing to do with

25   this buy -- this lone buy he made here.

```
 1            THE COURT:  Okay.
 2            MR. HANLEY:  So I can ask him that on redirect,
 3     but --
 4            THE COURT:  Whatever.  Whatever you want.  We're
 5     going to move on to redirect.
 6        (Whereupon, the bench conference was concluded.)
 7            THE COURT:  Anybody else?  Any other questions?
 8            Any redirect?
 9            MR. HANLEY:  Thank you, Your Honor.
10                     REDIRECT EXAMINATION
11     BY MR. HANLEY:
12     Q.  Sir, we talked a little bit about the money you were paid.
13         Was that from the buy you made in this case, or work you
14     did in cooperation in other law enforcement matters?
15     A.  Other matters.
16     Q.  Okay.
17            MR. HANLEY:  Nothing further, Your Honor.
18            THE COURT:  All right.  Thank you.  This witness is
19     excused.
20        (Witness excused.)
21            MR. GARDNER:  Your Honor, the Government's next
22     witness is BPD Officer Cedric Booth.  We're going to get him
23     right now.
24            THE COURT:  All right.
25            THE CLERK:  Please raise your right hand.
```

1    **CEDRIC BOOTH, GOVERNMENT'S WITNESS, SWORN**

2             **THE CLERK:**  Please be seated.

3             Please state and spell your name for the record,

4    please.

5             **THE WITNESS:**  First name is Cedric Booth,

6    C-E-D-R-I-C; last name, Booth, B-O-O-T-H.

7             **THE CLERK:**  Thank you.

8                     **DIRECT EXAMINATION**

9    **BY MR. GARDNER:**

10   Q.  Good afternoon, Officer.

11   A.  Good afternoon.

12   Q.  What's your current occupation?

13   A.  Detective in the Baltimore Police Department.

14   Q.  How long -- in Baltimore City?

15   A.  Yes, sir.

16   Q.  How long have you been with Baltimore City?

17   A.  Eleven years now.

18   Q.  And you said your current rank is detective?

19   A.  Yes, sir.

20   Q.  All right.  Where are you working at currently for

21   Baltimore City Police?

22   A.  Currently, I'm assigned to CitiWatch cameras.

23   Q.  And what else have you done for Baltimore City in your

24   11-year career?

25   A.  I've done patrol, I've done district ops, and I've done the

Direct Examination of Cedric Booth

1  undercover unit.

2  Q.  How long were you in the undercover unit?

3  A.  For four years.

4  Q.  Okay.  Were you in the undercover unit in 2006?

5  A.  Yes, sir.

6  Q.  As an undercover officer, did you primarily work with

7  narcotics, or did you deal in other types of undercover work?

8  A.  Primarily just narcotics.

9  Q.  Can you describe a little bit about how you're assigned

10  work or assigned a case in the undercover unit?

11  A.  So usually, with our squad, we have a sergeant and a

12  lieutenant.  The sergeant usually hands us our papers with

13  certain persons that might be targeted, or, if we get a

14  complaint from the districts that there is a certain area with

15  high narcotics and violence areas, we're assigned that area,

16  and not specifically targeting anyone; just assigned that area

17  to work it.

18  Q.  Okay.  Who was your sergeant in 2006?

19  A.  Sergeant Robert Velte.

20  Q.  So, when you're provided information about either an area

21  or a particular target to work on, do you typically know this

22  individual or this area?

23  A.  No.  We have no recollection of the area or the individual.

24  Q.  How are you able to infiltrate or work on targets or areas

25  that you really don't have familiarity with?

1    A.   Some of the ways that we work the areas is through plain

2    clothes.  We have to look a part, dress as kind of bummy as we

3    can possibly look, look nothing like police, nothing that has

4    police on us.  We have unmarked vehicles.

5    Q.   Okay.  In Baltimore, are there open-air drug markets?

6    A.   Yes, sir.

7    Q.   Is that typically what you work from the undercover

8    capacity?

9    A.   Yes, sir.

10   Q.   And I used the term, but what is an open-air drug market?

11   A.   Meaning it's open to the public.  It's an area that's --

12   you can walk through and, if you're looking to buy narcotics,

13   you could.

14   Q.   It's outside?

15   A.   Yes, sir.

16   Q.   It's not in somebody's residence or --

17   A.   Sometimes it is outside, and sometimes it is inside

18   somebody's residence.

19   Q.   Okay.  All right.  I want to direct your attention to late

20   October 2016.  Did you receive a request, either from

21   Sergeant Velte or from the FBI, to conduct some undercover

22   operations?

23   A.   Yes, sir.

24   Q.   Who did you receive that request from?

25   A.   I received my request from Sergeant Robert Velte.

Direct Examination of Cedric Booth

1    Q.  Okay.  What did Sergeant Velte ask you to do?

2    A.  He handed me a picture with an individual on it, and then

3    he said that the FBI needed help with doing a narcotics buy off

4    of this individual.

5    Q.  I want to show you a photograph.

6        Do you recognize this individual?

7    A.  Yes, sir.

8    Q.  And who or how do you recognize this individual?

9    A.  I recognize him from the picture that Sergeant Velte gave

10   us to help the FBI with their case.

11   Q.  Okay.  So this was the target of your undercover

12   investigation?

13   A.  Yes, sir.

14           THE CLERK:  Mr. Gardner, the exhibit number, please?

15           MR. GARDNER:  I'm sorry.  It is P3.

16           THE CLERK:  Thank you.

17   BY MR. GARDNER:

18   Q.  Had you had any interaction with this individual?

19   A.  Prior to the case?

20   Q.  Yes.

21   A.  No.

22   Q.  Okay.  Were you able to conduct any undercover purchases

23   from this individual?

24   A.  Yes, sir.

25   Q.  Did those purchases occur on October 31st and November 2nd,

1    2016?

2    A.  Yes, sir.

3    Q.  All right.  Let's talk about October 31st first.

4        So, on October 31st, 2016, did you equip yourself with any

5    type of recording device?

6    A.  Yes, sir.  We -- all the UCs have to have a recording and

7    audio device attached to them somewhere on their person.

8    Q.  Okay.  Did you have any money to conduct a purchase?

9    A.  Yes, sir.

10   Q.  How much money did you have?

11   A.  $60.

12   Q.  All right.  I want to show you what's been marked as

13   Government's Exhibit CD5.  Take a look at that and tell me if

14   you recognize it.

15       (Exhibit tendered to the Witness.)

16   A.  Yes, sir.

17   Q.  Are those partial recordings of your undercover buys on

18   October 31st and November 2nd, 2016?

19   A.  Yes, sir.

20       (Exhibit tendered to the Clerk.)

21   **BY MR. GARDNER:**

22   Q.  And do those -- does that exhibit contain the entire

23   recording of what you did on those two days, or just a part?

24   A.  The partial recording.

25   Q.  Okay.  Did you review the recordings after you conducted

1    the buy?

2    A.  I recorded -- I viewed the full-length video and the

3    shortened part -- portion of it.

4    Q.  Okay.  Do they accurately depict --

5    A.  Yes, sir.

6    Q.  -- the undercover operation?

7    A.  Yes, sir.

8    Q.  All right.  Now, we're going to look at this in just a

9    moment.  Do you have any -- without getting into detail about

10   the device you used, do you have any control over what the

11   camera is focused on or recording?

12   A.  To a degree, depending on where it's placed on our body.

13   Q.  Okay.

14          MR. GARDNER:  All right.  I'd like to play the first

15   two clips.  This is from the October 31st buy.

16      (Whereupon, a video was displayed from 8:42:29 to 8:42:31.)

17   BY MR. GARDNER:

18   Q.  First of all, what area are we looking at here?

19   A.  This is Harlem and Carey Street.

20   Q.  Okay.  Are you familiar with that -- very familiar with

21   that neighborhood?

22   A.  I'm only familiar through this case.  I've never worked the

23   area in patrol or any other narcotics unit.

24      (Whereupon, a video continued to be displayed from 8:42:31

25   to 8:42:55.)

Direct Examination of Cedric Booth                    T-V-33

1    **BY MR. GARDNER:**

2    Q.  Is that your voice we're hearing?

3    A.  Yes, sir.

4    Q.  What did you say to the individual on the corner?

5    A.  Are they up yet.

6    Q.  Okay.  What did you mean by that?

7    A.  Is the shop open?  Is anybody hitting on the street?

8    Q.  Okay.  You used another term there, "hitting."  What do you

9    mean by "hitting"?

10   A.  So that's slang for someone selling narcotics on the corner

11   or whatever location they're going to.

12   Q.  Okay.

13       (Whereupon, a video continued to be displayed from 8:42:55

14   to 8:43:09.)

15   **BY MR. GARDNER:**

16   Q.  After you asked the individual, "Are you up," what did they

17   say to you?

18   A.  "Yes.  Wait over there."

19   Q.  Okay.  Is that why you're heading in this direction?

20   A.  Yes, sir.

21   Q.  All right.

22       (Whereupon, a video continued to be displayed from 8:43:09

23   to 8:43:34.)

24   **BY MR. GARDNER:**

25   Q.  Who are you talking to right now?

1   A.  Another person that was waiting to buy pills.

2        (Whereupon, a video continued to be displayed from 8:43:34

3   to 8:44:23.)

4   **BY MR. GARDNER:**

5   Q.  That's the end of the first clip.  I'll play the second

6   clip here.

7        And, Detective Booth, why were you talking to that lady?

8   A.  Just to kind of blend in, to not be so obvious or the

9   oddball out on the street, and start a conversation, because

10  sometimes they do give information on individuals on the

11  street.

12       (Whereupon, a video continued to be displayed from 8:44:23

13  to 8:44:27.)

14  **BY MR. GARDNER:**

15  Q.  I cut you off.  What was the last part you said?

16  A.  They sometimes give information on maybe shootings or other

17  serious crimes that happened on the street.

18       (Whereupon, a video continued to be displayed from 8:44:27

19  to 8:44:32.)

20  **BY MR. GARDNER:**

21  Q.  What did you just say to the individual who is in the

22  building right there?

23  A.  The individual was the target.  I asked for six on the

24  blow.

25  Q.  Okay.  Is he the individual you initially approached when

Direct Examination of Cedric Booth                    T-V-35

1    you walked up --

2    A.  No.  That's two different people.

3    Q.  Okay.

4        (Whereupon, a video continued to be displayed from 8:44:32

5    to 8:44:38.)

6    **BY MR. GARDNER:**

7    Q.  When you said "six on the blow," what did you mean by that?

8    A.  Six pills of cocaine.

9    Q.  Cocaine, or heroin?

10   A.  Heroin.  I'm sorry.

11   Q.  Okay.  What does "blow" typically mean?

12   A.  "Blow" is a term used for heroin in its powder form.

13       (Whereupon, a video continued to be displayed from 8:44:38

14   to 8:46:24.)

15   **BY MR. GARDNER:**

16   Q.  What just happened right there?

17   A.  He handed me the pills.  I handed him the money, and I

18   placed the pills in my sock.

19   Q.  You said -- how much money did you have?

20   A.  60.

21   Q.  And how much money did you give the target?

22   A.  $60.

23   Q.  Okay.  All right.  And how many pills did you get in

24   return?

25   A.  Six.

1    Q.  You say you put them in your sock?

2    A.  Yes, sir.

3    Q.  Okay.

4        (Whereupon, a video continued to be displayed from 8:46:24

5    to 8:46:35.)

6    **BY MR. GARDNER:**

7    Q.  All right.  Did you just walk away?

8    A.  Yes, sir.  I headed back to my unmarked vehicle.

9    Q.  Okay.  Ultimately, what did you do with those pills?

10   A.  So our sergeant would usually send a group text, and

11   everybody involved with the case would meet up at another

12   secure location, and usually I give the property over to him,

13   and then he'll designate it to someone else to submit.

14   Q.  Okay.  So are you the person that submits it to Evidence

15   Control?

16   A.  No, none of us submit.

17   Q.  Okay.  And why is that?

18   A.  We're not supposed to be around any police buildings or

19   affiliated with police, to hold our cover.

20   Q.  Okay.  So you pass that off to someone else, and they

21   submit it to ECU?

22   A.  Yeah.  The cover team usually submits.

23   Q.  Okay.  And I used the term "ECU."  What is ECU?

24   A.  ECU is Evidence Control Unit.  That's where you submit

25   property recovered on the street or off a person.

1    Q.  Okay.  So, after you handed over the three pills, or six

2    pills, did you ever see them again?

3    A.  I saw -- this individual?

4    Q.  No.  The pills.  Did you ever see the pills?

5    A.  No.  I don't see the pills after I give it to the

6    supervisor in the cover team.

7            **MR. GARDNER:**  Okay.  Your Honor, I'd like to approach

8    the witness and show him what's marked as UC1 for

9    identification at this point.

10        (Document tendered to the Witness.)

11   **BY MR. GARDNER:**

12   Q.  Sir, can you take a look at that?

13   A.  Yes, sir.

14   Q.  And you can go ahead and flip that exhibit around real

15   quick.  Can you see there are several pills contained in that

16   exhibit?

17   A.  Yes.  Six pills in here.

18   Q.  Okay.  I understand you haven't seen those pills since the

19   day you purchased them.  Are the pills contained in UC1

20   consistent with what you bought on October 31st, 2016?

21   A.  Yes, sir.

22   Q.  Okay.  Thank you.

23        (Exhibit tendered to Mr. Gardner.)

24   **BY MR. GARDNER:**

25   Q.  All right.  Sir, you conducted another controlled purchase

1    the following day on -- or -- excuse me -- a couple days later

2    on November 2nd, 2016; is that right?

3    A.  Yes, sir.

4    Q.  All right.

5        (Whereupon, a video was displayed at 8:13:13.)

6    **BY MR. GARDNER**:

7    Q.  There is one clip contained in this part of the exhibit

8    and, sir, are we looking at the same general area?  Where did

9    you conduct this --

10   A.  It's the same location.

11   Q.  Same location?

12       (Whereupon, a video continued to be displayed from 8:13:13

13   to 8:13:57.)

14   **BY MR. GARDNER**:

15   Q.  All right.  What did you just say?

16   A.  I said, "Are they good, big brother?"

17   Q.  And then what did you say after that?

18   A.  "You got me for six."

19   Q.  Okay.  Well, first part, what do you mean by:  Are you good

20   today, big brother?

21   A.  Are they up?  Are they selling narcotics that day?

22   Q.  Okay.  And how about asking for six?  What did that mean?

23   A.  Six pills, the same as last time.

24       (Whereupon, a video continued to be displayed from 8:13:56

25   to 8:14:21.)

Direct Examination of Cedric Booth                    T-V-39

1    **BY MR. GARDNER:**

2    Q.  Why did you walk across the street to this area?

3    A.  He told me to wait over there.

4    Q.  Is it the same individual that you purchased from on

5    October 31st, 2016?

6    A.  Yes, sir.  Yes.

7        (Whereupon, a video continued to be displayed from 8:14:21

8    to 8:15:03.)

9    **BY MR. GARDNER:**

10   Q.  Officer -- Detective Booth, what's the device you have

11   there in your hand?

12   A.  The silver device is vape.

13   Q.  Okay.  So you were vaping?

14   A.  Yes, sir.

15   Q.  Okay.  Is that like an e-cigarette, or what is that?

16   A.  Yeah, I guess you could call it an e-cigarette.

17   Q.  Okay.

18       (Whereupon, a video continued to be displayed from 8:15:03

19   to 8:16:49.)

20   **BY MR. GARDNER:**

21   Q.  What just happened there, Detective Booth?

22   A.  We made the transaction.

23   Q.  Okay.  Well, what did you give the individual?

24   A.  The $60 from my sergeant.

25   Q.  Okay.  And what did you get in return?

Direct Examination of Cedric Booth

1    A.  The six pills.

2    Q.  Okay.  Just like the October 31st buy?

3    A.  Yes, sir.

4    Q.  What did you do with them?

5    A.  I placed them in my sock, as last time.

6    Q.  Okay.  And did you conduct a transaction on November 2nd

7    with the same person as October 31st?

8    A.  Yes, sir.

9        (Whereupon, a video continued to be displayed from 8:16:49

10   to 8:17:06.)

11   **BY MR. GARDNER:**

12   Q.  And, again, after the transaction, did you just walk away?

13   A.  Yes, sir.

14   Q.  All right.  And what did you do with the six pills you

15   purchased from the target?

16   A.  I handed them over to my supervisor, who, in turn, gave it

17   to one of the cover team men.

18   Q.  Okay.  All right.  I want to approach and show you what's

19   been marked as Government Exhibit UC4 for identification at

20   this time.

21       (Exhibit tendered to the Witness.)

22   **BY MR. GARDNER:**

23   Q.  Sir, can you take a look at the front and back of that

24   package.  Do you see that there are six pills in that package?

25   A.  Yes, sir.

Direct Examination of Cedric Booth                    T-V-41

1      Q.  And are they consistent with the six pills that you

2      purchased on November 2nd, 2016?

3      A.  Yes, sir.

4      Q.  Okay.  Thank you.

5          (Exhibit tendered to Mr. Gardner.)

6      **BY MR. GARDNER:**

7      Q.  I'd like to show you a couple of photographs as well.  This

8      will be UC3, UC6, and UC7.  Can you take a look at these and

9      tell me if you recognize those photographs.

10         (Exhibits tendered to the Witness.)

11             **THE WITNESS:**  Yes, sir.  The one in the doorway is

12     the target.

13     **BY MR. GARDNER:**

14     Q.  That's UC3.

15     A.  And the second one is the target approaching me, either

16     before the buy or after.

17     Q.  That's UC6.

18     A.  I've only seen this individual in the last one, one time.

19     I didn't get a name, didn't deal with him before.  He was

20     standing there with the target.

21     Q.  Okay.  That's UC7.  All right.

22         (Exhibits tendered to Mr. Gardner.)

23     **BY MR. GARDNER:**

24     Q.  All right.  Looking at Government's Exhibit UC3, do you see

25     the individual in the vestibule there on the left portion of

Direct Examination of Cedric Booth

1   the photograph?

2   A.  Yes, sir.

3   Q.  All right.  Is that the individual you purchased from on

4   October 31st, 2016?

5   A.  Yes, sir.

6   Q.  Okay.  This is UC6.

7           **MR. GARDNER:**  This is UC6, but I think it's labeled

8   wrong on my screen here.  Is it labeled right up there?

9           **THE CLERK:**  Yes.

10          **MR. GARDNER:**  Okay.  So, Your Honor, this is showing

11  UC4 on the screen.  It is labeled -- the actual exhibit is UC6.

12          **THE COURT:**  Okay.

13  **BY MR. GARDNER:**

14  Q.  Sir, you indicated you saw this individual but didn't get a

15  name; is that right?

16  A.  Yes, sir.

17  Q.  When you conducted the undercover purchase on November 2nd,

18  2016, did you interact with this individual at all?

19  A.  Not really.  We didn't exchange words directly.  When I

20  asked were they up, it was kind of directed to both of them,

21  because they were standing right there.  I didn't know who was

22  going to be serving at that time.

23  Q.  Which one responded:  This individual, or the target?

24  A.  The target.

25  Q.  But this individual was standing next to the target?

Direct Examination of Cedric Booth

```
1    A.  Yes, sir.

2    Q.  All right.  We'll look at UC7.

3        So is this photograph from the video on November 2nd, 2016?

4    A.  Yes, sir.

5    Q.  And is that the individual you purchased the six pills

6    from?

7    A.  Yes.

8    Q.  And that individual is this individual?

9    A.  Yes, sir.

10   Q.  Government's Exhibit P3.

11       I'd like to go over one more thing with you.  So this is

12   Government Exhibit A14.  Do you recall generally the area in

13   which you covered this -- in which you conducted this

14   undercover purchase?

15   A.  Yes, sir.  So, based on the map, I parked the unmarked car

16   somewhere near the school.

17   Q.  And, sir, the monitor you have there, you actually can

18   touch it and draw on it, so if you don't mind indicating --

19   A.  Oh, okay.

20   Q.  -- on the exhibit.

21   A.  (Indicating).  Like somewhere in this area, where I parked

22   and walked to the target area.

23   Q.  Okay.

24   A.  So I can show --

25   Q.  Can you indicate where you walked to?
```

1    A.  Okay.  So the "X" is going to be where I walked to

2    (indicating).

3    Q.  All right.  So you walked straight down Harlem Avenue?

4    A.  Yes, sir.

5    Q.  Okay.  And you indicated that this is a school right here

6    (indicating)?

7    A.  Yes, sir.

8    Q.  All right.  And, just for the record, I circled the school

9    on the center left of the photograph, and the witness indicated

10   that he started or parked in front of the school on the south

11   side and walked down to Harlem Avenue near the intersection of

12   Harlem and North Carey; is that right?

13   A.  Yes, sir.

14   Q.  Okay.

15          **MR. GARDNER:**  Can I have one moment, Your Honor?

16          **THE COURT:**  Yes.

17       (Pause.)

18          **MR. GARDNER:**  I have no further questions, Your

19   Honor.

20          **THE COURT:**  Thank you.

21          Any cross-examination?  Mr. Bardos?

22                       **CROSS-EXAMINATION**

23   **BY MR. BARDOS:**

24   Q.  Good afternoon.

25       Is it Detective, Officer?  What is the right title?

Cross-Examination of Cedric Booth (Mr. Bardos)          T-V-45

1   A.  Detective.

2   Q.  Detective Booth, my name is Rich Bardos.  I represent

3   Taurus Tillman, who I think you've just been talking about in

4   brief.

5       So the first time you got involved in this investigation

6   personally was in late October 2016?

7   A.  Yes, sir.

8   Q.  Are you aware that this investigation had been going on for

9   almost a year before that?

10  A.  No, sir.

11  Q.  Were you aware that there was a wiretap going on before

12  that?

13  A.  No, sir.

14  Q.  All right.  So they came to you at some point in late

15  October and said, "We'd like you to do undercover buys from

16  this person" --

17  A.  Yes.

18  Q.  -- right?

19      And they chose you as opposed to using, you know, a

20  cooperating witness, right?

21  A.  Yes, sir.

22  Q.  And so they didn't have to search you before you did the

23  transaction, because you're a police officer?

24  A.  Yes, sir.

25  Q.  All right.  So you went with $60 to purchase six pills?

Cross-Examination of Cedric Booth (Mr. Bardos)          T-V-46

1    A.  Yes, sir.

2    Q.  And you have some experience in investigating heroin

3    distribution, that sort of thing?

4    A.  Yes, sir.

5    Q.  All right.  So six pills would be -- let's see if we have

6    this.  So a gram would be about ten pills; is that fair?

7    A.  Yes, sir.

8    Q.  All right.  So six pills is .6 of a gram, right?

9    A.  Yes, sir.

10   Q.  You weren't buying in bulk; is that fair?

11   A.  I'm not buying in bulk.

12   Q.  You're not buying in bulk.  Okay.

13       So, the first time, you bought .6 grams, right?

14   A.  Uh-huh.

15   Q.  And, the second time, you bought .6 grams?

16   A.  Uh-huh.

17   Q.  I know -- let's do the math together.  That's a total 1.2

18   grams of heroin --

19   A.  Yes, sir.

20   Q.  -- right?

21       Did you pick six because that's like personal use?

22   A.  I can't remember the reason why.  I know sometimes our

23   sergeant just hands us money, and he says, whatever we have

24   available, make it work.

25   Q.  Okay.  But you knew that six was -- six pills is not a big

```
1    amount in the heroin trade, right?

2    A.  No, sir.

3    Q.  Okay.  All right.  And the total 1.2 that you got in late

4    October, early November, you gave them over to someone else who

5    gave them in to the --

6    A.  Cover team.

7    Q.  To ECU, correct?

8    A.  Yes, sir.

9    Q.  And that's the only thing that you've had to do with

10   Mr. Tillman or in this case, right?

11   A.  Yes, sir.  I've never dealt with him before or after that.

12   Q.  Okay.

13            MR. BARDOS:  All right.  Thank you.  That's all I

14   have.

15            THE COURT:  Thank you.

16            Anybody else?  Any questions?

17            MR. PROCTOR:  Briefly, Your Honor.  Boxed in.

18                      CROSS-EXAMINATION

19   BY MR. PROCTOR:

20   Q.  Good afternoon, sir.

21   A.  Good afternoon.

22   Q.  If I could ask you just to stand up for a second, because I

23   think you'll see better.  Do you see that gentleman over there

24   in the black hoodie?

25   A.  Yes, sir.
```

1    Q.  Was he the person you bought drugs from?

2    A.  To be honest with you, I can't remember.

3    Q.  Okay.  You can have a seat.

4        Or was he the other person standing out there, as you sit

5    here today?

6    A.  I can't recognize him, sir.

7    Q.  Okay.  So, as you sit here today, you just don't know

8    either way?

9    A.  I recognize the person I bought the narcotics from, and

10   that's the person I focused on as the targeted individual.

11   Q.  Okay.  So, the person you bought narcotics from, was it

12   that guy?

13   A.  No, sir.

14   Q.  But, as you sit here today, do you know if that guy was out

15   there, or not?

16   A.  The black hoodie, I couldn't tell you if he was out there

17   or not.

18   Q.  Okay.  Best of your recollection, you ever seen him before?

19   A.  No.

20            **MR. PROCTOR:**  That's all I have.

21            **THE COURT:**  Mr. Balter?

22            **MR. BALTER:**  Thank you, Your Honor.

23                     **CROSS-EXAMINATION**

24   **BY MR. BALTER:**

25   Q.  Officer Booth, I think you indicated, as you were

1    explaining what was shown on the video as you were entering

2    into the neighborhood, you were asking a number of individuals

3    you met on the street as to basically where you might go to

4    find some drugs; is that correct?

5    A.  Yes, sir.

6    Q.  All right.  So you understood this whole area -- that's

7    1300 block of Harlem -- is an open-air drug market, correct?

8    A.  Yes, sir.

9    Q.  All right.  So you're not the only person around looking

10   for drugs; is that accurate?

11   A.  No, sir, I'm not.

12   Q.  Okay.  You're seeing a lot of people in that area looking

13   for drugs, appearing as if they are distressed because of the

14   fact that they are drug users, I would take it; is that

15   correct?

16   A.  Yes, sir.

17   Q.  And the overall look of the neighborhood is a rather

18   distressed one; is that correct?

19   A.  Yes, sir.

20   Q.  All right.  I think we saw in the video, there are many,

21   many homes -- it's mainly three-story rowhouses in that area;

22   is that correct?

23   A.  Yes, sir.

24   Q.  All right.  And many of them are boarded up; is that

25   correct?

Cross-Examination of Cedric Booth (Mr. Balter)         T-V-50

1    A.  Yes, sir.

2    Q.  And many of the boarded-up houses, it's the first floor

3    that's boarded up, and the windows on the second and third

4    floors are wide open; is that correct?

5    A.  Yes, sir.

6    Q.  All right.  And you saw many houses that looked like that;

7    is that correct?

8    A.  Yes, sir.

9    Q.  All right.  In your estimation, they were most likely

10   abandoned houses; is that correct?

11   A.  I would assume so.

12   Q.  All right.  Now, other than the areas that are depicted in

13   the video, did you walk around that area at all?

14   A.  No.  I went to the targeted location and back to my

15   vehicle.

16   Q.  Okay.  And, again, that was on the 1300 block of --

17   A.  Of Harlem.

18   Q.  -- of Harlem.  All right.

19       Did you have the opportunity to look down any of the alleys

20   and see just generally what the condition of the alleys was?

21   A.  No, sir.

22   Q.  Okay.  Did you notice whether or not it looked like there

23   might be people simply randomly entering into the abandoned

24   houses and exiting from the abandoned houses?  Could you tell?

25   A.  I couldn't tell.

Cross-Examination of Cedric Booth (Mr. Balter)          T-V-51

```
1    Q.  Okay.  But there were a lot of people in that general area
2    who apparently were looking for drugs; is that correct?
3    A.  Yes, sir.
4    Q.  Did you have any estimation as to the number of people who
5    may have been engaging in street-type transactions as you went
6    through the area?
7    A.  I focused on what my assignment was, and that was it, so I
8    wouldn't pay attention to any other individuals.
9    Q.  Okay.  Well -- but you were aware of the fact that, from
10   what you could tell, you were not the only person buying at
11   that --
12   A.  Yes, sir.
13   Q.  Okay.  And would you say it was possible that there were --
14   while you were walking through, there were more than five
15   transactions going on?
16   A.  I wouldn't be able to tell you how many.
17   Q.  Could have been more than five, more than ten?
18   A.  I don't even have a number.
19        MR. BALTER:  I have nothing further, Your Honor.
20   Thank you.
21        THE COURT:  All right.  Thank you.
22        Anybody else?
23     (No response.)
24        THE COURT:  Any redirect?
25        MR. GARDNER:  No, Your Honor.
```

1          THE COURT:  Okay.  Thank you.  This witness is

2    excused.

3        (Witness excused.)

4          THE COURT:  And if I could see counsel at the bench

5    for just a minute on scheduling.

6        (Whereupon, the following conference was held at the

7    bench.)

8          THE COURT:  Just wondering where we're going next and

9    whether I should take a break.

10          MR. ROMANO:  I've got the next witness.  It's just a

11   chain of custody.  He's probably no more than five to seven

12   minutes, so I could probably at least get him on and off here.

13   So --

14          MR. PROCTOR:  I'll have at least 30 minutes of cross.

15          THE COURT:  Sure.  Okay.

16        (Laughter.)

17          MR. BARDOS:  Chain of custody for this --

18          MR. ROMANO:  For one of these --

19          MR. HANLEY:  One of two.

20          MR. BARDOS:  Okay.  I'm not going to contest the

21   chain of custody on these drugs.

22          MR. GARDNER:  Well, we've got to do it.

23          THE COURT:  Let's do it.

24          MR. BARDOS:  Okay.

25        (Whereupon, the bench conference was concluded.)

1          **THE COURT:**  The Government wants to call another

2    witness?

3          **MR. ROMANO:**  Your Honor, the Government's next

4    witness is Detective Ferguson.

5          **THE CLERK:**  Please raise your right hand.

6       **TRISTON FERGUSON, GOVERNMENT'S WITNESS, SWORN**

7          **THE CLERK:**  Please be seated.

8          Please state and spell your name for the record.

9          **THE WITNESS:**  Triston Ferguson.  First name,

10   T-R-I-S-T-O-N; last name, F-E-R-G-U-S-O-N.

11         **THE CLERK:**  Thank you.

12                      **DIRECT EXAMINATION**

13   **BY MR. ROMANO:**

14   Q.  Good afternoon, Detective.

15       Which law enforcement agency are you employed with?

16   A.  I am with Baltimore City Police Department.

17   Q.  And how long have you been with the BPD?

18   A.  Seventeen years.

19   Q.  All right.  What's your present assignment?

20   A.  Currently, I'm assigned to our GVED Unit in the City

21   State's Attorney's Office.

22   Q.  What are your duties there?

23   A.  It's to help the prosecutors investigate cases with gun

24   violence.

25   Q.  Okay.  How about back in 2016?  Were you assigned there, or

1    did you have a different assignment?

2    A.  2016, I was in the undercover squad.

3    Q.  Okay.  And what were your duties as part of the undercover

4    squad?

5    A.  The administrative side of the operations -- gather

6    evidence, write the warrants, execute search warrants.

7    Q.  Okay.  Were you also part of what's known as the cover

8    team?

9    A.  Yes, sir.

10   Q.  What's the cover team?

11   A.  The cover team goes out when the undercover goes to

12   initiate a buy, and the cover team stands by in close proximity

13   to safeguard the UCs.

14   Q.  Okay.  So, as the name implies, you provide a cover for the

15   undercovers; is that right?

16   A.  Yes, sir.

17   Q.  In part?  Okay.

18       You also said you had administrative functions as part of

19   the undercover squad; is that correct?

20   A.  Yes, sir.

21   Q.  Okay.  November 2nd, 2016, you're on duty and working that

22   date?

23   A.  Yes, sir.

24   Q.  All right.  And did there come a time on that date when you

25   assisted as part of the cover team in connection with a

 1    controlled buy in the 1300 block of Harlem Avenue here in

 2    Baltimore City?

 3    A.  Yes, sir.

 4    Q.  All right.  And, as part of that participation, did you

 5    take custody of certain drugs that Detective Booth had

 6    purchased?

 7    A.  Yes, sir.  It's part of the standard operation.

 8            **MR. ROMANO:**  All right.  UC4, counsel.

 9    **BY MR. ROMANO:**

10    Q.  Detective Ferguson, I'm going to show you what's previously

11    just been marked for identification as UC4 and ask if you'd

12    take a look at that and if you recognize it?

13        (Exhibit tendered to the Witness.)

14            **THE WITNESS:**  Yes, sir.

15    **BY MR. ROMANO:**

16    Q.  And what do you recognize it to be, Detective Ferguson?

17    A.  This is a package submission of suspected narcotics with my

18    name as the submitting officer.

19    Q.  Okay.  And, when you say "as the submitting officer," who

20    do you submit items such as -- incidentally, let me -- for the

21    record, there is a total of 1, 2, 3, 4, 5 --

22    A.  Six.

23    Q.  -- 6; is that right?

24    A.  Yes, sir.

25    Q.  Okay.  So who do you submit this to when you say you're the

1    submitting officer?

2    A.  So that gets submitted to the Evidence Control Unit, which

3    then processes it -- processes the drugs to determine if

4    they're real, fake, the quantity.

5    Q.  Okay.  So it goes to the Baltimore forensic lab for

6    chemical testing; is that correct?

7    A.  Yes, sir.

8    Q.  Okay.  That's not part of your duties, though, is it?

9    A.  No, sir.

10   Q.  Okay.  I'm going to show you now what's simply been marked

11   as Government's Exhibit 5.  Well, UC5, I guess I should say, to

12   be more specific.  And back it out here a little bit.

13       There is a number that appears here; does there not, sir?

14   A.  Yes, sir.

15   Q.  Okay.  And does that correspond to when you submit the

16   drugs to the Evidence Control Unit for --

17   A.  That's correct.  Each --

18   Q.  -- ultimately for testing?

19   A.  Each is assigned a property number.

20   Q.  Okay.  And you recognize that to be the property number

21   associated with the drugs that you got from Detective Booth on

22   November 2nd of 2016, sir?

23   A.  Yes, sir.  It has --

24   Q.  All right.  Thank --

25   A.  -- my name on it.

```
 1      Q.  Thank you, sir.

 2              MR. ROMANO:  Thank you, Detective.  That's all I had.

 3              THE WITNESS:  Okay.

 4              THE COURT:  All right.  Thank you.

 5              Any cross-examination?

 6              MR. BARDOS:  Could I just take a --

 7              MR. ROMANO:  Hang on there, Detective.

 8              THE COURT:  Hold on.  Hold on.

 9              MR. ROMANO:  You're not quite done yet.

10              MR. BARDOS:  I have no questions, Your Honor.  Thank

11      you.

12              THE COURT:  Okay.  No questions.  Thank you.  Now you

13      can go.

14              THE WITNESS:  Thank you.

15              THE COURT:  All right.

16         (Witness excused.)

17              THE COURT:  If I could see Ms. Moyé for just a

18      second.

19         (Whereupon, a conference was held at the bench off the

20      record with the Clerk.)

21              THE COURT:  Okay.  We're going to take a short

22      afternoon recess, and then I'm assuming there will be some more

23      witnesses?

24              MR. GARDNER:  Yes, Your Honor.

25              THE COURT:  All right.
```

```
 1              THE CLERK:   This Honorable Court now stands in
 2      recess.
 3           (Jury excused.)
 4           (Recess taken, 3:27 p.m. - 3:55 p.m.)
 5              THE CLERK:   This Honorable Court now resumes in
 6      session.
 7              THE COURT:   Okay.  Mr. Gardner?
 8              MR. GARDNER:   Your Honor, before we bring the jury
 9      in, I wanted to approach to discuss an issue, although you
10      might be discussing it --
11              THE COURT:   Yes.  I have an issue to discuss as well,
12      so sure.  Let's bring counsel up to the bench.
13              MR. GARDNER:   Okay.
14           (Whereupon, the following conference was held at the
15      bench.)
16              THE COURT:   Okay.
17              MR. GARDNER:   Your Honor, I was -- I just wanted to
18      inform the Court that I was told by the Marshals -- and the
19      Marshals might have told you already -- that a member of the
20      gallery snuck in a box cutter.
21              THE COURT:   Yes.
22              MR. GARDNER:   They brought it in.  They had it in
23      their belt, and then was transferring it to some -- to their
24      pants when the Marshals noticed it.  They seized it, and
25      they've taken the person out of the courtroom, but I just
```

1    wanted to make the Court aware.

2           **THE COURT:**  Thank you.  The Marshal did make me aware

3    of that as well.  I believe I saw the individual being called

4    down and removed.  So I'm sure everybody is interested to know

5    that.

6           I have to report to you that Juror Number 1 told

7    Ms. Moyé that, when she was -- let's see.  At some point --

8    Ms. Moyé will correct me if I'm wrong.  I think this was

9    sometime over the lunch break that this has happened, but Juror

10   Number 1 told Ms. Moyé just as they were coming in this

11   afternoon to listen to testimony that someone from the gallery

12   had been walking behind her, had been talking on their phone.

13   She heard a couple of words, enough to know that there was some

14   kind of conversation about the case, and then she kind of

15   stopped and let this person walk on so that she wouldn't hear

16   anything else.

17          I asked Ms. Moyé, first of all, to make sure the

18   juror did not discuss this with any other juror, and also did

19   she remember anything specific?  She said she recalled the

20   words Neptune and talk.

21          Is that right, Ms. Moyé?

22          **THE CLERK:**  And call.

23          **THE COURT:**  And call.  Neptune and call.  I don't see

24   anything about that that is significant.  It sounds as though

25   the juror did exactly what she was supposed to do, but I'm just

1    reporting it, which is why I -- you know, it is not a perfect

2    system, but why we sort of ask the gallery to stick around when

3    the jury goes out, but okay.

4           At the end of the day, I mean, I think we can still

5    go through whatever, approximately 5 o'clock, we have witnesses

6    for, but I do want to get counsel up in chambers to discuss the

7    Government's issue about spectators during part of the case.

8           **MR. GARDNER:**  Yes, Your Honor.

9           **MR. ROMANO:**  Thank you, Your Honor.

10          **THE COURT:**  Okay.

11          **MR. PROCTOR:**  Your Honor -- Mr. Gardner?

12          Judge, maybe you could speak to the Marshals about

13   this.  I don't really care today, but I think I will if

14   Mr. Prudente is ever in the room from *The Baltimore Sun*.  He

15   has been here most days, but I haven't seen him today.

16          The way I believe it should work when the Court takes

17   a break is the jurors leave first, then audience, then

18   defendants.  The way it worked -- and, when we come back, it

19   should be defendants, audience, jurors.  The reason for that is

20   so that no one sees Mr. Harrison and Mr. Tillman walking in,

21   and I do not want to see in *The Sun* that two defendants were

22   restrained.  How it worked at the last break was jurors,

23   defendants, with the audience still sitting here.

24          Again, I don't really care if the audience see, who

25   is here today, Mr. Harrison walking in and out on three-point

1    restraints, but, if there were members of the media here, I

2    really would.  So maybe we could just clear the audience right

3    after the jury leaves at every break, and then the Defendants

4    go in and out.

5            THE COURT:  Okay.  All right.  In fact, I sort of

6    thought that, at least on reentry, that that was how it

7    happened, that generally the public was not being allowed in

8    until all the Defendants were in and seated.

9            MR. PROCTOR:  They were here for the entire last

10   break.  The audience was free to stay through the whole break.

11           THE COURT:  Through this mid-afternoon --

12           MR. PROCTOR:  Yes.

13           THE COURT:  -- break?  Got it.  Okay.  Well, you all

14   can help me remember that, and, subject to my -- the Marshals

15   disagree with that for any reason, but that would make sense.

16           MR. PROCTOR:  Thank you.

17           THE COURT:  It makes it difficult to have a break,

18   but there we are.

19           MR. PROCTOR:  And, Judge, I told the Government this

20   at the break.  One of the jurors, the older white gentleman

21   with the cane, keeps saying, "Hi," to me, talking to me, and

22   nothing about the case, like, "Is it going to rain this

23   afternoon," type thing.  So, at some point, when you get a

24   chance, if you could just remind them, you know, you're not to

25   talk to counsel.  They've been told not to talk to you, say

```
 1       good morning, keep on walking.  There is no rush.  I just don't

 2       want anyone to say, "I saw Proctor talking to a juror," so --

 3               THE COURT:  Yes.

 4               MR. PROCTOR:  -- I just want to make the Court aware

 5       of that.

 6               THE COURT:  Okay.  Maybe I'll just make it a general

 7       that everybody is trying to be friendly, but the lawyers are

 8       not supposed to talk to you.  Please don't talk to them, and,

 9       if you believe you hear anyone else discussing the case, please

10       don't listen.  Remove yourself from the conversation, something

11       like that, which, as I say, is exactly what this juror did.

12               MR. PROCTOR:  That would be great.  Thanks.

13               THE COURT:  Okay.  Ms. Moyé?

14           (Whereupon, the bench conference was concluded.)

15           (Whereupon, a conference was held at the bench off the

16       record with the Clerk.)

17               THE COURT:  All right.  Are we ready for the jury?

18       All right.

19           (Jury enters.)

20               THE COURT:  All right.  Thank you.

21               Does the Government have another witness?

22               MR. HANLEY:  We do.  Thank you, Your Honor.  The

23       Government calls Detective Thomas.

24               THE COURT:  Okay.

25               THE CLERK:  Please raise your right hand.
```

1          **DETECTIVE CHRIS THOMAS, GOVERNMENT'S WITNESS, SWORN**

2                    **THE CLERK:**  Please be seated.

3                    Please speak and spell your name for the record,

4          please.

5                    **THE WITNESS:**  Detective Chris Thomas, C-H-R-I-S,

6          T-H-O-M-A-S.

7                    **THE CLERK:**  Can you get a little closer to the

8          microphone, please.  Thank you.

9                              **DIRECT EXAMINATION**

10         **BY MR. HANLEY:**

11         Q.  Good afternoon, sir.

12             Detective Thomas, who do you work for?

13         A.  Baltimore City Police Department.

14         Q.  How long have you worked for the Baltimore City Police?

15         A.  Eight and a half years now.

16         Q.  And we introduced you as a detective.  Prior to detective,

17         what rank did you hold?

18         A.  Police officer.

19         Q.  And what were your primary duties and responsibilities as a

20         police officer?

21         A.  Daily patrol functions, answering calls for service,

22         anything else that really needed to be done at the patrol

23         level.

24                    **THE COURT:**  If you can just get closer to the mic,

25         sir, and just kind of speak right up.  Thank you.

1          **MR. HANLEY:**  You can move the microphone a little

2     bit, too, if that helps.

3     **BY MR. HANLEY:**

4     Q.  How long have you been a detective now?

5     A.  Since February 2013.

6     Q.  And where are you currently assigned?

7     A.  Citywide Robbery.

8     Q.  I want to direct your attention back to February 21st,

9     2012.  Where were you assigned at that time?

10    A.  Western District Patrol.

11    Q.  And, specifically on that date, I want to direct your

12    attention then.

13        What were you working on that day?  What kind of specific

14    case?

15    A.  I was working just in a regular uniform capacity that day.

16    Q.  Okay.  So you wear suits today; is that safe to say?

17    A.  Yes.

18    Q.  Okay.  Back then, you were wearing the traditional police

19    uniform?

20    A.  Correct.

21    Q.  Okay.  And were you called in to any specific kind of

22    investigation on the 21st?

23    A.  On the 22nd.

24    Q.  22nd, yes.

25    A.  Yeah.  I was doing a drug investigation in the area of

1   Calhoun and Harlem.

2   Q.  Okay.  And who were you working with?

3   A.  Sergeant Landsman, another guy named John Sosa.

4   Q.  All right.  What was your specific role on that day?

5   A.  I was making covert observations of drug transactions.

6   Q.  And what area -- you mentioned the intersection.  What area

7   of town is that?

8   A.  That's the Western District.  It's Sector 1 in the Western.

9   Q.  Is there a name for that neighborhood?

10  A.  I think it's right on the border of Sandtown, Winchester.

11  Q.  Okay.  Describe your specific role that day in this

12  investigation.

13  A.  That day, I was in a vacant dwelling, just making

14  observations of suspected drug transactions.

15  Q.  Okay.  Are there a lot of vacant dwellings in that

16  neighborhood?

17  A.  Yes.  Yeah, there is.

18  Q.  Sir, on your screen, you should see Government's

19  Exhibit A14.  Do you see that?

20  A.  Yes.

21  Q.  Okay.  And this is -- it's like a Telustrator.  If you

22  don't mind, if you touch the screen, it'll show -- you can draw

23  where you were positioned that day.

24  A.  I was in a vacant house right here along Calhoun Street

25  (indicating).

Direct Examination of Detective Chris Thomas

1    Q.  Okay.  And where in the vacant house were you?

2    A.  I was in the rear --

3    Q.  Okay.

4    A.  -- making observations of this Harlem Park area.

5    Q.  Okay.  And do you remember approximately what time of day

6    you arrived at that vacant house?

7    A.  Around 3:15 p.m.

8    Q.  And are you in uniform at that time?

9    A.  Yes.

10   Q.  Okay.  So what were you looking for when you arrived at

11   that vacant house?  Did you have a specific target in mind?

12   A.  Yeah.  We were watching Terrell Sivells and Taurus Tillman.

13   Q.  Okay.  And did you see them that day?

14   A.  Yes, I did.

15   Q.  So tell us about the first time you saw -- first time you

16   saw Mr. Sivells.

17   A.  I was in the rear of the vacant home, just watching the

18   Harlem Park area, and I seen Mr. Sivells come in off Harlem

19   Avenue, run through the backyard area, and then go into a

20   vacant -- go up a fire escape, and he went to a vacant house.

21   The house actually has a Calhoun Street address.

22   Q.  Okay.  And can you show the jury where Calhoun is?

23   A.  Calhoun is this street right here (indicating).

24   Q.  Okay.  So the vacant house has a Calhoun address --

25   A.  Yes.

Direct Examination of Detective Chris Thomas                    T-V-67

1    Q.  -- and which is the direction that you saw Mr. Sivells

2    coming through?

3    A.  I seen Mr. Sivells come in off of Harlem, come down this

4    alley, which actually, I see here, has a street name of

5    Woodyear, and he run through this backyards, and up a fire

6    escape, and into 641 Calhoun.

7    Q.  Okay.  And does this -- you could see this from the

8    position you were in, in the vacant home?

9    A.  Correct.

10   Q.  Approximately how far away were you when you first saw

11   Mr. Sivells go into that vacant home?

12   A.  Three houses down.  I don't recall exactly, but it was only

13   a few houses away.

14   Q.  Okay.  And what did he do when he got there?

15   A.  He would go up the fire escape and into a second-story

16   window, and, from there, he was out of my sight.

17   Q.  Okay.

18   A.  He'd have come back out and go back down the fire escape

19   and go back out towards Harlem.

20   Q.  Did you see him come back out and go back down towards

21   Harlem?

22   A.  Yes.

23   Q.  Approximately how long did he spend inside the vacant house

24   before he went back down?

25   A.  Moments.  Thirty seconds, less than a minute.

Direct Examination of Detective Chris Thomas                T-V-68

1    Q.  Okay.  In the course of the afternoon, did you see that

2    happen more than once?

3    A.  Yeah, I seen this -- these actions occur five times that

4    day.

5    Q.  Okay.  Did you see him meet with anyone on the street?

6    A.  Yes.

7    Q.  Who did you see him meet with?

8    A.  I don't have the gentleman's name, but I have a description

9    of him in my report, but he'd meet up with a guy right there at

10   the -- right there at Woodyear Street at the alley that leads

11   to Harlem Avenue.

12   Q.  Okay.  What did they do when they met up?

13   A.  What appeared to be exchange CDS -- suspected drugs.

14            MR. BALTER:  Objection.

15            THE COURT:  Overruled.

16   BY MR. HANLEY:

17   Q.  Go ahead.

18   A.  They appeared to make a hand-to-hand drug transaction.

19   Q.  Okay.  And what did he do after that -- Mr. Sivells?

20   A.  He would walk back out towards Harlem.

21   Q.  Okay.  After you saw this a number of times, that path of

22   travel to the house and back, did you notify other members of

23   your team?

24   A.  Yeah.  I notified Sergeant Landsman and Officer Sosa.

25   Q.  Okay.  And what happened then?

1    A.   Gave them his last direction of travel, and they went and

2    they located him and apprehended him.

3              **MR. BALTER:**   Objection to what they did, personal

4    knowledge.

5              **THE COURT:**   Sustained.   If you want to establish

6    foundation.

7              **MR. HANLEY:**   I will.

8    **BY MR. HANLEY:**

9    Q.   So, sir, you notified members of your team, correct?

10   A.   Correct.

11   Q.   Okay.   And then what did your team do?

12   A.   My team, they went and located him and put him --

13             **THE COURT:**   How does he know what his team --

14   **BY MR. HANLEY:**

15   Q.   Okay.   Could you see your team at this point --

16   A.   I could not see the team.

17   Q.   -- or are you still in the back of the house?

18   A.   I could not see the team at this point.

19   Q.   Okay.   Does somebody make an arrest at some point?

20   A.   Yes.

21   Q.   And who does that?

22             **MR. BALTER:**   Again, personal knowledge.

23             **MR. HANLEY:**   He has personal knowledge of who made

24   the arrest.

25             **MR. BALTER:**   How does he see that?

Direct Examination of Detective Chris Thomas

1          **THE COURT:**  How?  How does he know that other than

2    being told?

3          **MR. BALTER:**  Right.

4          **THE COURT:**  Can you --

5          **MR. HANLEY:**  Okay.

6    **BY MR. HANLEY:**

7    Q.  Are you present at this -- in this vacant home?

8    A.  I am in the vacant home, yes.

9    Q.  Do you leave your position in the vacant home at some

10   point?

11   A.  I do leave my position eventually.

12   Q.  And where did you go after that?

13   A.  I meet up with Sergeant Landsman.  Then I go into the rear

14   house of 641 North Calhoun.

15   Q.  And what did you see at the rear house of 641 North

16   Calhoun?

17   A.  It's a vacant -- it's a complete mess inside, and we see a

18   bunch of sandwich bags that's used to store drugs in.  And

19   then, from there, we look around, and I observe drugs sitting

20   on top of a wall, because the ceiling is collapsed and fallen

21   down.  And I see a plastic bag sitting on top of the wall, and

22   I grab it, pull it down, and there is a --

23          **THE REPORTER:**  A little bit slower.

24   **BY MR. HANLEY:**

25   Q.  She's typing this, so if you go a little bit slower.  So

 1    let's walk back a little bit.

 2    A.  Okay.

 3    Q.  You went into that vacant home?

 4    A.  Correct.

 5    Q.  Why did you go in that vacant home?

 6    A.  To look for drugs.

 7    Q.  Okay.  And why were you looking in that vacant home for

 8    drugs?

 9    A.  Because that's where I seen Terrell Sivells go.

10    Q.  Okay.  And what's the first thing you noticed when you

11    walked into that vacant home?

12    A.  Trash everywhere --

13    Q.  Okay.

14    A.  -- and plastic bags that are used to hold drugs.

15    Q.  And, when you say they're used to hold drugs, how do you

16    know that?

17    A.  From working in drug enforcement and making drug arrests.

18    Q.  Okay.  And what was the condition --

19            **MR. BALTER:**  Objection.  Move to strike.  Wasn't

20    based on --

21            **THE COURT:**  Based on his experience, which he just

22    related?

23            **MR. BALTER:**  Withdraw.

24            **THE COURT:**  Okay.

25    **BY MR. HANLEY:**

Direct Examination of Detective Chris Thomas

1   Q.   After the sandwich bags, what did you notice?

2   A.   I noticed the ceiling was falling down, and, on top of the

3   wall, where the closet actually meets the exterior wall, there

4   was a plastic bag sitting on top, and I reached up, and I

5   grabbed that plastic bag, because all the rest were on the

6   floor.   Then, when I grabbed that plastic bag, it contained

7   four blacktop vials inside of it with suspected cocaine inside.

8   Q.   Okay.   So explain how the -- you said the ceiling is

9   falling down?

10   A.   Correct.

11   Q.   So is there a -- which direction is this?   Is this in the

12   first room you see, or were you looking around the house?

13   A.   The fire escape goes up the rear into the rear side window,

14   and then, from there, the first room I go into, that was the

15   room that has all the plastic bags.   That was the room that has

16   the ceiling falling down.   That was the same room that I

17   located four blacktop vials in.

18   Q.   Okay.   And you suspected that there were drugs inside the

19   vials?

20   A.   Correct.

21   Q.   Okay.   What else did you find?

22   A.   In the front room of the house, there was more packaging

23   material that's used for packaging narcotics for street-level

24   sales.

25   Q.   And, at this point, had you participated in surveillance of

 1    drug activity before?

 2    A.  Yes.

 3    Q.  In that neighborhood and other neighborhoods?

 4    A.  Yes.

 5    Q.  Okay.  And, when you say that you saw things that might be

 6    used for packaging, what kind of items were those?

 7    A.  There were more empty vials and plastic bags, little tiny

 8    Ziploc bags.

 9    Q.  Did you have any interaction with Terrell Sivells?

10    A.  Yes.

11    Q.  When was that?

12    A.  That was after the arrest was made and he was transported

13    back to the Western District.

14    Q.  Okay.  And did you speak with him?

15    A.  I'm sure --

16              MR. BALTER:  Objection.

17              THE WITNESS:  -- we had brief conversations, yes.

18    BY MR. HANLEY:

19    Q.  Okay.  Did you recover anything from Mr. Sivells?

20    A.  I recovered money from him.

21    Q.  Did you personally recover the money from him?

22    A.  That, I don't recall.

23    Q.  Okay.  Were you present when money was recovered?

24    A.  Yes.

25    Q.  Do you remember how much money was recovered?

Direct Examination of Detective Chris Thomas                    T-V-74

1    A.  $981, I believe.

2    Q.  All right.  And did you see Taurus Tillman there?

3    A.  Yes.

4    Q.  What was Taurus Tillman doing while you were conducting

5    surveillance?

6    A.  He was walking up and down Harlem.  He would come into the

7    rear alley, look around, then go back out to the street.

8    Q.  Okay.  It's the same rear alley that you're looking at

9    through the rear of that vacant home?

10   A.  Correct.  Woodyear, right there.

11   Q.  Okay.  And did you personally recover anything from

12   Taurus Tillman?

13   A.  I don't recall if I recovered anything off of him myself.

14   Q.  Were you there when anything was recovered?

15   A.  Yes.

16   Q.  And what was recovered from Taurus Tillman?

17   A.  U.S. money -- U.S. currency, more money.

18   Q.  Approximately how much?

19   A.  $612.

20          **MR. HANLEY:**  May I approach, Your Honor?

21          **THE COURT:**  Yes.

22       (Exhibits tendered to the Witness.)

23   **BY MR. HANLEY:**

24   Q.  Sir, I'm handing you what's been marked as Government's

25   Exhibits D3, D4, and D5.

```
 1              Do you recognize those?

 2    A.  Yes.

 3    Q.  And how do you recognize those?

 4    A.  That's the way we set out money at Evidence and photograph

 5    it before it gets submitted.

 6    Q.  And is this the same money you recovered on that day, or

 7    that was recovered in your presence on that day?

 8    A.  Yes.

 9    Q.  And it's organized in denominations?

10    A.  Correct.

11         (Exhibits tendered to the Clerk.)

12         (Document tendered to Mr. Hanley.)

13    BY MR. HANLEY:

14    Q.  That's Government's Exhibit D3, D4, and D5.

15         And, sir, after -- did you recover -- let's go back to the

16    bag that you found.  You said it was kind of on top of a wall,

17    sort of?

18    A.  Correct.

19    Q.  And what was in the -- what did you suspect to be in the

20    bag?

21              MR. BARDOS:  Objection.

22              THE COURT:  Sustained.  What was in the bag?

23    BY MR. HANLEY:

24    Q.  What did the bag appear to be?  What -- sorry.

25         Describe what was in the bag?
```

1    A.  The bag had four little glass vials in it, black caps

2    inside of them -- on them, and inside the vials were white

3    rock-like substance.

4    Q.  Okay.  And did you or someone else submit those items for

5    testing to the laboratory?

6    A.  Yes.  Officer Sosa submitted everything to Evidence.

7    Q.  Okay.  And do you know if they were tested?

8    A.  Yes, they were.

9    Q.  And do you know if the narcotics from 2012 exist today?

10   A.  I do not know that.

11   Q.  Okay.  But you do know they were tested?

12   A.  Yes, they were.

13            **MR. BALTER:**  Objection.

14            **MR. HANLEY:**  One moment, Your Honor.

15            **THE COURT:**  I'm going to sustain the objection unless

16   you have some --

17            **MR. HANLEY:**  It's okay.  He answered it already.

18            **THE COURT:**  All right.  Objection sustained.

19   **BY MR. HANLEY:**

20   Q.  Sir, I have -- Government's Exhibit A14 is back up on the

21   screen there.

22       To be clear, the items you recovered were in a different

23   house than the one that you were positioned in doing

24   surveillance, correct?

25   A.  Yes.

1    Q.  Okay.  Can you put on the map where you were and where the

2    drugs were recovered?

3    A.  The drugs were recovered from 641, which I don't know

4    exactly right now which one 641 is.

5    Q.  If you can get as close as you can remember it.

6    A.  It's not writing on the screen, sir.

7            **THE CLERK:**  You touch it with your fingernail.

8            **MR. HANLEY:**  Try now.

9            **THE WITNESS:**  It's still not working.

10           There we go.  It's up there.  All right.

11   (Indicating).

12   **BY MR. HANLEY:**

13   Q.  Okay.  To be clear, that first spot you're drawing, which

14   one is this?

15   A.  That would be where I recovered everything.

16   Q.  Okay.  And then now draw --

17   A.  I was --

18   Q.  -- where you were positioned.

19   A.  -- a couple houses south in this area (indicating).

20   Q.  Okay.  So the addresses are going to have different

21   streets; is that correct?

22   A.  No, no.  They're -- both houses where the drugs were

23   recovered and the house I was making observation in have a

24   North Calhoun Street address --

25   Q.  North Calhoun?

Cross-Examination of Detective Chris Thomas (Mr. Balter)                    T-V-78

```
1    A.  -- in the 600 block.

2    Q.  And approximately two or three houses away?

3    A.  Correct.

4    Q.  Okay.

5              MR. HANLEY:  Nothing further, Your Honor.

6              THE COURT:  All right.  Any questions, Mr. Balter?

7              MR. BALTER:  Yes, Your Honor.

8              Your Honor, let me just note -- I'm not going to

9    argue it now, but I'm going to move to strike the testimony

10   with respect to the knowledge of the fact the drugs had been

11   tested.

12             THE COURT:  I sustained your objection, so yes.  Any

13   reference to whether the drugs were or were not tested is

14   stricken.  That's not in evidence right now.

15                        CROSS-EXAMINATION

16   BY MR. BALTER:

17   Q.  Okay.  Detective --

18       (Counsel conferring.)

19   BY MR. BALTER:

20   Q.  Detective, again, referring to your location where you

21   were, you described it as being in an abandoned rowhouse on the

22   600 block of Calhoun; is that correct?

23   A.  Yes.

24   Q.  Okay.  Now, did you bring any close-up pictures of the way

25   in which those locations appear with you today?
```

1    A.  No, sir.

2    Q.  Any pictures of the front of the house or the back of the

3    house?

4    A.  No.

5    Q.  Okay.  But you're familiar with this area; is that correct?

6    A.  Yes.

7    Q.  All right.  And I believe you said that the location that

8    you saw Mr. Sivells enter was 631 North Calhoun; is that

9    correct?

10   A.  641.

11   Q.  Oh, it was 641?  Did you say 631 before?

12   A.  I don't recall.

13   Q.  Okay.  And you don't know how many houses south of the

14   intersection of Harlem it is; is that correct?

15   A.  No, because the houses face Harlem.  Then there is an

16   alley, and then there is an apartment building, and there is

17   another alley, and it was a couple houses from there.

18           **MR. BALTER:**  Madam Clerk, if I could just switch it

19   so that I could use the overhead myself.

20           And if you could clear your monitor.  Thank you very,

21   very much.

22           **THE CLERK:**  You're welcome.

23   **BY MR. BALTER:**

24   Q.  And so, again, let me go back.  You arrived near the

25   intersection of Harlem and Calhoun on the 22nd of February for

```
 1        the purpose of doing surveillance, correct?

 2        A.  Yes.

 3        Q.  And was the location that you went to conduct surveillance

 4        a location that you had used before?

 5        A.  I have used that same location.  I can't remember if it was

 6        before this incident or after this incident, but I have used

 7        that same location multiple times.

 8        Q.  Okay.  And that location existed on the east side of

 9        Calhoun directly south of Harlem, three or four houses from the

10        corner; is that correct?

11        A.  Not quite.  The houses on Harlem face Harlem.  They have a

12        Harlem Street -- Harlem Avenue address.  Then, right here in

13        front of that L and H of Calhoun, that's an apartment building.

14        Down some, sir.  Down, down, down, right where your pink arrow

15        is at.

16        Q.  So, right there, that is the block, and it's one of those

17        houses that you set up surveillance, correct?

18        A.  A couple of houses down from where your pen is at.

19        Q.  Okay.  So it's a bit --

20        A.  In that general --

21        Q.  -- further down?

22        A.  -- area, yes.

23        Q.  So would it be four houses down from the corner of Harlem,

24        five houses down, or you're not sure?

25        A.  I don't have a house count, sir.
```

1    Q.  Okay.  And your testimony was, I believe, that you saw

2    Mr. Sivells enter an alley off of Harlem in the middle of the

3    block over here (indicating) from your vantage point from the

4    back of that -- the abandoned house on Calhoun, correct?

5    A.  Again, your pen is too high.  I was closer --

6    Q.  Too high.  Lower than that?

7    A.  I was closer to where this pink arrow is.

8    Q.  Okay.  So it's actually closer to the corner of Edmondson?

9    A.  Well, your sheet of paper moved a little bit, sir.  The

10   pink arrow was up a little bit higher in this a moment ago.

11   Q.  All right.

12   A.  Go down a couple of houses.  I was at -- go up, up, up.

13   Right -- right about that area.  That's where I was.

14   Q.  Okay.  All right.  And, from that vantage point, were you

15   able to see up onto Harlem Avenue?

16   A.  No.  I could see the Woodyear right here, which is that

17   alley I was speaking of, and I could see him go in and out back

18   to Harlem Avenue.

19   Q.  Okay.  From the location you were at -- first of all, let

20   me ask you:  How did you get entry into the house that you were

21   using for your surveillance?

22   A.  It was a vacant house.  I just walked in.

23   Q.  Okay.  You walked in from the back?

24   A.  Yes.

25   Q.  Okay.  And so anybody could have walked into that house

1    from the back, correct?

2    A.  Correct.

3    Q.  Did you see any evidence of drug dealing in that house?

4    A.  Not that I remember.

5    Q.  Okay.  But you can't exclude the possibility?  You just

6    weren't looking for drugs at the location you were looking for

7    your surveillance, correct?

8    A.  Correct.

9    Q.  Okay.  And, when you were looking out at that house, you

10   had a number of different vantage points, I take it; is that

11   correct?

12   A.  Only from the rear.

13   Q.  Okay.  You were looking from the rear, but you could look

14   directly -- it would be directly east towards Carey Street, or

15   you could look more towards the north, towards Harlem Avenue;

16   is that correct?

17   A.  That particular house I was in has like a bay window in the

18   rear, which bumps out -- actually, very similar shape to this

19   desk right here, so I had a window that faced right, a window

20   that faced straight, and a window that faced left.

21   Q.  Okay.  Now, when you were in there conducting your

22   surveillance, you were taking pictures; is that correct?

23   A.  Yes.

24   Q.  Okay.  Would you have those pictures with you?

25   A.  Those pictures were on a departmental phone that was

1    returned back to the department.

2    Q.  When you say it was returned back to the department, do you

3    know where it is as we speak now?

4    A.  No.  They upgraded phone systems.

5    Q.  Did anybody ever ask you to go and retrieve the important

6    surveillance pictures that you took on those days?

7    A.  No.

8    Q.  Did those surveillance pictures -- as you recall, would

9    they have depicted Mr. Sivells?

10   A.  Yes.

11   Q.  Okay.  But you don't have any of those pictures?  Now we're

12   just going on your word; is that correct?

13   A.  Correct.

14   Q.  All right.  And so, as you're looking out of the back area

15   there, before you saw Mr. Sivells, had you seen any

16   transactions being conducted?

17   A.  Not this day, no.

18   Q.  Okay.  So, as far as you know, all you're seeing is

19   Mr. Sivells entering into the alley off of Harlem where you

20   have got the arrows pointed to right here (indicating); is that

21   correct?

22   A.  Correct.

23   Q.  All right.  So he's coming in, and, as he's coming into

24   that alley, the first time you're seeing him, he's basically

25   coming in a southerly direction; is that right?

1    A.  Yes.

2    Q.  All right.  And, as he's coming in that southerly

3    direction, you've seen -- you had not seen him engage in any

4    drug activity; is that right?

5    A.  Correct.

6    Q.  But what you're seeing is him come in and start in the

7    direction of another abandoned residence on the -- that's

8    facing the rear of which, or which is located on the Calhoun

9    Street side, correct?

10   A.  Correct.

11   Q.  And the location that he's going into is how many houses

12   north of where you're situated?

13   A.  A few houses.

14   Q.  When you say "a few," do you mean three houses, four

15   houses, two houses --

16   A.  Two to three.  I don't -- I didn't get a house count that

17   day.

18   Q.  You did not get --

19   A.  I don't have a house count now.

20   Q.  Let me ask you this:  Did you have pictures of him actually

21   going into that house?

22   A.  I had photos of him going up the fire escape and entering

23   in the second-floor window, yes.

24   Q.  Okay.  And so, if you had still had those pictures, that

25   probably would have shown how many houses away from you he was;

1    is that correct?

2    A.  That's a good assumption.

3    Q.  You took pictures as he came into the alley and headed

4    towards that other abandoned house, correct?

5    A.  Correct.

6    Q.  You said you took pictures as he went up the fire escape

7    into that house; is that correct?

8    A.  Correct.

9    Q.  All right.  So all of that would have been visible in terms

10   of what you had that day; is that right?

11   A.  Yes.

12   Q.  Okay.  But, as we stand here now, you don't recall at least

13   how many houses away he was; am I correct?

14   A.  Correct.

15   Q.  All right.  Now, you did not see him do anything as he came

16   into that house which suggested that he was carrying anything;

17   is that correct?

18   A.  Correct.

19   Q.  All right.  So he came in without you seeing him carrying

20   anything and went into that house for a few moments; is that

21   right?

22   A.  Correct.

23   Q.  Okay.  And you said he was in there for a minute, two

24   minutes?  How long was he in there?

25   A.  Thirty seconds to a minute.  Very brief point in time.

Cross-Examination of Detective Chris Thomas (Mr. Balter)       T-V-86

1    Q.  Okay.  And, after you had finished your surveillance from

2    that location where you were situated, you were able to get

3    access into the house where you observed him enter; is that

4    correct?

5    A.  Correct.

6    Q.  And, when he -- when you entered that location, 641, you

7    were able to walk right in; is that correct?

8    A.  I went up the fire escape and into the same window I seen

9    him go into.

10   Q.  So, from what you could tell, any person in that

11   neighborhood could have entered that location at any time; is

12   that correct?

13   A.  That's possible, but nobody else entered that house during

14   my observations except for Mr. Sivells.

15   Q.  Well, on that -- how long were you observing him at that

16   point?

17   A.  Hour and a half.

18   Q.  Okay.  And so, in the hours -- what time did you arrive to

19   begin?

20   A.  3:15 p.m.

21   Q.  About what time?

22   A.  3:15 p.m.

23   Q.  So, say, between 8:00 in the morning and 3:15 p.m., you

24   would have no idea how many people might have been in and out

25   of that house, correct?

Cross-Examination of Detective Chris Thomas (Mr. Balter)        T-V-87

1    A.  Correct.

2    Q.  And, from 3:15 -- you were there from 3:15 until about

3    4:45?

4    A.  About, yes.

5    Q.  And, after 4:45, you don't know who might have gone in or

6    out of that house; is that correct?

7    A.  Correct.

8    Q.  I take it you did nothing to secure that location after you

9    took whatever it was that you were seizing from the residence

10   out; is that correct?

11   A.  Correct.

12   Q.  Okay.  And you said you saw Mr. Sivells go in and come out

13   on five occasions; is that right?

14   A.  Yes.

15   Q.  All right.  Did you make a note which indicated there was

16   exactly five occasions?

17   A.  In my incident report, I documented the five occasions.

18   Q.  You documented five occasions.  And, after the first time

19   he went in, you saw him come back out; is that right?

20   A.  Correct.

21   Q.  And he exited, and he went northbound in that same alley up

22   to Harlem Street; is that right?

23   A.  Correct.

24   Q.  Okay.  And, when he got to Harlem Street, did he turn to

25   the east, or did he turn to the west?

1    A.  I can't see Harlem Street.  I can just see the alley that

2    leads to Harlem.

3    Q.  You can see the alley that leads to Harlem.

4        When he arrived at the exact intersection of Harlem and the

5    alley, can you see him at that point?

6    A.  No.

7    Q.  Okay.  So he's out of your sight at that point; is that

8    right?

9    A.  Correct.

10   Q.  Before he arrived at Harlem Street, had you seen him in

11   contact with any other individuals?

12   A.  Not at that point in time.  I mean, they're vacant.

13   Q.  At that point, you had not seen him in contact with anyone?

14   A.  Correct.

15   Q.  All right.  So, by the time you saw him exiting the alley,

16   going up to Harlem, you surmised he arrived at the corner of

17   Harlem and the alley; is that correct?

18   A.  Say again?

19   Q.  You understand, or you assumed that, as he was leaving,

20   going northbound in the alley, back towards Harlem, he was

21   going to reach Harlem, correct?

22   A.  Correct.

23   Q.  By the time he got there, you could not see him; is that

24   right?

25   A.  Correct.

Cross-Examination of Detective Chris Thomas (Mr. Balter)          T-V-89

```
1    Q.  And you have no idea whether he went to the right or to the
2    left from the alley; is that right?
3    A.  Correct.
4    Q.  So you, of your own ability to observe, had not seen
5    anything with respect to him conducting a transaction after the
6    first time; is that right?
7    A.  Correct.  I seen one hand-to-hand transaction that the
8    gentleman came into the mouth of the alley --
9    Q.  All right.
10   A.  -- to the rear of the house.
11   Q.  Let me just -- I haven't gotten there with you yet.
12        So, after the first time he came through, you didn't see a
13   transaction.  The second time -- the second time that he --
14   after he had gone in and exited -- exited the residence from
15   the back, he did the same thing; is that right?
16   A.  Correct.
17   Q.  And you didn't see any transactions at that time either,
18   did you?
19   A.  Correct.
20   Q.  Okay.  Third time, the same thing?
21   A.  Correct.
22   Q.  Fourth time?
23   A.  Correct.
24   Q.  Fifth time?
25   A.  Correct.
```

Cross-Examination of Detective Chris Thomas (Mr. Balter)          T-V-90

1    Q.  All right.  So you haven't seen Mr. Sivells engaged --

2    after watching him go in and out of that house on five

3    different occasions, you have not seen him engage in any kind

4    of hand-to-hand activity with any individual; am I correct?

5    A.  Back it up just one moment.  Yes, I seen one hand-to-hand

6    transaction.  The rest happened out of my sight past on Harlem

7    Avenue.  The one particular time, the buyer came all the way

8    down the mouth of the alley and stood at the corner of the

9    building, and I observed that transaction.

10   Q.  Oh, so you did see Mr. Sivells engage in a hand-to-hand?

11   A.  Correct.

12   Q.  All right.  And that was -- you say that was in the alley?

13   A.  At the end of the alley at the corner of the house -- the

14   rear corner of the house.

15   Q.  At the rear corner of the house in this alley (indicating),

16   or --

17   A.  Correct.

18   Q.  -- over here --

19   A.  On Woodyear.

20   Q.  -- in the back of the house that he went in?

21   A.  On Woodyear, that first alley.

22   Q.  The first alley?

23   A.  Right there (indicating).

24   Q.  So how far would he have been from Harlem at that point?

25   A.  The length of the house.

Cross-Examination of Detective Chris Thomas (Mr. Balter)          T-V-91

1   Q.  The length of the house.  And did you take pictures of

2   that?

3   A.  Yes.

4   Q.  Okay.  So that would have been on that same film you took

5   the other surveillance pictures on?

6   A.  Correct.

7   Q.  Now, was it after that fifth occasion that you left your

8   station in the surveillance house?

9   A.  Yes.

10  Q.  Okay.  And, as you left the location, where did you head?

11  A.  To 641 North Calhoun Street.

12  Q.  So you went directly up to the location that you believed

13  was being used as a stash location; is that right?

14  A.  Correct, yes.

15  Q.  All right.  You yourself never went up to make any

16  observations of what was going on on Harlem Street at all?

17  A.  No.

18  Q.  All right.  Now, you testified about making a number of

19  observations of items that you saw inside the 641 location that

20  you thought were connected with drugs; is that right?

21  A.  Yes.

22  Q.  Clear plastic bag, some black-topped vials, some razor

23  blades, residue, things of that sort; is that right?

24  A.  Yes.

25  Q.  And those are all things, from your experience, you

Cross-Examination of Detective Chris Thomas (Mr. Balter)        T-V-92

1    associate with drug trafficking?

2    A.  Correct.

3    Q.  All right.  Now, am I correct in understanding you never

4    actually observed Mr. Sivells touching or in any way holding or

5    showing to you in any way any of the items that you saw in that

6    residence at 641?  Is that correct?

7    A.  Of course, I can't see inside the house from my location.

8    Q.  Exactly.  You couldn't see inside it.

9        So there was a question in your mind as to who may have

10   been in contact with those items of evidence that you seized;

11   isn't that right?

12   A.  I didn't have no question.

13   Q.  Well, you didn't see anybody touch anything in that house,

14   did you?

15   A.  Correct.

16   Q.  You had no idea who had been in that house before 3:15 in

17   the afternoon when you arrived, did you?

18   A.  Correct.

19   Q.  As a detective, aren't you interested in all the

20   possibilities of who may have come in contact with what you

21   perceived to be contraband?

22   A.  I believe Mr. Sivells was in contact with the stuff when he

23   went inside the home.

24   Q.  Well -- but you know that there are other possibilities,

25   aren't there, Detective?

1    A.   Sure.

2    Q.   There are other possibilities, and a good investigator

3    might want to determine whether or not there is a way to

4    determine whether or not somebody else handled that evidence;

5    isn't that correct?

6    A.   Correct.

7    Q.   When you seize evidence, you can designate it for testing

8    for fingerprints; isn't that right?

9    A.   We have --

10   Q.   Isn't that correct?

11   A.   We haven't tested fingerprints off of drug paraphernalia.

12   Q.   You can't test fingerprints off of drug paraphernalia --

13   A.   I said these here were not submitted for fingerprint

14   analysis.

15   Q.   I'm sorry.  What was that?

16   A.   These particular drugs submitted today or on this case was

17   not submitted for fingerprint analysis, no.

18   Q.   It could have been, though, correct?

19   A.   Correct.

20   Q.   And you didn't do that; is that right?

21   A.   Correct.

22   Q.   It could have been submitted for DNA analysis as well,

23   isn't that right?

24   A.   Correct.

25   Q.   And, if it was submitted for fingerprint analysis, that

Cross-Examination of Detective Chris Thomas (Mr. Balter)        T-V-94

1    might have shown positively anybody who would have come in

2    contact with those items; isn't that right?

3    A.  It would have shown who was touching them.

4    Q.  Who was touching them.  That's correct.

5        You might have potentially -- somebody that you suspected

6    might have touched them, correct?

7    A.  Correct.

8    Q.  You might have learned that there were other individuals

9    who touched them; isn't that correct?

10   A.  Correct.

11   Q.  But, because of the fact that you didn't submit them for

12   that type of testing, we'll never know whether or not anybody's

13   fingerprints were on those items; isn't that correct?

14   A.  Yes.

15   Q.  And we'll never know whether or not anybody's DNA was on

16   those items, isn't that correct?

17   A.  Yes.

18   Q.  And we'll never know, because of the fact that you didn't

19   take care to maintain the pictures you took on that day,

20   whether or not Terrell Sivells was actually walking down that

21   alley; isn't that correct?

22            **MR. HANLEY:**  Objection.

23            **THE WITNESS:**  In all fairness, I didn't think I'd

24   needed photos six and a half years later.

25            **MR. BALTER:**  I have nothing further, Your Honor.

1          **THE COURT:**  And Mr. Bardos?

2                      **CROSS-EXAMINATION**

3      **BY MR. BARDOS:**

4      Q.  Good afternoon, Officer.

5      A.  How are you doing?

6      Q.  My name is Rich Bardos.  I represent Mr. Tillman.

7          Do you have a copy of your report with you?

8      A.  Yes.

9      Q.  Can I just take a look at it?

10         (Document tendered to Mr. Bardos.)

11         (Document tendered to the Witness.)

12     **BY MR. BARDOS:**

13     Q.  They're actually two reports; is that right?

14     A.  That's actually just the narrative here.

15     Q.  Okay.  Is the narrative accurate?

16     A.  Yes.

17     Q.  Okay.  So you got to the scene -- and, before, you

18     testified -- let me start over.

19         You started with the Baltimore City Police in 2010; is that

20     right?

21     A.  No.  2009.

22     Q.  2009.  So this was probably your third year of working

23     there --

24     A.  Correct.

25     Q.  -- somewhere in there?

1          And you've written reports before?

2     A.   Yes.

3     Q.   Do it on a regular basis?

4     A.   Yes.

5     Q.   It's important to get all the important facts in your

6     report?

7     A.   Correct.

8     Q.   All right.  Because you don't necessarily remember

9     everything, as you said, six years later?

10    A.   Yes.

11    Q.   All right.  So did you read your report before, in

12    preparation for your testimony this afternoon?

13    A.   Yes.

14    Q.   And that's how you know precisely that, on February 22nd,

15    2012, you arrived at 3:15?

16    A.   Correct.

17    Q.   Because you put it in your report?

18    A.   Yes.

19    Q.   All right.  So, at some point -- and I'll go through the

20    steps, but I just want to cut to the end for a second.

21         At some point, the arrest began, right?

22    A.   Yes.

23    Q.   And the beginning of that was that a marked police car came

24    to the scene, right?

25    A.   That would've been Sergeant Landsman and Officer Sosa.

Cross-Examination of Detective Chris Thomas (Mr. Bardos)          T-V-97

1   Q.  Right.  So there was -- you are no longer covert?

2   A.  I was still covert.

3   Q.  But the police were not?

4   A.  Correct.

5   Q.  All right.  And that happened around 1720 hours, or around

6   20 after 5:00?

7   A.  Yes.

8   Q.  All right.  So you were there observing whatever you

9   observed for a little over two hours, correct?

10  A.  Correct.

11  Q.  Okay.  And I think you told Mr. Balter that, when you were

12  where you were, you could not see Harlem Avenue?

13  A.  Correct.

14  Q.  But, when you first got there, you could see Harlem Avenue?

15  A.  I was on Harlem to get to where I needed to go.

16  Q.  Okay.

17              THE REPORTER:  I'm sorry.  One more time.

18              THE WITNESS:  I was on Harlem Avenue to access my

19  area.

20  BY MR. BARDOS:

21  Q.  All right.  And so, when you first got there, you did

22  not -- when you got to where you were located in the vacant

23  house, you could not see Mr. Tillman, correct?

24  A.  Correct.

25  Q.  And I think you testified on direct, though, that you saw

Cross-Examination of Detective Chris Thomas (Mr. Bardos)                T-V-98

1     him walk up and down Harlem?

2     A.  I seen him come up and down an alley that leads to Harlem.

3     Q.  Okay.  So not on Harlem, but you saw him in the alley?

4     A.  Correct.

5     Q.  He wasn't carrying anything?

6     A.  I can't remember.

7     Q.  And you never saw any hand-to-hand -- what you perceived as

8     hand-to-hand transactions with Mr. Tillman?

9     A.  Correct.

10    Q.  And he was ultimately arrested?

11    A.  Correct.

12    Q.  And he was searched?

13    A.  Correct.

14    Q.  And is it fair to say that there were no drugs found on, or

15    suspected drugs found on Mr. Tillman?

16    A.  Yes.

17    Q.  No packaging materials?

18    A.  Correct.

19    Q.  No black-top vials?

20    A.  Correct.

21    Q.  All right.  I know you said that you saw him walking down

22    the alley, but you never saw him going into the house that you

23    thought was the stash house, did you?

24    A.  I did not.

25    Q.  All he's doing is walking --

1      A.  Correct.

2      Q.  -- correct?

3          And then, when he gets arrested, he has $612 on him?

4      A.  Yes.

5      Q.  Were you the officer that made the decision to arrest

6      Mr. Tillman?

7      A.  Based on observations from the other guys out on the

8      street, yes.

9      Q.  Okay.  Even though he had -- you'd not seen him actually

10     participating in any drug transactions, correct?

11     A.  Not from my location.

12     Q.  Not from your location.  Okay.

13             **MR. BARDOS:**  All right.  That's all I have.  Thank

14     you, Your Honor.

15             **THE COURT:**  Okay.  Mr. Proctor?

16             **MR. PROCTOR:**  Thank you.

17                         **CROSS-EXAMINATION**

18     **BY MR. PROCTOR:**

19     Q.  Good afternoon, sir.

20         February 22nd, 2012, does that sound right?

21     A.  Yes.

22     Q.  And, on that occasion, on that day, you saw two people that

23     you believe were involved in drug transactions; is that

24     correct?

25     A.  Correct.

1    Q.  See that gentleman over there in the black hoodie --

2    A.  Yes.

3    Q.  -- sitting next to Ms. Wicks?

4        He wasn't either of those gentlemen, was he?

5    A.  He was not.

6            **MR. PROCTOR:**  That's all I have.

7            **THE COURT:**  Anyone else?

8        (No response.)

9            **THE COURT:**  Any redirect?

10                      **REDIRECT EXAMINATION**

11   **BY MR. HANLEY:**

12   Q.  Detective Thomas, is it -- I think you testified an hour

13   and a half, and then it might have been closer to two.  In that

14   time, the five times Mr. Sivells went into the house, did you

15   see anyone else enter or leave that vacant house at 641?

16   A.  I did not.

17           **MR. HANLEY:**  Thank you.  Nothing further.

18           **THE COURT:**  Thank you, sir.  You are excused, and let

19   me consult with counsel about the schedule.

20       (Witness excused.)

21       (Whereupon, the following discussion occurred at the

22   bench.)

23           **THE COURT:**  Just who is your next witness?  If I can

24   get something done.

25           **MR. GARDNER:**  Mark James -- Special Agent Mark James.

1    He did the search of 2307 Avalon.  We can start it.

2              **THE COURT:**  Okay.

3              **MR. GARDNER:**  I don't think we'll finish, but we can

4    start it.

5              **THE COURT:**  Okay.  Thanks.

6         (Whereupon, the bench conference was concluded.)

7              **THE COURT:**  If the Government can call another

8    witness, I think we can at least get started on another

9    witness.

10             **MR. GARDNER:**  Yes, Your Honor.  The Government calls

11   FBI Special Agent Mark James.

12             **THE CLERK:**  Please raise your right hand.

13        **MARK JAMES, GOVERNMENT'S WITNESS, SWORN**

14             **THE CLERK:**  Please be seated.

15             **THE WITNESS:**  Thank you.

16             **THE CLERK:**  Please speak and spell your name for the

17   record.

18             **THE WITNESS:**  Mark James, M-A-R-K, J-A-M-E-S.

19             **THE CLERK:**  Thank you.

20             **THE WITNESS:**  You're welcome.

21                         **DIRECT EXAMINATION**

22   **BY MR. GARDNER:**

23   Q.  Good afternoon, Special Agent James.

24   A.  Good afternoon.

25   Q.  Could you tell me what your current occupation is?

Direct Examination of Mark James                    T-V-102

```
 1    A.   I'm a special agent for the FBI.

 2    Q.   How long have you been with the FBI?

 3    A.   Approximately 14 years.

 4    Q.   Where are you currently assigned with the FBI?

 5    A.   Assigned to the Safe Streets Task Force in the Baltimore

 6    Division.

 7    Q.   How long have you been with Safe Streets?

 8    A.   In the Baltimore Division, since 2013, and previously in

 9    P.G. County Safe Streets from 2005 to 2012.

10    Q.   So it covered most of your career?

11    A.   Most of it, yes.

12    Q.   Okay.  Are you aware of an investigation involving

13    Montana Barronette and other individuals?

14    A.   Yes.

15    Q.   Did you have any role in that investigation?

16    A.   Just to assist as needed.

17    Q.   Okay.  Did there come different points where you did

18    assist?

19    A.   Yes.

20    Q.   Who are the primary case agents for that investigation?

21    A.   Mark Neptune, Dan Delorenzo.

22    Q.   I want to direct your attention to October 27th, 2016.

23         Did you assist in the investigation on that date?

24    A.   Yes.

25    Q.   And what did you do?
```

1    A.  I was the seizing agent team leader at a search warrant,

2    2307 Avalon in Baltimore, Maryland.

3    Q.  Okay.  You said you were the seizing agent and the team

4    leader; is that right?

5    A.  Correct.

6    Q.  First of all, what does it mean to be the team leader?

7    A.  Team leader, you're going to give a briefing before the --

8    typically, you'll give a briefing before the search warrant and

9    the entry.  You're going to assign roles and just be kind of

10   the overall in charge of the operation.

11   Q.  And how about seizing agent?  What does that mean?

12   A.  Seizing agent, when items of evidence are collected,

13   they're brought to a central agent, the seizing agent.  That

14   seizing agent, at the conclusion of the search, will be

15   responsible for taking custody of the items of evidence.

16   Q.  As the team leader, do you give instructions or a briefing

17   to all the participants of the search warrant?

18   A.  Yes.  Typically, before any search warrant or any entry, a

19   briefing is conducted of everybody's assignment, everybody's

20   role.

21   Q.  Can you describe what type of residence 2307 Avalon is?

22   A.  It's a rowhouse.

23   Q.  Okay.  All right.  How many -- how many floors?

24   A.  Basement, middle level, upstairs.

25   Q.  Okay.  And, 2307 Avalon, was the basement a finished

1   basement, or an unfinished basement?

2   A.  Finished.

3   Q.  Okay.  Do you recall any of the members of the search team

4   on that day?

5   A.  I can remember several of the members, yes.

6   Q.  Okay.  Who were they, the ones that you remember?

7   A.  Special Agent William Filbert, Special Agent Bill Epkins,

8   Special Agent Kim McDonald, Task Force Officer Mark Neptune,

9   Intel Analyst Christian Dawson, Task Force Officer Jeff Lilly.

10  Q.  Okay.  Were there other members of the Safe Streets Task

11  Force there that day?

12  A.  Yes.

13  Q.  Okay.  Can you describe -- first of all, do you remember

14  the time of day that this search occurred -- morning,

15  afternoon, night?

16  A.  It was daytime.  Not -- I'd have to look at my notes to

17  remember exactly what time.  I don't recall.

18  Q.  Okay.  But this wasn't a 5-o'clock-in-the-morning type

19  search?

20  A.  It was not.

21  Q.  Okay.  Do you recall how you and the other officers made

22  entry into 2307 Avalon?

23  A.  I recall entry being made.  I don't know if it was forced

24  entry or not.  I do remember, once entry was made, we called

25  the residents -- residents out of the house, and then we went

1    inside the house and cleared -- cleared and secured the rest of

2    the residence.

3    Q.  When you called the residents out, how many individuals

4    came out of the residence?

5    A.  It was four adults and one infant child.

6    Q.  And then you said you secured the residence.  What does

7    that mean?

8    A.  That means just to go through the residence, make sure

9    there is nobody else inside the residence, and then that's

10   determined to be clear for -- clear and ready for the search.

11   Q.  Okay.  Did the residents that were brought outside of the

12   2307 Avalon -- did they remain outside, or were they allowed to

13   come back in during the search?

14   A.  We leave it up to the individual whether they want to stay

15   outside or come back in.  I can't recall what they chose and

16   who stayed and who stayed outside.

17   Q.  If people are allowed to come back in the residence, were

18   they allowed to go wherever they wanted?

19   A.  No.  They have to -- we typically ask them to sit usually

20   in the main room, just so they're not in the way of our search.

21   Q.  Okay.  I'd like to show you some photographs.  This is

22   going to be Government's Exhibit AV12 to 28.

23            MR. GARDNER:  If I could approach the witness, Your

24   Honor.

25            THE COURT:  Yes.

```
 1          (Exhibits tendered to the Witness.)

 2    BY MR. GARDNER:

 3    Q.  Sir, go ahead and take a look at those photographs.  If you

 4    could, flip through each one, and, when you've gone through all

 5    of them, I'll ask you some questions.

 6          (Witness reviewing exhibits.)

 7    BY MR. GARDNER:

 8    Q.  Do you recognize all of those photographs?

 9    A.  Yes.

10    Q.  Are all those photographs taken at 2307 Avalon on

11    October 27th, 2016?

12    A.  Yes.

13    Q.  Are some of them photographs of prior to the search and

14    some of them during the search?

15    A.  Yes.

16    Q.  Okay.  Are they all accurate depictions of what 2307 Avalon

17    looked like that day?

18    A.  Yes.

19          (Exhibits tendered to the Clerk.)

20              THE CLERK:  Thank you.

21    BY MR. GARDNER:

22    Q.  All right.  We'll start with Government's Exhibit AV12.

23    What are we looking at here?

24    A.  That is the exterior of 2307 Avalon.

25    Q.  Now, the first set of pictures that we're going to look at,
```

1    are all these photographs pre-search photographs?

2    A.  Yes.  That's what we call entry photos, or photos that we

3    take before we begin searching.

4    Q.  Why do you do that?

5    A.  We do that to show the condition and where everything is

6    located prior to us beginning to search through items.

7    Q.  Okay.  And so what are we looking at here in AV13?

8    A.  That would be the entry photo to Room -- what we labeled

9    Room A, which is the living room.

10   Q.  This is the first room that you see when you enter the

11   residence?

12   A.  That is correct.

13   Q.  AV14, what is this?

14   A.  That's an entry photo to Room B, which would be considered,

15   I believe, the dining room of the --

16   Q.  Is this on --

17   A.  -- main level.

18   Q.  Okay.  AV15, what is this?

19   A.  Entry photo to room labeled D, which is the kitchen, the

20   main level.

21   Q.  AV16?

22   A.  Entry photo for Room E, which is in the basement.

23   Q.  Is this part of the finished basement?

24   A.  Yes.

25   Q.  AV17?

Direct Examination of Mark James                          T-V-108

1      A.  Entry photo to Room F, which is a basement bedroom.

2      Q.  And I should have asked you.  There is letters on several

3      of the walls of the photos that we're looking at.  Is that

4      something that was there, or is that something that the FBI

5      did?

6      A.  No.  We placed those items -- we placed those letters on

7      the wall just so we can label -- makes it easier for us to

8      label where -- which room items of evidence were located.

9      Q.  This is AV18.

10     A.  It's Room G, which is an upstairs bedroom.

11     Q.  AV19?

12     A.  Entry photo of Room H, which is also an upstairs bedroom.

13     Q.  Okay.  AV20?

14     A.  Entry photo to one of the bathrooms.

15     Q.  AV21?

16     A.  Entry photo to Room J, which is also an upstairs bedroom.

17     Q.  And I jumped ahead a little bit.  Okay.

18         So, during your search, did you seize items relevant to the

19     investigation?

20     A.  We did.

21     Q.  All right.  Let's start with AV23.

22         What are we looking at in this photograph?

23     A.  That is a DTLR bag that was located under the stairs in the

24     basement.

25     Q.  Okay.  What does DTLR stand for?

```
1      A.   Downtown Locker Room.

2      Q.   Okay.  Is that a company?

3      A.   It's a store, yes.

4      Q.   What do they sell?

5      A.   I believe they sell athletic apparel and shoes.

6      Q.   AV24?  What are we looking at in AV24?

7      A.   That's a picture, if you open the bag, of the inside of the

8      bag and some of the items contained in that bag.

9      Q.   Again, I think I asked you, but let me make sure.  Where

10     was this item located?

11     A.   Under the stairs in the basement.

12     Q.   Basement.  Can you describe for the jury -- so there is a

13     finished portion of the basement; is that right?

14     A.   Correct.

15     Q.   Is the entire basement finished?

16     A.   I believe the -- in the back, there was a utility room, so

17     a majority of -- I would say the majority of the basement.

18     Q.   Setting the utility room aside, was it just one big room,

19     or was there multiple rooms?

20     A.   There was one room as you came downstairs, which is Room E,

21     and then there was a bedroom, Room F.

22     Q.   So let's go back to AV23.

23          So, in AV23, you mentioned this was under the stairs?

24     A.   Correct.

25     Q.   Okay.  And are we actually looking at these boards here --
```

1    on the left-hand portion of the photograph, are those support

2    beams for the staircase?

3    A.   For the stairs, correct.

4    Q.   Okay.  Let's go to AV25.  What are we looking at in AV25?

5    A.   It's a photograph of the DTLR bag and the contents that

6    were inside of the DTLR bag.

7    Q.   Okay.  So we saw a photograph of materials in the DTLR bag,

8    and now this is everything laid out on the floor?

9    A.   Correct.

10   Q.   All right.  Let's look at AV26.  What are we looking at in

11   this photograph?

12   A.   That's United States currency that was seized during the

13   search.

14   Q.   Okay.  And where was that currency found?

15   A.   That was Room J, which is an upstairs back bedroom.

16   Q.   And what are we looking at specifically in this photograph?

17   A.   That's a -- that's a pillow on top of the currency.

18   Q.   Okay.  You said that was found in Room J?

19   A.   Correct.

20   Q.   This room?

21   A.   That's it.

22   Q.   Go back to AV27.  What are we looking at in this

23   photograph?

24   A.   That's the same currency that was in the previous

25   photograph.  It's just taken at -- from outside of underneath

1    the pillow.

2    Q.   AV28?  What are we looking at in this photograph?

3    A.   That's a card.  On the card is the initial T and the last

4    name Sivells.

5    Q.   Last name Sivells?

6    A.   Correct.

7    Q.   And where was this located?

8    A.   I believe that was in Room J as well.

9    Q.   And, AV22, what are we looking at in this photograph?

10   A.   That's paperwork with the name Terrell A. Sivells on it.

11   Q.   And where was this paperwork found?

12   A.   I believe that was in Room G, which is the upstairs front

13   bedroom.

14   Q.   So we have the one document found in Room J where the money

15   was, and then this document was found in Room G; is that right?

16   A.   That's right.

17   Q.   And those are the two upstairs bedrooms?

18   A.   Correct.  Two of the three, yes.

19   Q.   Two of the three.  Okay.

20        **MR. GARDNER:**  Your Honor, I'd like to approach the

21   witness and show him several exhibits.

22        **THE COURT:**  All right.

23        **MR. GARDNER:**  I think we'll start with the easiest

24   one.  This is Government Exhibit AV9.

25        (Document tendered to the Witness.)

**BY MR. GARDNER:**

Q.  Do you recognize that, sir?

A.  Yes.  That's the United States currency that was seized during the search warrant.

Q.  Okay.  Did you count that currency?

A.  I did with the -- myself and other FBI personnel, yes.

Q.  And how much is it?

A.  $1,846.

Q.  I'll retrieve that exhibit and show you what's been marked as Government's Exhibit AV1.

Do you recognize that, sir?

A.  Yes.  That's the DTLR bag that was located during the search that had the items in it.

Q.  In the photo that we looked at earlier?

A.  Correct.

Q.  And that was located underneath the staircase; is that right?

A.  Correct.

Q.  I show you a couple more exhibits here.  I'll take this.

This is Government's Exhibit -- it's not in very good order, but there is AV4, AV3, AV6, AV2, and AV5.  Can you look at all those exhibits and tell me if you recognize them.

A.  Yes, I do.

Q.  Okay.  Why don't you pick whichever one, tell us what the exhibit number is, and tell us what it is.

```
 1    A.   Okay.  This is AV2.  It's a Ziploc bag containing gel caps.

 2    Q.   And where was that recovered -- was that recovered at 2307

 3    Avalon?

 4    A.   It was recovered at 2307 Avalon, Room E, which is the

 5    basement under the stairs, in the DTLR bag.

 6    Q.   Okay.  And, looking at -- if you look at your screen, AV25,

 7    is that the exhibit you just mentioned?

 8    A.   That is.  That is.

 9    Q.   And what is it specifically?

10    A.   Gel capsules.

11    Q.   And --

12    A.   Empty gel caps.

13    Q.   I apologize.

14         All right.  If you can pick up the next exhibit.

15    A.   This is AV4, which is capping trays, and that was located

16    in the same location inside the DTLR bag.

17    Q.   Going back to AV25, are those the capping trays that you're

18    holding in your hand?

19    A.   That is.

20    Q.   Okay.  And can we go to the next exhibit?

21    A.   This is a black scale, which was also located in the DTLR

22    bag.

23    Q.   Is it a digital scale?

24    A.   It is.

25    Q.   Okay.  And is that the scale right there?
```

1    A.   Yes, it is.  And it is AV6.

2    Q.   Okay.  Thank you.  What exhibit number is that?

3    A.   AV5, which is -- well, it's plastic bags containing a white

4    powder.

5    Q.   Containing a white powder?

6    A.   Correct.

7    Q.   Is that the white powder right there on AV25, just

8    underneath the sifters?

9    A.   Yes.

10   Q.   Okay.

11   A.   AV3 -- AV3, which is two cards and located in the DTLR bag

12   under the basement stairs.

13   Q.   Okay.  And are these the two cards on AV25, the blue and

14   orange cards in the top middle portion of the photograph?

15   A.   Yes.

16   Q.   Okay.  And I forgot to show you one exhibit.  This is

17   Government's Exhibit AV8.

18        Have you seen that exhibit before, sir?

19   A.   I have.

20   Q.   And what does that exhibit contain?

21   A.   This contains the sifters.

22            **THE COURT:**  And let me know when you're at a good

23   breaking point, Mr. Gardner.

24            **MR. GARDNER:**  I'm just about there, Your Honor, if

25   that's okay.

1          THE COURT:  Okay.  Sure.

2          MR. GARDNER:  Whoops.

3   BY MR. GARDNER:

4   Q.  We talked about those three sifters right there on AV25?

5   A.  Yes.

6   Q.  That's what's contained in that box right there?

7   A.  Yes.

8   Q.  All right.

9          MR. GARDNER:  And just 30 seconds, Your Honor.

10         THE COURT:  No, that's fine.

11         MR. GARDNER:  I forgot another exhibit.

12  BY MR. GARDNER:

13  Q.  Showing you what's been marked as Government's Exhibit AV7.

14      Do you recognize those items?

15  A.  Yes, those are five mannite bars.

16  Q.  And were those seized from 2307 Avalon?

17  A.  Yes.

18  Q.  And are those the mannite bars on AV25?

19  A.  Yes, and there is one more.  Yes.  Yes.

20  Q.  Right there in the middle portion of the photograph?

21  A.  Correct.

22  Q.  Okay.

23         MR. GARDNER:  One more exhibit, Your Honor.

24         THE COURT:  That's fine.

25  BY MR. GARDNER:

```
 1     Q.  This is AV10.  You mentioned that you seized the documents

 2     from Room G, I believe; is that right?

 3     A.  Yes.  These documents, yes.

 4     Q.  Are those those documents?

 5     A.  Correct.

 6     Q.  And whose name are those documents in?

 7     A.  Terrell A. Sivells.

 8             MR. GARDNER:  Your Honor, I think I covered

 9     everything I wanted to.

10             THE COURT:  Sure.  I'm a little confused about the

11     documents, because I think I had heard about two, but one was

12     in Room J, and one was in Room G.

13             MR. GARDNER:  Yes, Your Honor.

14             THE COURT:  Are those different?

15             MR. GARDNER:  I only put into evidence one of those.

16             THE COURT:  Just put in one, so it's one document.

17     Okay.

18             MR. GARDNER:  Yes, Your Honor.

19             THE COURT:  Got it.

20             MR. GARDNER:  I think I've covered everything I want

21     to, Your Honor.  I assume Mr. James will be on the stand

22     tomorrow morning.  I don't think I'll have any more questions,

23     but can I reserve until then?

24             THE COURT:  Sure.  That's absolutely fine.  We

25     will -- but, yes, the witness can step down for now.
```

1            (Witness excused pending further examination.)

2            **THE COURT:**  We're going to start -- I'll ask everyone

3      to stick around, including people in the audience.

4            I'm going to excuse the jury for the day, and just a

5      reminder, ladies and gentlemen, to leave your notes here.  Keep

6      an open mind.  Don't talk about the case.  Again, it is

7      possible, as I think I mentioned at the beginning, that you

8      might see some of these folks out in the lobby, and, if they

9      seem to be ignoring you, again, nobody is supposed to be trying

10     to be rude, but even the counsel are just not supposed to talk

11     to you, and you're not supposed to talk to them outside the

12     courtroom here.

13           And, if you think you overhear anything about the

14     case, I appreciate it that you just sort of remove yourself and

15     not listen to it.  So, again, just need to listen to what you

16     hear here in the courtroom about this case.

17           We will resume tomorrow morning at 10:00.  Thank you

18     very much, and I will see you all tomorrow at 10:00.  Everybody

19     else can stay here for a few minutes.

20         (Jury excused.)

21           **THE COURT:**  All right.  And, counsel, I'll see you up

22     in chambers on another matter, and maybe, let's say, about

23     another five minutes after or so after we recess.

24           What law enforcement witnesses do you expect for

25     tomorrow?

```
 1              MR. GARDNER:  Detective Landsman, and then we'll have
 2     several chemists here, Your Honor.
 3              THE COURT:  All right.
 4              MR. GARDNER:  Karen Hall, who is now with the FDA,
 5     but was DEA.  We'll have David Randolph, who was a DEA chemist.
 6     He's now in training at Quantico.  And then I think we'll have
 7     two state chemists:  Hongde Pan -- I'm sure I'm saying that
 8     wrong -- and then also Barry Verger, who is also a chemist from
 9     the State, Your Honor.
10              THE COURT:  Chemists.  All right.  So results of
11     various substances being tested?
12              MR. GARDNER:  Yes, Your Honor.
13              THE COURT:  All right.  All right.  Well, we'll then
14     excuse everyone in the audience and everyone else, and I'll see
15     counsel in about five minutes upstairs.
16              THE CLERK:  Okay.  This Honorable Court now stands
17     adjourned.
18          (Proceedings adjourned.)
19
20
21
22
23
24
25
```

CERTIFICATE OF OFFICIAL REPORTER

        I, Martin J. Giordano, Registered Merit Reporter and

Certified Realtime Reporter, in and for the United States

District Court for the District of Maryland, do hereby certify,

pursuant to 28 U.S.C. § 753, that the foregoing is a true and

correct transcript of the stenographically-reported proceedings

held in the above-entitled matter and that the transcript page

format is in conformance with the regulations of the Judicial

Conference of the United States.


                    Dated this 11th day of July 2019.



                    _Martin J. Giordano_____

                    MARTIN J. GIORDANO, RMR, CRR

                    FEDERAL OFFICIAL COURT REPORTER

```
1                                      INDEX

2              UNITED STATES v. MONTANA BARRONETTE, et al.

3          TRIAL - VOL V (AFTERNOON SESSION) - SEPTEMBER 26, 2018

4

5

6                                                              PAGE
     COMMENCEMENT OF PROCEEDINGS............................   2
7
     WITNESSES FOR
8      THE GOVERNMENT:

9    COURTNEY DUNN
         Sworn..................................................   3
10       Direct Examination by MR. HANLEY......................   4
         Cross-Examination by MR. LAWLOR.......................  15
11       Cross-Examination by MR. BURNHAM......................  22
         Redirect Examination by MR. GARDNER...................  26
12       Witness Excused.......................................  26

13   CEDRIC BOOTH
         Sworn.................................................  27
14       Direct Examination by MR. GARDNER.....................  27
         Cross-Examination by MR. BARDOS.......................  44
15       Cross-Examination by MR. PROCTOR......................  47
         Cross-Examination by MR. BALTER.......................  48
16       Witness Excused.......................................  52

17   TRISTON FERGUSON
         Sworn.................................................  53
18       Direct Examination by MR. ROMANO......................  53
         Witness Excused.......................................  57
19
     DETECTIVE CHRIS THOMAS
20       Sworn.................................................  63
         Direct Examination by MR. HANLEY......................  63
21       Cross-Examination by MR. BALTER.......................  78
         Cross-Examination by MR. BARDOS.......................  95
22       Cross-Examination by MR. PROCTOR......................  99
         Redirect Examination by MR. HANLEY.................... 100
23       Witness Excused....................................... 100

24

25
```

```
 1                                                    PAGE
     MARK JAMES
 2       Sworn................................................ 101
         Direct Examination by MR. GARDNER.................... 101
 3       Witness Excused..................................... 117

 4   PROCEEDINGS ADJOURNED.................................. 118
```

## $

**$1,846** [1] - 112:8
**$2,200** [2] - 25:21, 25:24
**$4,500** [2] - 12:12, 12:17
**$5,000** [2] - 25:2, 25:4
**$60** [4] - 31:11, 35:22, 39:24, 45:25
**$612** [2] - 74:19, 99:3
**$7,000** [2] - 17:16, 20:4
**$7,200** [1] - 22:16
**$981** [1] - 74:1

## 1

**1** [4] - 55:21, 59:6, 59:10, 65:8
**1.2** [2] - 46:17, 47:3
**100** [2] - 120:22, 120:23
**101** [3] - 2:24, 121:2, 121:2
**10:00** [2] - 117:17, 117:18
**11-year** [1] - 27:24
**117** [1] - 121:3
**118** [1] - 121:4
**11th** [1] - 119:14
**1300** [3] - 49:7, 50:16, 55:1
**14** [1] - 102:3
**15** [1] - 120:10
**1720** [1] - 97:5

## 2

**2** [2] - 55:21, 120:6
**2,200** [4] - 22:22, 23:3, 25:4, 25:21
**20** [1] - 97:6
**2005** [1] - 102:9
**2006** [2] - 28:4, 28:18
**2009** [2] - 95:21, 95:22
**2010** [4] - 4:17, 15:9, 16:11, 95:19
**2012** [5] - 64:9, 76:9, 96:15, 99:20, 102:9
**2013** [2] - 64:5, 102:8
**2014** [4] - 4:19, 5:7, 16:4, 16:11
**2016** [22] - 6:4, 6:17, 18:5, 21:19, 29:20, 31:1, 31:4, 31:18, 37:20, 38:2, 39:5, 41:2, 42:4, 42:18, 43:3, 45:6, 53:25, 54:2, 54:21, 56:22, 102:22, 106:11
**2018** [3] - 1:7, 3:1, 120:3
**2019** [1] - 119:14
**21201** [1] - 2:24
**21st** [2] - 64:8, 64:22
**22** [1] - 120:11
**22nd** [5] - 64:23, 64:24, 79:25, 96:14, 99:20
**2307** [12] - 101:1, 103:2, 103:21, 103:25, 104:22, 105:12, 106:10, 106:16, 106:24, 113:2, 113:4, 115:16
**26** [5] - 1:7, 3:1, 120:3, 120:11, 120:12
**27** [2] - 120:13, 120:14

**27th** [2] - 102:22, 106:11
**28** [2] - 105:22, 119:8
**2:14** [1] - 1:8
**2nd** [9] - 30:25, 31:18, 38:2, 40:6, 41:2, 42:17, 43:3, 54:21, 56:22

## 3

**3** [2] - 55:21, 120:9
**30** [2] - 52:14, 115:9
**31st** [10] - 30:25, 31:3, 31:4, 31:18, 32:15, 37:20, 39:5, 40:2, 40:7, 42:4
**3:15** [8] - 66:7, 86:20, 86:22, 86:23, 87:2, 92:16, 96:15
**3:27** [1] - 58:4
**3:55** [1] - 58:4

## 4

**4** [2] - 55:21, 120:10
**4,500** [1] - 12:11
**410-962-4504** [1] - 2:25
**44** [1] - 120:14
**47** [1] - 120:15
**48** [1] - 120:15
**4:45** [2] - 87:3, 87:5

## 5

**5** [3] - 55:21, 56:11, 60:5
**5,000** [2] - 22:21, 25:22
**5-o'clock-in-the-morning** [1] - 104:18
**52** [1] - 120:16
**53** [2] - 120:17, 120:18
**57** [1] - 120:18
**5:00** [1] - 97:6
**5:09** [1] - 1:8

## 6

**6** [4] - 46:8, 46:13, 46:15, 55:23
**60** [1] - 35:20
**600** [2] - 78:1, 78:22
**63** [2] - 120:20, 120:20
**631** [2] - 79:8, 79:11
**641** [12] - 67:6, 70:14, 70:15, 77:3, 77:4, 79:10, 79:11, 86:6, 91:11, 91:19, 92:6, 100:15

## 7

**7** [1] - 6:4
**7,200** [1] - 5:23
**753** [1] - 119:8
**78** [1] - 120:21
**7th** [5] - 6:16, 18:5, 20:12, 20:16, 21:19

## 8

**8:00** [1] - 86:23
**8:13:13** [2] - 38:5, 38:12
**8:13:56** [1] - 38:24
**8:13:57** [1] - 38:13
**8:14:21** [2] - 38:25, 39:7
**8:15:03** [2] - 39:8, 39:18
**8:16:49** [2] - 39:19, 40:9
**8:17:06** [1] - 40:10
**8:42:29** [1] - 32:16
**8:42:31** [2] - 32:16, 32:24
**8:42:55** [2] - 32:25, 33:13
**8:43:09** [2] - 33:14, 33:22
**8:43:34** [2] - 33:23, 34:2
**8:44:23** [2] - 34:3, 34:12
**8:44:27** [2] - 34:13, 34:18
**8:44:32** [2] - 34:19, 35:4
**8:44:38** [2] - 35:5, 35:13
**8:46:24** [2] - 35:14, 36:4
**8:46:35** [1] - 36:5

## 9

**95** [1] - 120:21
**99** [1] - 120:22

## A

**A14** [3] - 43:12, 65:19, 76:20
**abandoned** [7] - 50:10, 50:23, 50:24, 78:21, 81:4, 84:7, 85:4
**ability** [1] - 89:4
**able** [6] - 28:24, 30:22, 51:16, 81:15, 86:2, 86:7
**ABOVE** [1] - 1:9
**above-entitled** [1] - 119:10
**ABOVE-ENTITLED** [1] - 1:9
**absolutely** [1] - 116:24
**abundance** [1] - 25:24
**access** [2] - 86:3, 97:18
**accurate** [3] - 49:10, 95:15, 106:16
**accurately** [1] - 32:4
**actions** [1] - 68:3
**activity** [3] - 73:1, 84:4, 90:4
**actual** [1] - 42:11
**addition** [3] - 17:14, 19:3, 20:3
**additional** [1] - 25:4
**address** [5] - 24:21, 66:21, 66:24, 77:24, 80:12
**addresses** [1] - 77:20
**adjourned** [2] - 118:17, 118:18
**ADJOURNED.................................** [1] - 121:4
**administrative** [2] - 54:5, 54:18
**adults** [1] - 105:5
**affiliated** [1] - 36:19

**afternoon** [20] - 22:14, 27:10, 27:11, 44:24, 47:20, 47:21, 53:14, 57:22, 59:11, 61:11, 61:23, 63:11, 68:1, 92:17, 95:4, 96:12, 99:19, 101:23, 101:24, 104:15
**AFTERNOON** [2] - 1:5, 120:3
**agency** [1] - 53:15
**Agent** [7] - 2:11, 100:25, 101:11, 101:23, 104:7, 104:8
**agent** [9] - 5:25, 102:1, 103:1, 103:3, 103:11, 103:12, 103:13, 103:14
**agents** [2] - 21:22, 102:20
**ago** [2] - 14:21, 81:10
**agree** [2] - 6:14, 17:11
**ahead** [6] - 18:22, 23:17, 37:14, 68:17, 106:3, 108:17
**ain't** [3] - 10:11, 10:12, 22:4
**air** [3] - 29:5, 29:10, 49:7
**al** [2] - 1:5, 120:2
**Alan** [1] - 1:16
**Alfred** [1] - 2:3
**alley** [30] - 67:4, 68:10, 74:7, 74:8, 79:16, 79:17, 81:2, 81:17, 83:19, 83:24, 85:3, 87:21, 88:1, 88:3, 88:5, 88:15, 88:17, 88:20, 89:2, 89:8, 90:8, 90:12, 90:13, 90:15, 90:21, 90:22, 94:21, 98:2, 98:3, 98:22
**alleys** [2] - 50:19, 50:20
**allowed** [4] - 61:7, 105:12, 105:17, 105:18
**almost** [1] - 45:9
**altogether** [1] - 5:23
**AMERICA** [1] - 1:3
**amount** [1] - 47:1
**analysis** [4] - 93:14, 93:17, 93:22, 93:25
**Analyst** [1] - 104:9
**answer** [1] - 23:20
**answered** [1] - 76:17
**answering** [1] - 63:21
**apartment** [2] - 79:16, 80:13
**apologize** [1] - 113:13
**apparel** [1] - 109:5
**appear** [2] - 75:24, 78:25
**appeared** [2] - 68:13, 68:18
**appearing** [1] - 49:13
**appreciate** [1] - 117:14
**apprehended** [1] - 69:2
**approach** [8] - 7:19, 23:7, 37:7, 40:18, 58:9, 74:20, 105:23, 111:20
**approached** [1] - 34:25
**approaching** [1] - 41:15
**apropos** [1] - 24:24
**area** [34] - 11:13, 11:15, 28:14, 28:15, 28:16, 28:20, 28:22, 28:23, 29:11, 32:18, 32:23, 38:8, 39:2, 43:12, 43:21, 43:22, 49:6, 49:12, 49:21, 50:13, 51:1, 51:6, 64:25, 65:6, 66:4, 66:18, 66:19, 77:19, 79:5, 80:22, 81:13, 83:14, 97:19
**areas** [4] - 28:15, 28:24, 29:1, 50:12

**argue** [1] - 78:9
**arrest** [5] - 69:19, 69:24, 73:12, 96:21, 99:5
**arrested** [3] - 16:4, 98:10, 99:3
**arresting** [1] - 16:24
**arrests** [1] - 71:17
**arrive** [1] - 86:18
**arrived** [10] - 9:5, 13:18, 66:6, 66:10, 79:24, 88:4, 88:10, 88:16, 92:17, 96:15
**arrow** [3] - 80:14, 81:7, 81:10
**arrows** [1] - 83:20
**aside** [1] - 109:18
**assign** [1] - 103:9
**assigned** [12] - 27:22, 28:9, 28:10, 28:15, 28:16, 53:20, 53:25, 56:19, 64:6, 64:9, 102:4, 102:5
**assignment** [4] - 51:7, 53:19, 54:1, 103:19
**assist** [4] - 18:12, 102:16, 102:18, 102:23
**Assistant** [3] - 1:13, 1:14, 1:19
**assisted** [1] - 54:25
**associate** [1] - 92:1
**associated** [1] - 56:21
**assume** [2] - 50:11, 116:21
**assumed** [1] - 88:19
**assuming** [1] - 57:22
**assumption** [1] - 85:2
**athletic** [1] - 109:5
**attached** [1] - 31:7
**attention** [7] - 6:3, 20:11, 29:19, 51:8, 64:8, 64:12, 102:22
**Attorney** [3] - 1:13, 1:14, 1:14
**Attorney's** [1] - 53:21
**audience** [8] - 60:17, 60:19, 60:23, 60:24, 61:2, 61:10, 117:3, 118:14
**audio** [1] - 31:7
**authorities** [1] - 16:21
**AV1** [1] - 112:10
**AV10** [1] - 116:1
**AV12** [2] - 105:22, 106:22
**AV13** [1] - 107:7
**AV14** [1] - 107:18
**AV15** [1] - 107:18
**AV16** [1] - 107:21
**AV17** [1] - 107:25
**AV18** [1] - 108:9
**AV19** [1] - 108:11
**AV2** [2] - 112:21, 113:1
**AV20** [1] - 108:13
**AV21** [1] - 108:15
**AV22** [1] - 111:9
**AV23** [3] - 108:21, 109:22, 109:23
**AV24** [2] - 109:6
**AV25** [8] - 110:4, 113:6, 113:17, 114:7, 114:13, 115:4, 115:18
**AV26** [1] - 110:10
**AV27** [1] - 110:22

**AV28** [1] - 111:2
**AV3** [3] - 112:21, 114:11
**AV4** [2] - 112:21, 113:15
**AV5** [2] - 112:21, 114:3
**AV6** [2] - 112:21, 114:1
**AV7** [1] - 115:13
**AV8** [1] - 114:17
**AV9** [1] - 111:24
**available** [1] - 46:24
**Avalon** [12] - 101:1, 103:2, 103:21, 103:25, 104:22, 105:12, 106:10, 106:16, 106:24, 113:3, 113:4, 115:16
**Avenue** [13] - 44:3, 44:11, 55:1, 66:19, 68:11, 80:12, 81:15, 81:18, 82:15, 90:7, 97:12, 97:14, 97:18
**aware** [7] - 45:8, 45:11, 51:9, 59:1, 59:2, 62:4, 102:12

# B

**B-O-O-T-H** [1] - 27:6
**backyard** [1] - 66:19
**backyards** [1] - 67:5
**bag** [24] - 70:21, 72:4, 72:5, 72:6, 75:16, 75:20, 75:22, 75:24, 75:25, 76:1, 91:22, 108:23, 109:7, 109:8, 110:5, 110:6, 110:7, 112:12, 113:1, 113:5, 113:16, 113:22, 114:11
**bags** [7] - 70:18, 71:14, 72:1, 72:15, 73:7, 73:8, 114:3
**ball** [5] - 12:24, 13:5, 13:6, 13:9
**BALTER** [19] - 22:9, 48:22, 48:24, 51:19, 68:14, 69:3, 69:22, 69:25, 70:3, 71:19, 71:23, 73:16, 76:13, 78:7, 78:16, 78:19, 79:18, 79:23, 94:25
**Balter** [4] - 1:19, 48:21, 78:6, 97:11
**BALTER.....................** [2] - 120:15, 120:21
**Baltimore** [22] - 1:7, 2:24, 7:1, 15:17, 16:25, 25:19, 27:13, 27:14, 27:16, 27:21, 27:23, 29:5, 53:16, 55:2, 56:5, 60:14, 63:13, 63:14, 95:19, 102:5, 102:8, 103:2
**BARDOS** [12] - 44:23, 47:13, 52:17, 52:20, 52:24, 57:6, 57:10, 75:21, 95:3, 95:12, 97:20, 99:13
**Bardos** [6] - 1:21, 44:21, 45:2, 95:1, 95:6, 95:10
**BARDOS.....................** [2] - 120:14, 120:21
**BARRONETTE** [2] - 1:5, 120:2
**Barronette** [2] - 1:15, 102:13
**Barry** [1] - 118:8
**bars** [2] - 115:15, 115:18
**based** [5] - 20:8, 43:15, 71:20, 71:21, 99:7
**basement** [15] - 103:24, 103:25, 104:1, 107:22, 107:23, 108:1, 108:24, 109:11, 109:12, 109:13, 109:15,

109:17, 113:5, 114:12
**basis** [1] - 96:3
**bathrooms** [1] - 108:14
**bay** [1] - 82:17
**beams** [1] - 110:2
**bedroom** [7] - 108:1, 108:10, 108:12, 108:16, 109:21, 110:15, 111:13
**bedrooms** [1] - 111:17
**BEFORE** [1] - 1:10
**began** [1] - 96:21
**begin** [2] - 86:19, 107:3
**beginning** [3] - 96:23, 107:6, 117:7
**behalf** [13] - 1:12, 1:15, 1:18, 1:20, 1:22, 2:2, 2:4, 2:6, 2:8, 22:23, 23:4, 25:5, 25:14
**behind** [1] - 59:12
**belt** [1] - 58:23
**bench** [13] - 23:10, 24:22, 26:6, 52:4, 52:7, 52:25, 57:19, 58:12, 58:15, 62:14, 62:15, 100:22, 101:6
**best** [1] - 48:18
**better** [2] - 24:5, 47:23
**between** [1] - 86:23
**big** [7] - 4:10, 12:25, 20:24, 38:16, 38:20, 46:25, 109:18
**bigger** [2] - 13:5, 13:9
**Bill** [1] - 104:7
**bit** [13] - 10:2, 25:8, 26:12, 28:9, 56:12, 64:2, 70:23, 70:25, 71:1, 80:19, 81:9, 81:10, 108:17
**black** [7] - 47:24, 48:16, 76:1, 91:22, 98:19, 100:1, 113:21
**black-top** [1] - 98:19
**black-topped** [1] - 91:22
**blacktop** [2] - 72:7, 72:17
**blades** [1] - 91:23
**Blake** [1] - 3:3
**BLAKE** [1] - 1:10
**blend** [1] - 34:8
**block** [7] - 49:7, 50:16, 55:1, 78:1, 78:22, 80:16, 81:3
**blow** [4] - 34:24, 35:7, 35:11, 35:12
**blue** [1] - 114:13
**boarded** [3] - 49:24, 50:2, 50:3
**boarded-up** [1] - 50:2
**boards** [1] - 109:25
**body** [1] - 32:12
**Booth** [10] - 26:22, 27:5, 27:6, 34:7, 39:10, 39:21, 45:2, 48:25, 55:5, 56:21
**BOOTH** [2] - 27:1, 120:13
**border** [1] - 65:10
**bought** [6] - 37:20, 46:13, 46:15, 48:1, 48:9, 48:11
**box** [2] - 58:20, 115:6
**boxed** [1] - 47:17
**BPD** [2] - 27:22, 53:17
**break** [10] - 52:9, 59:9, 60:17, 60:22, 61:3, 61:10, 61:13, 61:17, 61:20
**breaking** [1] - 114:23

**brief** [4] - 24:24, 45:4, 73:17, 85:25
**briefing** [4] - 103:7, 103:8, 103:16, 103:19
**briefly** [2] - 22:10, 47:17
**bring** [8] - 3:4, 3:7, 3:8, 20:15, 23:23, 58:8, 58:12, 78:24
**brother** [2] - 38:16, 38:20
**brought** [4] - 3:19, 58:22, 103:13, 105:11
**Broughton** [1] - 2:2
**building** [4] - 34:22, 79:16, 80:13, 90:9
**buildings** [1] - 36:18
**bulk** [3] - 46:10, 46:11, 46:12
**bummy** [1] - 29:2
**bumps** [1] - 82:18
**bunch** [1] - 70:18
**BURNHAM** [5] - 22:10, 22:13, 23:6, 24:21, 24:24
**Burnham** [4] - 2:5, 22:11, 22:14, 24:24
**BURNHAM.....................** [1] - 120:11
**Bussard** [1] - 4:16
**buy** [13] - 14:15, 25:25, 26:13, 29:12, 30:3, 32:1, 32:15, 34:1, 40:2, 41:16, 54:12, 55:1
**buyer** [1] - 90:7
**buying** [4] - 46:10, 46:11, 46:12, 51:10
**buys** [2] - 31:17, 45:15
**BY** [69] - 4:8, 5:6, 7:22, 8:6, 15:6, 22:13, 26:11, 27:9, 30:17, 31:21, 32:17, 33:1, 33:15, 33:24, 34:4, 34:14, 34:20, 35:6, 35:15, 36:6, 37:11, 37:24, 38:6, 38:14, 39:1, 39:9, 39:20, 40:11, 40:22, 41:6, 41:13, 41:23, 42:13, 44:23, 47:19, 48:24, 53:13, 55:9, 55:15, 63:10, 64:3, 68:16, 69:8, 69:14, 70:6, 70:24, 71:25, 73:18, 74:23, 75:13, 75:23, 76:19, 77:12, 78:16, 78:19, 79:23, 95:3, 95:12, 97:20, 99:18, 100:11, 101:22, 106:2, 106:7, 106:21, 112:1, 115:3, 115:12, 115:25

**C**

**Calhoun** [19] - 65:1, 65:24, 66:21, 66:22, 66:23, 66:24, 67:6, 70:14, 70:16, 77:24, 77:25, 78:22, 79:8, 79:25, 80:9, 80:13, 81:4, 84:8, 91:11
**camera** [1] - 32:11
**cameras** [1] - 27:22
**cane** [1] - 61:21
**capacity** [2] - 29:8, 64:15
**capping** [2] - 113:15, 113:17
**caps** [3] - 76:1, 113:1, 113:12
**capsules** [1] - 113:10
**car** [6] - 6:23, 9:5, 9:9, 9:12, 13:15, 13:18, 19:8, 43:15, 96:23
**card** [2] - 111:3
**cards** [3] - 114:11, 114:13, 114:14
**care** [3] - 60:13, 60:24, 94:19

**career** [2] - 27:24, 102:10
**Carey** [3] - 32:19, 44:12, 82:14
**Carlos** [1] - 2:7
**carrying** [3] - 85:16, 85:19, 98:5
**case** [25] - 15:19, 15:25, 21:21, 24:15, 25:5, 25:18, 25:22, 25:23, 26:13, 28:10, 30:10, 30:19, 32:22, 36:11, 47:10, 59:14, 60:7, 61:22, 62:9, 64:14, 93:16, 102:20, 117:6, 117:14, 117:16
**cases** [1] - 53:23
**Catherine** [1] - 3:3
**CATHERINE** [1] - 1:10
**caught** [1] - 15:10
**caution** [1] - 25:24
**CCB-16-0597** [1] - 1:4
**CD5** [1] - 31:13
**CDS** [1] - 68:13
**Cedric** [2] - 26:22, 27:5
**CEDRIC** [3] - 27:1, 27:6, 120:13
**ceiling** [4] - 70:20, 72:2, 72:8, 72:16
**center** [1] - 44:9
**central** [1] - 103:13
**certain** [3] - 28:13, 28:14, 55:5
**CERTIFICATE** [1] - 119:1
**Certified** [1] - 119:6
**certify** [1] - 119:7
**chain** [3] - 52:11, 52:17, 52:21
**chair** [1] - 4:2
**chambers** [2] - 60:6, 117:22
**chance** [1] - 61:24
**charge** [5] - 15:10, 15:15, 17:12, 17:15, 103:10
**charged** [6] - 4:19, 5:7, 5:8, 16:14, 16:15
**Charles** [3] - 2:5, 22:14, 24:24
**check** [2] - 12:14, 25:13
**chemical** [1] - 56:6
**chemist** [2] - 118:5, 118:8
**chemists** [3] - 118:2, 118:7, 118:10
**child** [1] - 105:5
**chose** [2] - 45:19, 105:15
**CHRIS** [3] - 63:1, 63:5, 120:19
**Chris** [1] - 63:5
**Christian** [1] - 104:9
**Christopher** [2] - 1:14, 2:7
**cigarette** [2] - 39:15, 39:16
**circled** [1] - 44:8
**CitiWatch** [1] - 27:22
**City** [10] - 27:14, 27:16, 27:21, 27:23, 53:16, 53:20, 55:2, 63:13, 63:14, 95:19
**Citywide** [1] - 64:7
**clear** [7] - 61:2, 76:22, 77:13, 79:20, 91:22, 105:10
**cleared** [2] - 105:1
**CLERK** [16] - 3:2, 3:22, 3:25, 4:6, 8:5, 26:25, 27:2, 27:7, 30:14, 30:16, 42:9, 53:5, 53:7, 53:11, 58:1, 58:5, 59:22, 62:25, 63:2, 63:7, 77:7, 79:22, 101:12,

101:14, 101:16, 101:19, 106:20, 118:16
**Clerk** [7] - 8:4, 31:20, 57:20, 62:16, 75:11, 79:18, 106:19
**client** [2] - 23:12, 23:19
**clip** [3] - 34:5, 34:6, 38:7
**clips** [1] - 32:15
**close** [3] - 54:12, 77:5, 78:24
**close-up** [1] - 78:24
**closer** [8] - 4:2, 4:9, 63:7, 63:24, 81:5, 81:7, 81:8, 100:13
**closet** [1] - 72:3
**clothes** [1] - 29:2
**cocaine** [3] - 35:8, 35:9, 72:7
**collapsed** [1] - 70:20
**collected** [1] - 103:12
**color** [1] - 13:7
**coming** [6] - 59:10, 67:2, 83:23, 83:25, 84:2
**COMMENCEMENT** [1] - 120:6
**community** [1] - 14:18
**company** [1] - 109:2
**compensation** [1] - 25:3
**complaint** [1] - 28:14
**complete** [1] - 70:17
**computer** [1] - 2:21
**concern** [1] - 25:6
**concerns** [1] - 3:7
**concluded** [4] - 26:6, 52:25, 62:14, 101:6
**conclusion** [1] - 103:14
**condition** [3] - 50:20, 71:18, 107:5
**conduct** [6] - 29:21, 30:22, 31:8, 38:9, 40:6, 80:3
**conducted** [6] - 31:25, 37:25, 42:17, 43:13, 83:16, 103:19
**conducting** [3] - 74:4, 82:21, 89:5
**conference** [8] - 26:6, 52:6, 52:25, 57:19, 58:14, 62:14, 62:15, 101:6
**Conference** [1] - 119:12
**conferring** [1] - 78:18
**conformance** [1] - 119:11
**confused** [1] - 116:10
**connected** [1] - 91:20
**connection** [1] - 54:25
**considered** [1] - 107:14
**consistent** [2] - 37:20, 41:1
**consult** [1] - 100:19
**CONT** [1] - 2:1
**contact** [6] - 88:11, 88:13, 92:10, 92:20, 92:22, 94:2
**contain** [2] - 31:22, 114:20
**contained** [6] - 37:15, 37:19, 38:7, 72:6, 109:8, 115:6
**containing** [3] - 113:1, 114:3, 114:5
**contains** [1] - 114:21
**contents** [1] - 110:5
**contest** [1] - 52:20
**CONTINUED** [1] - 1:9

**continued** [14] - 32:24, 33:13, 33:22, 34:2, 34:12, 34:18, 35:4, 35:13, 36:4, 38:12, 38:24, 39:7, 39:18, 40:9
**contraband** [1] - 92:21
**control** [3] - 14:18, 20:8, 32:10
**Control** [4] - 36:15, 36:24, 56:2, 56:16
**controlled** [3] - 6:14, 37:25, 55:1
**conversation** [3] - 34:9, 59:14, 62:10
**conversations** [1] - 73:17
**conversed** [1] - 19:1
**convicted** [3] - 4:25, 5:8, 5:12
**conviction** [4] - 4:16, 16:12, 17:20, 20:4
**cooperate** [3] - 16:21, 16:23, 17:12
**cooperated** [3] - 4:23, 5:14, 25:18
**cooperating** [3] - 6:4, 25:23, 45:20
**cooperation** [6] - 4:24, 17:8, 17:16, 20:5, 25:3, 26:14
**cooperator** [1] - 5:18
**cooperators** [2] - 25:7, 25:14
**copy** [1] - 95:7
**corner** [10] - 33:4, 33:10, 80:10, 80:23, 81:8, 88:16, 90:8, 90:13, 90:14, 90:15
**correct** [149] - 4:17, 4:21, 4:25, 22:25, 47:7, 49:4, 49:7, 49:15, 49:18, 49:22, 49:25, 50:4, 50:7, 50:10, 51:2, 54:19, 56:6, 56:17, 59:8, 64:20, 67:9, 69:9, 69:10, 71:4, 72:10, 72:20, 74:10, 75:10, 75:18, 76:24, 77:21, 78:3, 78:22, 79:5, 79:9, 79:14, 80:1, 80:10, 80:17, 81:4, 82:1, 82:2, 82:7, 82:8, 82:11, 82:16, 82:22, 83:12, 83:13, 83:21, 83:22, 84:5, 84:9, 84:10, 85:1, 85:4, 85:5, 85:7, 85:8, 85:13, 85:14, 85:17, 85:18, 85:22, 86:4, 86:5, 86:7, 86:12, 86:25, 87:1, 87:6, 87:7, 87:10, 87:11, 87:20, 87:23, 88:9, 88:14, 88:17, 88:21, 88:22, 88:25, 89:3, 89:7, 89:16, 89:19, 89:21, 89:23, 89:25, 90:4, 90:11, 90:17, 91:6, 91:14, 92:2, 92:3, 92:6, 92:15, 92:18, 93:5, 93:6, 93:10, 93:18, 93:19, 93:21, 93:24, 94:4, 94:6, 94:7, 94:9, 94:10, 94:13, 94:16, 94:21, 95:24, 96:7, 96:16, 97:4, 97:9, 97:10, 97:13, 97:23, 97:24, 98:4, 98:9, 98:11, 98:13, 98:18, 98:20, 99:1, 99:2, 99:10, 99:24, 99:25, 103:5, 107:12, 109:14, 109:24, 110:3, 110:9, 110:19, 111:6, 111:18, 112:15, 112:18, 114:6, 115:21, 116:5, 119:9
**correspond** [1] - 56:15
**counsel** [11] - 23:17, 52:4, 55:8, 58:12, 60:6, 61:25, 78:18, 100:19, 117:10, 117:21, 118:15
**count** [4] - 80:25, 84:16, 84:19, 112:5
**County** [4] - 15:17, 16:25, 25:19, 102:9
**couple** [6] - 8:7, 16:10, 24:3, 38:1, 41:7, 59:13, 77:19, 79:17, 80:18, 81:12, 112:19
**course** [2] - 68:1, 92:7
**COURT** [97] - 1:1, 3:4, 3:9, 3:11, 3:13,

3:21, 5:3, 7:20, 15:3, 22:8, 22:11, 23:8, 23:16, 24:2, 24:19, 26:1, 26:4, 26:7, 26:18, 26:24, 42:12, 44:16, 44:20, 47:15, 48:21, 51:21, 51:24, 52:1, 52:4, 52:8, 52:15, 52:23, 53:1, 57:4, 57:8, 57:12, 57:15, 57:17, 57:21, 57:25, 58:7, 58:11, 58:16, 58:21, 59:2, 59:23, 60:10, 61:5, 61:11, 61:13, 61:17, 62:3, 62:6, 62:13, 62:17, 62:20, 62:24, 63:24, 68:15, 69:5, 69:13, 70:1, 70:4, 71:21, 71:24, 74:21, 75:22, 76:15, 76:18, 78:6, 78:12, 95:1, 99:15, 100:7, 100:9, 100:18, 100:23, 101:2, 101:5, 101:7, 105:25, 111:22, 114:22, 115:1, 115:10, 115:24, 116:10, 116:14, 116:16, 116:19, 116:24, 117:2, 117:21, 118:3, 118:10, 118:13, 119:18
**Court** [10] - 3:2, 3:8, 58:1, 58:5, 58:18, 59:1, 60:16, 62:4, 118:16, 119:7
**court** [1] - 13:1
**Court's** [1] - 3:18
**Courthouse** [1] - 2:23
**Courtney** [1] - 3:16
**COURTNEY** [3] - 3:24, 4:5, 120:9
**courtroom** [4] - 4:10, 58:25, 117:12, 117:16
**cover** [11] - 36:19, 36:22, 37:6, 40:17, 47:6, 54:7, 54:10, 54:11, 54:12, 54:14, 54:25
**covered** [4] - 43:13, 102:10, 116:8, 116:20
**covert** [3] - 65:5, 97:1, 97:2
**crime** [3] - 4:21, 5:7, 16:16
**crimes** [2] - 5:12, 34:17
**Criminal** [1] - 1:4
**cross** [6] - 22:15, 23:12, 24:25, 44:21, 52:14, 57:5
**Cross** [3] - 120:10, 120:11, 120:14, 120:15, 120:15, 120:21, 120:21, 120:22
**CROSS** [8] - 15:5, 22:12, 44:22, 47:18, 48:23, 78:15, 95:2, 99:17
**cross-examination** [3] - 24:25, 44:21, 57:5
**CROSS-EXAMINATION** [8] - 15:5, 22:12, 44:22, 47:18, 48:23, 78:15, 95:2, 99:17
**Cross-Examination** [8] - 120:10, 120:11, 120:14, 120:15, 120:15, 120:21, 120:21, 120:22
**CRR** [2] - 2:23, 119:17
**CSOs** [1] - 3:10
**currency** [7] - 74:17, 110:12, 110:14, 110:17, 110:24, 112:3, 112:5
**current** [3] - 27:12, 27:18, 101:25
**custody** [5] - 52:11, 52:17, 52:21, 55:5, 103:15
**cut** [2] - 34:15, 96:20
**cutter** [1] - 58:20

# D

**D-U-N-N** [1] - 4:5
**D3** [2] - 74:25, 75:14
**D4** [2] - 74:25, 75:14
**D5** [2] - 74:25, 75:14
**daily** [1] - 63:21
**Dan** [1] - 102:21
**Daniel** [1] - 1:13
**dark** [2] - 7:12, 7:13
**dark-skinned** [2] - 7:12, 7:13
**date** [4] - 54:22, 54:24, 64:11, 102:23
**Dated** [1] - 119:14
**David** [1] - 118:5
**Dawson** [1] - 104:9
**days** [4] - 31:23, 38:1, 60:15, 83:6
**daytime** [1] - 104:16
**DEA** [2] - 118:5
**deal** [2] - 28:7, 41:19
**dealing** [1] - 82:3
**dealt** [1] - 47:11
**decide** [1] - 20:4
**decision** [1] - 99:5
**Defendant** [8] - 1:15, 1:18, 1:20, 1:22, 2:2, 2:4, 2:6, 2:8
**defendants** [4] - 60:18, 60:19, 60:21, 60:23
**Defendants** [3] - 1:6, 61:3, 61:8
**Defender** [1] - 1:19
**definitely** [1] - 12:8
**degree** [1] - 32:12
**delay** [1] - 3:20
**Delorenzo** [1] - 102:21
**denied** [1] - 24:6
**denominations** [1] - 75:9
**department** [2] - 83:1, 83:2
**Department** [3] - 27:13, 53:16, 63:13
**departmental** [1] - 82:25
**depict** [1] - 32:4
**depicted** [2] - 50:12, 83:9
**depictions** [1] - 106:16
**describe** [11] - 7:11, 11:25, 12:1, 12:23, 13:4, 28:9, 65:11, 75:25, 103:21, 104:13, 109:12
**described** [2] - 21:5, 78:21
**description** [1] - 68:8
**designate** [2] - 36:13, 93:7
**desk** [1] - 82:19
**detail** [1] - 32:9
**detective** [6] - 27:13, 27:18, 63:16, 64:4, 92:19
**DETECTIVE** [2] - 63:1, 120:19
**Detective** [22] - 34:7, 39:10, 39:21, 44:25, 45:1, 45:2, 53:4, 53:14, 55:5, 55:10, 55:16, 56:21, 57:2, 57:7, 62:23, 63:5, 63:12, 78:17, 78:20, 92:25, 100:12, 118:1
**determine** [3] - 56:3, 93:3, 93:4

**determined** [1] - 105:10
**device** [9] - 19:10, 19:16, 19:22, 20:12, 31:5, 31:7, 32:10, 39:10, 39:12
**devices** [1] - 21:9
**different** [10] - 3:19, 16:10, 35:2, 54:1, 76:22, 77:20, 82:10, 90:3, 102:17, 116:14
**difficult** [1] - 61:17
**digital** [1] - 113:23
**dining** [1] - 107:15
**Direct** [5] - 120:10, 120:14, 120:18, 120:20, 121:2
**direct** [9] - 5:4, 6:3, 20:11, 22:15, 29:19, 64:8, 64:11, 97:25, 102:22
**DIRECT** [5] - 4:7, 27:8, 53:12, 63:9, 101:21
**directed** [2] - 21:11, 42:20
**direction** [7] - 33:19, 67:1, 69:1, 72:11, 83:25, 84:3, 84:7
**directly** [11] - 4:1, 5:17, 5:24, 6:1, 22:19, 25:9, 42:19, 80:9, 82:14, 91:12
**disagree** [1] - 61:15
**disclosed** [1] - 25:23
**discuss** [5] - 8:9, 58:9, 58:11, 59:18, 60:6
**discussing** [2] - 58:10, 62:9
**discussion** [2] - 23:9, 100:21
**displayed** [16] - 32:16, 32:24, 33:13, 33:22, 34:2, 34:12, 34:18, 35:4, 35:13, 36:4, 38:5, 38:12, 38:24, 39:7, 39:18, 40:9
**distressed** [2] - 49:13, 49:18
**distribute** [4] - 4:17, 4:20, 15:12, 16:15
**distribution** [1] - 46:3
**DISTRICT** [2] - 1:1, 1:1
**District** [5] - 64:10, 65:8, 73:13, 119:7
**district** [1] - 27:25
**districts** [1] - 28:14
**DIVISION** [1] - 1:2
**Division** [2] - 102:6, 102:8
**DNA** [2] - 93:22, 94:15
**Docket** [1] - 1:4
**document** [3] - 111:14, 111:15, 116:16
**Document** [7] - 7:21, 8:4, 37:10, 75:12, 95:10, 95:11, 111:25
**documented** [2] - 87:17, 87:18
**documents** [5] - 116:1, 116:3, 116:4, 116:6, 116:11
**DOJ** [1] - 1:14
**done** [8] - 19:17, 27:23, 27:25, 57:9, 63:22, 100:24
**door** [1] - 3:19
**doorway** [1] - 41:11
**down** [30] - 44:3, 44:11, 50:19, 59:4, 67:3, 67:12, 67:18, 67:20, 67:24, 70:21, 70:22, 72:2, 72:9, 72:16, 74:6, 80:14, 80:18, 80:21, 80:23, 80:24, 81:12, 90:8, 94:20, 98:1, 98:2, 98:21, 116:25
**downstairs** [1] - 109:20

**Downtown** [5] - 9:25, 10:20, 10:23, 12:19, 109:1
**draw** [3] - 43:18, 65:22, 77:16
**drawing** [1] - 77:13
**dress** [1] - 29:2
**drive** [1] - 6:21
**driving** [2] - 9:4, 9:19
**drove** [2] - 6:22, 13:19
**drug** [20] - 4:20, 16:16, 29:5, 29:10, 49:7, 49:14, 64:25, 65:5, 65:14, 68:18, 71:17, 73:1, 82:3, 84:4, 92:1, 93:11, 93:12, 99:10, 99:23
**drug-trafficking** [1] - 16:16
**drugs** [33] - 5:11, 12:21, 12:23, 13:12, 14:10, 48:1, 49:4, 49:10, 49:13, 51:2, 52:21, 55:5, 56:3, 56:16, 56:21, 68:13, 70:18, 70:19, 71:6, 71:8, 71:14, 71:15, 72:18, 77:2, 77:3, 77:22, 78:10, 78:13, 82:6, 91:20, 93:16, 98:14, 98:15
**DTLR** [10] - 108:23, 108:25, 110:5, 110:6, 110:7, 112:12, 113:5, 113:16, 113:21, 114:11
**dude** [20] - 7:12, 7:13, 7:25, 8:1, 8:8, 8:12, 8:15, 8:18, 8:25, 9:8, 10:4, 10:5, 10:24, 10:25, 11:18, 12:3, 12:7
**dudes** [4] - 8:12, 10:9, 10:15, 12:3
**due** [1] - 3:7
**Dunn** [9] - 3:16, 3:22, 4:9, 4:12, 15:7, 22:14, 24:25, 25:1, 25:14
**DUNN** [2] - 3:24, 120:9
**during** [10] - 16:16, 19:11, 60:7, 86:13, 105:13, 106:14, 108:18, 110:12, 112:4, 112:12
**duties** [4] - 53:22, 54:3, 56:8, 63:19
**duty** [1] - 54:21
**dwelling** [1] - 65:13
**dwellings** [1] - 65:15

# E

**e-cigarette** [2] - 39:15, 39:16
**early** [1] - 47:4
**easier** [1] - 108:7
**easiest** [1] - 111:23
**east** [3] - 80:8, 82:14, 87:25
**ECU** [5] - 36:21, 36:23, 36:24, 47:7
**Edmondson** [1] - 81:8
**eight** [1] - 63:15
**either** [11] - 7:1, 12:3, 12:7, 12:18, 18:2, 28:20, 29:20, 41:15, 48:8, 89:17, 100:4
**election** [1] - 19:25
**eleven** [1] - 27:17
**embark** [1] - 19:17
**employed** [1] - 53:15
**empty** [2] - 73:7, 113:12
**encounter** [2] - 20:13, 21:5
**encountered** [1] - 21:23
**end** [4] - 34:5, 60:4, 90:13, 96:20

**ended** [1] - 21:14
**enforcement** [25] - 4:23, 4:24, 5:15, 5:18, 5:20, 6:5, 6:17, 6:19, 6:25, 7:5, 8:7, 8:25, 9:9, 12:12, 12:17, 13:19, 13:21, 18:8, 18:15, 21:11, 25:20, 26:14, 53:15, 71:17, 117:24
**engage** [3] - 84:3, 90:3, 90:10
**engaged** [1] - 90:1
**engaging** [1] - 51:5
**ensure** [1] - 21:11
**enter** [5] - 79:8, 81:2, 86:3, 100:15, 107:10
**entered** [3] - 86:6, 86:11, 86:13
**entering** [4] - 49:1, 50:23, 83:19, 84:22
**enters** [2] - 3:12, 62:19
**entire** [4] - 21:5, 31:22, 61:9, 109:15
**ENTITLED** [1] - 1:9
**entitled** [1] - 119:10
**entry** [16] - 81:20, 103:9, 103:18, 104:22, 104:23, 104:24, 107:2, 107:8, 107:14, 107:19, 107:22, 108:1, 108:12, 108:14, 108:16
**Epkins** [1] - 104:7
**equip** [1] - 31:4
**escape** [6] - 66:20, 67:6, 67:15, 67:18, 72:13, 84:22, 85:6, 86:8
**Esquire** [9] - 1:16, 1:17, 1:21, 1:23, 1:23, 2:3, 2:5, 2:7, 2:9
**establish** [1] - 69:5
**estimation** [2] - 50:9, 51:4
**et** [2] - 1:5, 120:2
**eventually** [1] - 70:11
**everywhere** [1] - 71:12
**Evidence** [6] - 36:14, 36:24, 56:2, 56:16, 75:4, 76:6
**evidence** [10] - 54:6, 78:14, 82:3, 92:10, 93:4, 93:7, 103:12, 103:15, 108:8, 116:15
**exact** [1] - 88:4
**exactly** [8] - 24:2, 59:25, 62:11, 67:12, 77:4, 87:16, 92:8, 104:17
**Examination** [15] - 120:10, 120:10, 120:11, 120:11, 120:14, 120:14, 120:15, 120:15, 120:18, 120:20, 120:21, 120:21, 120:22, 120:22, 121:2
**EXAMINATION** [15] - 4:7, 15:5, 22:12, 26:10, 27:8, 44:22, 47:18, 48:23, 53:12, 63:9, 78:15, 95:2, 99:17, 100:10, 101:21
**examination** [5] - 22:15, 24:25, 44:21, 57:5, 117:1
**except** [1] - 86:14
**exchange** [3] - 19:11, 42:19, 68:13
**exclude** [1] - 82:5
**excuse** [3] - 38:1, 117:4, 118:14
**excused** [10] - 26:19, 26:20, 52:2, 52:3, 57:16, 58:3, 100:18, 100:20, 117:1, 117:20
**Excused**.................................... [5] - 120:12, 120:16, 120:18, 120:23, 121:3

**execute** [1] - 54:6
**exhibit** [18] - 30:14, 31:22, 37:14, 37:16, 38:7, 42:11, 43:20, 112:9, 112:25, 113:7, 113:14, 113:20, 114:2, 114:16, 114:18, 114:20, 115:11, 115:23
**Exhibit** [22] - 31:13, 31:15, 31:20, 37:23, 40:19, 40:21, 41:5, 41:24, 43:10, 43:12, 55:13, 56:11, 65:19, 75:14, 76:20, 105:22, 106:22, 111:24, 112:10, 112:20, 114:17, 115:13
**exhibits** [4] - 106:6, 111:21, 112:19, 112:22
**Exhibits** [7] - 41:10, 41:22, 74:22, 74:25, 75:11, 106:1, 106:19
**exist** [1] - 76:9
**existed** [1] - 80:8
**exited** [3] - 87:21, 89:14
**exiting** [2] - 50:24, 88:15
**expect** [2] - 25:10, 117:24
**expenses** [2] - 25:7, 25:13
**experience** [4] - 46:2, 71:21, 91:25
**explain** [2] - 3:19, 72:8
**explaining** [1] - 49:1
**exterior** [2] - 72:3, 106:24
**eye** [1] - 20:15

## F

**F-E-R-G-U-S-O-N** [1] - 53:10
**face** [3] - 17:15, 79:15, 80:11
**faced** [3] - 82:19, 82:20
**facing** [1] - 84:8
**fact** [7] - 25:3, 49:14, 51:9, 61:5, 78:10, 94:11, 94:18
**facts** [1] - 96:5
**failed** [1] - 25:12
**fair** [7] - 16:21, 18:3, 18:13, 20:5, 46:6, 46:10, 98:14
**fairness** [1] - 94:23
**fake** [1] - 56:4
**fallen** [1] - 70:20
**falling** [3] - 72:2, 72:9, 72:16
**familiar** [4] - 32:20, 32:22, 79:5
**familiarity** [1] - 28:25
**far** [3] - 67:10, 83:18, 90:24
**fat** [23] - 7:12, 7:13, 7:25, 8:1, 8:8, 8:12, 8:15, 8:18, 8:25, 9:8, 9:14, 9:19, 10:4, 10:5, 10:14, 10:24, 11:10, 11:18, 12:3, 12:7, 12:18, 19:4, 21:18
**fault** [2] - 23:16
**FBI** [14] - 2:11, 6:7, 6:13, 7:1, 17:1, 29:21, 30:3, 30:10, 101:11, 102:1, 102:2, 102:4, 108:4, 112:6
**FDA** [1] - 118:4
**February** [5] - 64:5, 64:8, 79:25, 96:14, 99:20
**Federal** [1] - 1:19
**FEDERAL** [1] - 119:18
**felony** [2] - 4:16, 16:12

**Ferguson** [4] - 53:4, 53:9, 55:10, 55:16
**FERGUSON** [2] - 53:6, 120:17
**few** [6] - 14:20, 67:13, 84:13, 84:14, 85:20, 117:19
**fifteen** [1] - 10:7
**fifth** [2] - 89:24, 91:7
**Filbert** [1] - 104:7
**film** [1] - 91:4
**fine** [5] - 3:11, 3:21, 115:10, 115:24, 116:24
**fingernail** [1] - 77:7
**fingerprint** [3] - 93:13, 93:17, 93:25
**fingerprints** [4] - 93:8, 93:11, 93:12, 94:13
**finish** [1] - 101:3
**finished** [6] - 86:1, 103:25, 104:2, 107:23, 109:13, 109:15
**fire** [8] - 66:20, 67:5, 67:15, 67:18, 72:13, 84:22, 85:6, 86:8
**firearm** [1] - 4:20
**first** [36] - 3:7, 6:11, 6:12, 8:17, 27:5, 31:3, 32:14, 32:18, 34:5, 38:19, 45:5, 46:13, 50:2, 53:9, 59:17, 60:17, 66:15, 67:10, 71:10, 72:12, 72:14, 77:13, 81:19, 83:24, 87:18, 89:6, 89:12, 90:21, 90:22, 97:14, 97:21, 103:6, 104:13, 106:25, 107:10
**five** [20] - 10:9, 10:15, 11:1, 21:23, 21:25, 24:3, 51:14, 51:17, 52:11, 68:3, 80:24, 87:13, 87:16, 87:17, 87:18, 90:2, 100:14, 115:15, 117:23, 118:15
**flip** [2] - 37:14, 106:4
**Floor** [1] - 2:23
**floor** [4] - 50:2, 72:6, 84:23, 110:8
**floors** [2] - 50:4, 103:23
**Floyd** [1] - 2:8
**FOCR** [1] - 2:23
**focused** [3] - 32:11, 48:10, 51:7
**folks** [1] - 117:8
**following** [5] - 23:9, 38:1, 52:6, 58:14, 100:21
**FOR** [3] - 1:1, 1:9, 120:7
**Force** [4] - 102:5, 104:8, 104:9, 104:11
**force** [1] - 17:1
**forced** [1] - 104:23
**foregoing** [1] - 119:8
**forensic** [1] - 56:5
**forgot** [2] - 114:16, 115:11
**form** [1] - 35:12
**format** [1] - 119:11
**foundation** [1] - 69:6
**four** [10] - 15:24, 16:19, 28:3, 72:7, 72:17, 76:1, 80:9, 80:23, 84:14, 105:5
**fourth** [1] - 89:22
**Fourth** [1] - 2:23
**free** [2] - 18:2, 61:10
**friendly** [1] - 62:7
**front** [6] - 40:23, 44:10, 72:22, 79:2, 80:13, 111:12

**full** [2] - 4:3, 32:2
**full-length** [1] - 32:2
**functions** [2] - 54:18, 63:21

# G

**gallery** [3] - 58:20, 59:11, 60:2
**GARDNER** [69] - 26:21, 27:9, 30:15,
  30:17, 31:21, 32:14, 32:17, 33:1,
  33:15, 33:24, 34:4, 34:14, 34:20, 35:6,
  35:15, 36:6, 37:7, 37:11, 37:24, 38:6,
  38:14, 39:1, 39:9, 39:20, 40:11, 40:22,
  41:6, 41:13, 41:23, 42:7, 42:10, 42:13,
  44:15, 44:18, 51:25, 52:22, 57:24,
  58:8, 58:13, 58:17, 58:22, 60:8,
  100:25, 101:3, 101:10, 101:22,
  105:23, 106:2, 106:7, 106:21, 111:20,
  111:23, 112:1, 114:24, 115:2, 115:3,
  115:9, 115:11, 115:12, 115:23,
  115:25, 116:8, 116:13, 116:15,
  116:18, 116:20, 118:1, 118:4, 118:12
**Gardner** [8] - 1:13, 30:14, 37:23, 41:5,
  41:22, 58:7, 60:11, 114:23
**GARDNER.................** [1] - 120:11
**GARDNER.................** [2] - 120:14,
  121:2
**Gary** [1] - 1:23
**gather** [1] - 54:5
**gel** [3] - 113:1, 113:10, 113:12
**general** [4] - 38:8, 51:1, 62:6, 80:20
**generally** [3] - 43:12, 50:20, 61:7
**generosity** [2] - 17:14, 17:16
**gentleman** [5] - 21:18, 47:23, 61:20,
  89:8, 100:1
**gentleman's** [1] - 68:8
**gentlemen** [3] - 19:11, 100:4, 117:5
**gesture** [3] - 11:20, 13:4, 17:8
**Giglio** [1] - 25:8
**Giordano** [1] - 119:5
**GIORDANO** [2] - 2:23, 119:17
**given** [5] - 5:20, 17:24, 17:25, 22:19,
  25:9
**glass** [1] - 76:1
**golf** [2] - 13:5, 13:9
**GOVERNMENT** [1] - 120:8
**Government** [17] - 1:12, 3:13, 3:15,
  17:14, 22:16, 23:17, 25:1, 25:6, 40:19,
  43:12, 53:1, 61:19, 62:21, 62:23,
  101:7, 101:10, 111:24
**GOVERNMENT'S** [5] - 3:24, 27:1, 53:6,
  63:1, 101:13
**Government's** [17] - 26:21, 31:13,
  41:24, 43:10, 53:3, 56:11, 60:7, 65:18,
  74:24, 75:14, 76:20, 105:22, 106:22,
  112:10, 112:20, 114:17, 115:13
**grab** [1] - 70:22
**grabbed** [2] - 72:5, 72:6
**gram** [2] - 46:6, 46:8
**grams** [3] - 46:13, 46:15, 46:18

**grand** [1] - 17:22
**great** [2] - 25:6, 62:12
**group** [3] - 10:25, 11:3, 36:10
**guess** [2] - 39:16, 56:11
**Guillaume** [1] - 2:3
**guilty** [1] - 15:19
**gun** [5] - 5:11, 16:16, 53:23
**guy** [12] - 9:14, 9:19, 10:14, 11:10,
  12:18, 19:4, 21:18, 48:12, 48:14, 65:3,
  68:9
**guys** [1] - 99:7
**GVED** [1] - 53:20

# H

**half** [4] - 63:15, 86:17, 94:24, 100:13
**Hall** [1] - 118:4
**hand** [24] - 3:23, 11:20, 13:2, 26:25,
  39:11, 53:5, 62:25, 68:18, 89:7, 90:4,
  90:5, 90:10, 98:7, 98:8, 101:12, 110:1,
  113:18
**hand-to-hand** [7] - 68:18, 89:7, 90:4,
  90:5, 90:10, 98:7, 98:8
**handed** [7] - 12:21, 12:23, 30:2, 35:17,
  37:1, 40:16
**handing** [2] - 7:23, 74:24
**handled** [1] - 93:4
**hands** [2] - 28:12, 46:23
**hang** [1] - 57:7
**Hanley** [3] - 1:14, 24:20, 75:12
**HANLEY** [49] - 3:6, 3:10, 3:15, 3:18, 4:8,
  5:5, 5:6, 7:19, 7:22, 8:6, 15:1, 23:24,
  24:7, 24:12, 24:16, 24:18, 25:17, 26:2,
  26:9, 26:11, 26:17, 52:19, 62:22,
  63:10, 64:1, 64:3, 68:16, 69:7, 69:8,
  69:14, 69:23, 70:5, 70:6, 70:24, 71:25,
  73:18, 74:20, 74:23, 75:13, 75:23,
  76:14, 76:17, 76:19, 77:8, 77:12, 78:5,
  94:22, 100:11, 100:17
**HANLEY.................** [1] - 120:22
**HANLEY.................** [2] - 120:10,
  120:20
**Harlem** [53] - 32:19, 44:3, 44:11, 44:12,
  49:7, 50:17, 50:18, 55:1, 65:1, 66:4,
  66:18, 67:3, 67:19, 67:21, 68:11,
  68:20, 74:6, 79:14, 79:15, 79:25, 80:9,
  80:11, 80:12, 80:23, 81:2, 81:15,
  81:18, 82:15, 83:19, 87:22, 87:24,
  88:1, 88:2, 88:3, 88:4, 88:10, 88:16,
  88:17, 88:20, 88:21, 90:6, 90:24,
  91:16, 97:12, 97:14, 97:15, 97:18,
  98:1, 98:2, 98:3
**Harrison** [3] - 1:22, 60:20, 60:25
**Harry** [1] - 2:9
**head** [1] - 91:10
**headed** [2] - 36:8, 85:3
**heading** [1] - 33:19
**hear** [5] - 4:11, 19:12, 59:15, 62:9,
  117:16

**heard** [2] - 59:13, 116:11
**hearing** [1] - 33:2
**Heights** [1] - 6:20
**held** [5] - 52:6, 57:19, 58:14, 62:15,
  119:10
**help** [5] - 4:10, 30:3, 30:10, 53:23, 61:14
**helps** [1] - 64:2
**hereby** [1] - 119:7
**heroin** [7] - 18:6, 35:9, 35:10, 35:12,
  46:2, 46:18, 47:1
**Hi** [1] - 61:21
**high** [3] - 28:15, 81:5, 81:6
**higher** [1] - 81:10
**hitting** [3] - 33:7, 33:8, 33:9
**hold** [6] - 36:19, 57:8, 63:17, 71:14,
  71:15
**holding** [2] - 92:4, 113:18
**home** [12] - 66:17, 67:8, 67:11, 70:7,
  70:8, 70:9, 71:3, 71:5, 71:7, 71:11,
  74:9, 92:23
**homes** [1] - 49:21
**honest** [1] - 48:2
**Hongde** [1] - 118:7
**Honor** [55] - 3:6, 3:15, 3:19, 5:1, 5:5,
  7:19, 15:1, 15:2, 22:9, 22:10, 23:7,
  23:11, 23:24, 24:21, 25:17, 26:9,
  26:17, 26:21, 37:7, 42:10, 44:15,
  44:19, 47:17, 48:22, 51:19, 51:25,
  53:3, 57:10, 57:24, 58:8, 58:17, 60:8,
  60:9, 60:11, 62:22, 74:20, 76:14, 78:5,
  78:7, 78:8, 94:25, 99:14, 101:10,
  105:24, 111:20, 114:24, 115:9,
  115:23, 116:8, 116:13, 116:18,
  116:21, 118:2, 118:9, 118:12
**Honorable** [5] - 3:2, 3:3, 58:1, 58:5,
  118:16
**HONORABLE** [1] - 1:10
**hoodie** [3] - 47:24, 48:16, 100:1
**hour** [2] - 86:17, 100:12
**hours** [3] - 86:18, 97:5, 97:9
**house** [56] - 65:24, 66:1, 66:6, 66:11,
  66:20, 66:21, 66:24, 67:23, 68:22,
  69:17, 70:14, 70:15, 72:12, 72:22,
  76:23, 77:23, 79:2, 79:3, 80:25, 81:4,
  81:20, 81:22, 81:25, 82:3, 82:9, 82:17,
  84:16, 84:19, 84:21, 85:4, 85:7, 85:16,
  85:20, 86:3, 86:13, 86:25, 87:6, 89:10,
  90:2, 90:13, 90:14, 90:15, 90:20,
  90:25, 91:1, 91:8, 92:7, 92:13, 92:16,
  97:23, 98:22, 98:23, 100:14, 100:15,
  104:25, 105:1
**houses** [27] - 50:2, 50:6, 50:10, 50:24,
  67:12, 67:13, 77:19, 77:22, 78:2,
  79:13, 79:15, 79:17, 80:9, 80:11,
  80:17, 80:18, 80:23, 80:24, 81:12,
  84:11, 84:13, 84:14, 84:15, 84:25,
  85:13

# I

**idea** [3] - 86:24, 89:1, 92:16
**identification** [5] - 7:23, 7:24, 37:9, 40:19, 55:11
**identify** [2] - 23:25, 24:3
**identifying** [1] - 23:25
**ignoring** [1] - 117:9
**impeachment** [1] - 25:8
**implies** [1] - 54:14
**important** [3] - 83:5, 96:5
**IN** [1] - 1:1
**incident** [4] - 19:16, 80:6, 87:17
**incidentally** [1] - 55:20
**including** [1] - 117:3
**INDEX** [1] - 120:1
**indicate** [1] - 43:25
**indicated** [5] - 42:14, 44:5, 44:9, 48:25, 87:15
**indicating** [5] - 43:18, 44:6, 81:3, 83:20, 90:15
**indicating)** [8] - 12:25, 43:21, 44:2, 65:25, 66:23, 77:11, 77:19, 90:23
**individual** [31] - 19:3, 28:22, 28:23, 30:2, 30:4, 30:6, 30:8, 30:18, 30:23, 33:4, 33:16, 34:21, 34:23, 34:25, 37:3, 39:4, 39:23, 41:18, 41:25, 42:3, 42:14, 42:18, 42:23, 42:25, 43:5, 43:8, 48:10, 59:3, 90:4, 105:14
**individuals** [7] - 34:10, 49:2, 51:8, 88:11, 94:8, 102:13, 105:3
**indulgence** [1] - 3:18
**infant** [1] - 105:5
**infiltrate** [1] - 28:24
**inform** [1] - 58:18
**information** [5] - 25:8, 25:10, 28:20, 34:10, 34:16
**initial** [1] - 111:3
**initiate** [1] - 54:12
**inside** [20] - 9:24, 11:23, 12:18, 29:17, 67:23, 70:17, 72:7, 72:18, 76:2, 91:19, 92:7, 92:8, 92:23, 105:1, 105:9, 109:7, 110:6, 113:16
**instructions** [1] - 103:16
**Intel** [1] - 104:9
**intent** [4] - 4:17, 4:20, 15:12, 16:15
**interact** [1] - 42:18
**interaction** [2] - 30:18, 73:9
**interested** [2] - 59:4, 92:19
**intersection** [5] - 44:11, 65:6, 79:14, 79:25, 88:4
**introduced** [1] - 63:16
**investigate** [1] - 53:23
**investigating** [1] - 46:2
**investigation** [11] - 30:12, 45:5, 45:8, 64:22, 64:25, 65:12, 102:12, 102:15, 102:20, 102:23, 108:19
**investigator** [1] - 93:2
**involved** [3] - 36:11, 45:5, 99:23

**involvement** [1] - 14:14
**involving** [1] - 102:12
**issue** [3] - 58:9, 58:11, 60:7
**it'll** [1] - 65:22
**item** [1] - 109:10
**items** [19] - 55:20, 73:6, 76:4, 76:22, 91:19, 92:5, 92:10, 94:2, 94:13, 94:16, 103:12, 103:15, 107:6, 108:6, 108:8, 108:18, 109:8, 112:13, 115:14
**itself** [1] - 21:8

# J

**J-A-M-E-S** [1] - 101:18
**jail** [4] - 15:25, 17:15, 17:18, 20:3
**James** [6] - 100:25, 101:11, 101:18, 101:23, 116:21
**JAMES** [2] - 101:13, 121:1
**January** [5] - 6:4, 6:16, 18:5, 20:11, 21:18
**Jeff** [1] - 104:9
**Jenifer** [1] - 1:23
**John** [2] - 1:14, 65:3
**Joseph** [1] - 1:19
**Jr** [1] - 2:9
**Judge** [2] - 60:12, 61:19
**Judicial** [1] - 119:11
**July** [1] - 119:14
**jumped** [1] - 108:17
**jurisdiction** [1] - 15:15
**Juror** [2] - 59:6, 59:9
**juror** [2] - 59:18, 59:25, 62:2, 62:11
**jurors** [4] - 60:17, 60:19, 60:22, 61:20
**JURY** [1] - 1:10
**jury** [10] - 3:7, 7:11, 19:11, 58:8, 60:3, 61:3, 62:17, 66:22, 109:12, 117:4
**Jury** [4] - 3:12, 58:3, 62:19, 117:20

# K

**Karen** [1] - 118:4
**keep** [3] - 11:6, 62:1, 117:5
**keeps** [1] - 61:21
**kept** [1] - 11:9
**Kevin** [3] - 6:12, 6:13, 7:4
**Kim** [1] - 104:8
**kind** [14] - 6:23, 19:10, 29:2, 34:8, 42:20, 59:14, 63:25, 64:13, 64:21, 73:6, 75:16, 90:3, 103:9
**kitchen** [1] - 107:19
**knowledge** [4] - 69:4, 69:22, 69:23, 78:10
**known** [1] - 54:7
**Krystal** [1] - 2:11

# L

**lab** [1] - 56:5
**label** [2] - 108:7, 108:8
**labeled** [5] - 42:7, 42:8, 42:11, 107:8, 107:19
**laboratory** [1] - 76:5
**ladies** [2] - 19:11, 117:5
**lady** [1] - 34:7
**laid** [1] - 110:8
**landlord** [7] - 5:24, 6:2, 17:25, 22:20, 23:3, 23:5, 25:5
**Landsman** [5] - 65:3, 68:24, 70:13, 96:25, 118:1
**last** [12] - 6:11, 27:6, 34:15, 38:23, 40:5, 41:18, 53:10, 60:22, 61:9, 69:1, 111:3, 111:5
**late** [4] - 29:19, 45:6, 45:14, 47:3
**Laughter** [1] - 52:16
**law** [24] - 4:23, 4:24, 5:14, 5:18, 5:20, 6:4, 6:17, 6:19, 6:25, 7:5, 8:7, 8:25, 9:9, 12:12, 12:17, 13:18, 13:21, 18:8, 18:15, 21:11, 25:20, 26:14, 53:15, 117:24
**Lawlor** [4] - 1:17, 15:4, 24:7, 24:19
**LAWLOR** [6] - 5:1, 15:6, 22:7, 24:10, 24:15, 24:17
**LAWLOR......................** [1] - 120:10
**lawyers** [1] - 62:7
**leader** [5] - 103:1, 103:4, 103:6, 103:7, 103:16
**leading** [1] - 5:1
**leads** [4] - 68:10, 88:2, 88:3, 98:2
**learned** [1] - 94:8
**leasing** [2] - 5:25, 18:12
**least** [6] - 24:2, 52:12, 52:14, 61:6, 85:12, 101:8
**leave** [7] - 8:24, 60:17, 70:9, 70:11, 100:15, 105:14, 117:5
**leaves** [2] - 22:22, 61:3
**leaving** [1] - 88:19
**left** [11] - 9:9, 10:1, 13:13, 13:14, 41:25, 44:9, 82:20, 89:2, 91:7, 91:10, 110:1
**left-hand** [1] - 110:1
**length** [3] - 32:2, 90:25, 91:1
**less** [1] - 67:25
**letter** [2] - 25:1, 25:16
**letters** [2] - 108:2, 108:6
**level** [5] - 63:23, 72:23, 103:24, 107:17, 107:20
**Liberty** [1] - 6:20
**lieutenant** [1] - 28:12
**life** [1] - 23:20
**likely** [1] - 50:9
**Lilly** [1] - 104:9
**Lincoln** [1] - 6:24
**line** [1] - 10:14
**listen** [4] - 59:11, 62:10, 117:15
**living** [1] - 107:9

**lobby** [1] - 117:8
**located** [15] - 69:2, 69:12, 72:17, 84:8, 97:22, 107:6, 108:8, 108:23, 109:10, 111:7, 112:12, 112:16, 113:15, 113:21, 114:11
**location** [32] - 7:1, 8:24, 9:18, 10:18, 14:4, 33:11, 36:12, 38:10, 38:11, 50:14, 78:20, 79:7, 80:3, 80:4, 80:5, 80:7, 80:8, 81:19, 82:6, 84:11, 86:2, 86:6, 86:11, 87:8, 91:10, 91:12, 91:13, 91:19, 92:7, 99:11, 99:12, 113:16
**locations** [1] - 78:25
**Locker** [5] - 9:25, 10:20, 10:23, 12:19, 109:1
**Lombard** [1] - 2:24
**lone** [1] - 25:25
**look** [30] - 10:10, 10:11, 10:12, 21:22, 22:4, 24:4, 29:2, 29:3, 31:13, 32:8, 37:12, 40:23, 41:8, 43:2, 49:17, 50:19, 55:12, 70:19, 71:6, 74:7, 82:13, 82:15, 95:9, 104:16, 106:3, 106:25, 110:10, 112:21, 113:6
**looked** [3] - 22:6, 50:6, 50:22, 106:17, 112:14
**looking** [30] - 16:18, 29:12, 32:18, 38:8, 41:24, 49:9, 49:12, 51:2, 66:10, 71:7, 72:12, 74:8, 82:6, 82:9, 82:13, 83:14, 106:23, 107:7, 108:3, 108:22, 109:6, 109:25, 110:4, 110:10, 110:16, 110:22, 111:2, 111:9, 113:6
**lower** [1] - 81:6
**LS** [1] - 6:24
**lunch** [1] - 59:9

## M

**Madam** [1] - 79:18
**main** [3] - 105:20, 107:17, 107:20
**maintain** [1] - 94:19
**majority** [2] - 109:17
**mall** [12] - 8:13, 10:21, 11:13, 11:15, 13:19, 14:5, 18:6, 18:9, 18:25, 20:22, 20:24, 21:8
**Mall** [5] - 9:3, 9:4, 9:18, 9:21, 9:23
**malls** [1] - 20:24
**mannite** [2] - 115:15, 115:18
**map** [2] - 43:15, 77:1
**marijuana** [4] - 4:17, 4:20, 15:13, 16:15
**Mark** [6] - 2:11, 100:25, 101:11, 102:21, 104:8
**MARK** [3] - 101:13, 101:18, 121:1
**mark** [1] - 101:18
**marked** [10] - 7:23, 31:12, 37:8, 40:19, 55:11, 56:10, 74:24, 96:23, 112:9, 115:13
**market** [2] - 29:10, 49:7
**markets** [1] - 29:5
**Marshal** [1] - 59:2
**Marshals** [5] - 58:18, 58:19, 58:24,

60:12, 61:14
**Martin** [1] - 119:5
**MARTIN** [2] - 2:23, 119:17
**MARYLAND** [1] - 1:1
**Maryland** [4] - 1:7, 2:24, 103:2, 119:7
**material** [1] - 72:23
**materials** [2] - 98:17, 110:7
**math** [1] - 46:17
**matter** [2] - 117:22, 119:10
**MATTER** [1] - 1:9
**matters** [2] - 26:14, 26:15
**McDonald** [1] - 104:8
**mean** [16] - 12:1, 18:24, 19:19, 24:13, 33:6, 33:9, 35:7, 35:11, 38:19, 38:22, 60:4, 84:14, 88:12, 103:6, 103:11, 105:7
**meaning** [1] - 29:11
**means** [1] - 105:8
**mechanical** [1] - 2:21
**media** [1] - 61:1
**meet** [12] - 6:17, 6:19, 8:13, 13:18, 14:2, 18:8, 18:23, 36:11, 68:5, 68:7, 68:9, 70:13
**meeting** [2] - 20:22, 21:12
**meets** [1] - 72:3
**member** [1] - 58:19
**members** [9] - 6:25, 8:7, 11:3, 61:1, 68:22, 69:9, 104:3, 104:5, 104:10
**men** [1] - 40:17
**mentioned** [6] - 25:21, 65:6, 109:23, 113:7, 116:1, 117:7
**Merit** [1] - 119:5
**mess** [1] - 70:17
**met** [10] - 8:1, 8:25, 14:4, 14:5, 18:22, 18:23, 18:25, 49:3, 68:12
**mic** [1] - 63:24
**Michael** [1] - 1:17
**microphone** [4] - 4:1, 4:9, 63:8, 64:1
**mid** [1] - 61:11
**mid-afternoon** [1] - 61:11
**middle** [4] - 81:2, 103:24, 114:14, 115:20
**might** [16] - 19:21, 28:13, 49:3, 50:23, 58:10, 58:19, 73:5, 86:24, 87:5, 93:3, 94:1, 94:5, 94:6, 94:8, 100:13, 117:8
**milling** [1] - 20:25
**Mills** [1] - 15:16
**mind** [5] - 43:18, 65:22, 66:11, 92:9, 117:6
**mind's** [1] - 20:15
**mine** [1] - 24:15
**minute** [5] - 11:16, 52:5, 67:25, 85:23, 85:25
**minutes** [9] - 9:22, 10:7, 10:15, 52:12, 52:14, 85:24, 117:19, 117:23, 118:15
**moment** [6] - 15:1, 32:9, 44:15, 76:14, 81:10, 90:5
**moments** [2] - 67:25, 85:20
**Mondawmin** [5] - 9:3, 9:4, 9:18, 9:21,

9:23
**money** [28] - 5:20, 5:22, 12:2, 12:6, 12:10, 12:15, 18:2, 22:19, 25:7, 25:9, 25:19, 26:12, 31:8, 31:10, 35:17, 35:19, 35:21, 46:23, 73:20, 73:21, 73:23, 73:25, 74:17, 75:4, 75:6, 111:14
**monitor** [2] - 43:17, 79:20
**Montana** [3] - 8:16, 8:22, 102:13
**MONTANA** [2] - 1:5, 120:2
**months** [2] - 15:24, 16:19
**morning** [5] - 62:1, 86:23, 104:14, 116:22, 117:17
**most** [5] - 20:24, 50:9, 60:15, 102:10, 102:11
**mouth** [3] - 4:10, 89:8, 90:8
**move** [6] - 4:1, 4:9, 26:5, 64:1, 71:19, 78:9
**moved** [1] - 81:9
**Moyé** [7] - 57:17, 59:7, 59:8, 59:10, 59:17, 59:21, 62:13
**MR** [205] - 3:6, 3:10, 3:15, 3:18, 4:8, 5:1, 5:5, 5:6, 7:19, 7:22, 8:6, 15:1, 15:6, 22:7, 22:9, 22:10, 22:13, 23:6, 23:7, 23:11, 23:14, 23:15, 23:18, 23:24, 24:7, 24:10, 24:12, 24:15, 24:16, 24:17, 24:18, 24:21, 24:24, 25:17, 26:2, 26:9, 26:11, 26:17, 26:21, 27:9, 30:15, 30:17, 31:21, 32:14, 32:17, 33:1, 33:15, 33:24, 34:4, 34:14, 34:20, 35:6, 35:15, 36:6, 37:7, 37:11, 37:24, 38:6, 38:14, 39:1, 39:9, 39:20, 40:11, 40:22, 41:6, 41:13, 41:23, 42:7, 42:10, 42:13, 44:15, 44:18, 44:23, 47:13, 47:17, 47:19, 48:20, 48:22, 48:24, 51:19, 51:25, 52:10, 52:14, 52:17, 52:18, 52:19, 52:20, 52:22, 52:24, 53:3, 53:13, 55:8, 55:9, 55:15, 57:2, 57:6, 57:7, 57:9, 57:10, 57:24, 58:8, 58:13, 58:17, 58:22, 60:8, 60:9, 60:11, 61:9, 61:12, 61:16, 61:19, 62:4, 62:12, 62:22, 63:10, 64:1, 64:3, 68:14, 68:16, 69:3, 69:7, 69:8, 69:14, 69:22, 69:23, 69:25, 70:3, 70:5, 70:6, 70:24, 71:19, 71:23, 71:25, 73:16, 73:18, 74:20, 74:23, 75:13, 75:21, 75:23, 76:13, 76:14, 76:17, 76:19, 77:8, 77:12, 78:5, 78:7, 78:16, 78:19, 79:18, 79:23, 94:22, 94:25, 95:3, 95:12, 97:20, 99:13, 99:16, 99:18, 100:6, 100:11, 100:17, 100:25, 101:3, 101:10, 101:22, 105:23, 106:2, 106:7, 106:21, 111:20, 111:23, 112:1, 114:24, 115:2, 115:3, 115:9, 115:11, 115:12, 115:23, 115:25, 116:8, 116:13, 116:15, 116:18, 116:20, 118:1, 118:4, 118:12, 120:10, 120:10, 120:11, 120:11, 120:14, 120:14, 120:15, 120:15, 120:18, 120:20, 120:21, 120:21, 120:22, 120:22, 121:2

**multiple** [2] - 80:7, 109:19
**must** [1] - 16:18

# N

**name** [29] - 4:3, 6:10, 6:11, 6:12, 7:10, 8:16, 27:3, 27:5, 27:6, 41:19, 42:15, 45:2, 53:8, 53:9, 53:10, 54:14, 55:18, 56:25, 63:3, 65:9, 67:4, 68:8, 95:6, 101:16, 111:4, 111:5, 111:10, 116:6
**named** [3] - 6:13, 8:21, 65:3
**names** [1] - 7:3
**narcotics** [14] - 6:14, 28:7, 28:8, 28:15, 29:12, 30:3, 32:23, 33:10, 38:21, 48:9, 48:11, 55:17, 72:23, 76:9
**narrative** [2] - 95:14, 95:15
**nature** [1] - 20:4
**near** [3] - 43:16, 44:11, 79:24
**necessarily** [1] - 96:8
**need** [2] - 18:19, 117:15
**needed** [6] - 23:4, 30:3, 63:22, 94:24, 97:15, 102:16
**neighborhood** [7] - 32:21, 49:2, 49:17, 65:9, 65:16, 73:3, 86:11
**neighborhoods** [1] - 73:3
**Neptune** [5] - 2:11, 59:20, 59:23, 102:21, 104:8
**never** [9] - 32:22, 47:11, 91:15, 92:3, 94:12, 94:15, 94:18, 98:7, 98:22
**next** [11] - 3:5, 13:12, 26:21, 42:25, 52:8, 52:10, 53:3, 100:3, 100:23, 113:14, 113:20
**Nieto** [1] - 2:7
**night** [1] - 104:15
**nobody** [3] - 86:13, 105:9, 117:9
**none** [2] - 25:21, 36:16
**nonetheless** [1] - 20:19
**normally** [1] - 18:11
**North** [6] - 44:12, 70:14, 70:15, 77:24, 79:8, 91:11
**north** [3] - 77:25, 82:15, 84:12
**northbound** [2] - 87:21, 88:20
**NORTHERN** [1] - 1:2
**note** [2] - 78:8, 87:15
**notes** [2] - 104:16, 117:5
**nothing** [11] - 15:2, 25:24, 26:17, 29:3, 51:19, 61:22, 78:5, 87:8, 94:25, 100:17
**notice** [2] - 50:22, 72:1
**noticed** [3] - 58:24, 71:10, 72:2
**notified** [2] - 68:24, 69:9
**notify** [3] - 13:21, 13:22, 68:22
**November** [10] - 30:25, 31:18, 38:2, 40:6, 41:2, 42:17, 43:3, 47:4, 54:21, 56:22
**number** [17] - 16:11, 16:14, 17:18, 17:20, 17:22, 30:14, 49:2, 51:4, 51:18, 56:13, 56:19, 56:20, 68:21, 82:10, 91:18, 112:25, 114:2

**Number** [2] - 59:6, 59:10

# O

**o'clock** [1] - 60:5
**object** [1] - 5:1
**objection** [10] - 68:14, 69:3, 71:19, 73:16, 75:21, 76:13, 76:15, 76:18, 78:12, 94:22
**observation** [1] - 77:23
**observations** [7] - 65:5, 65:14, 66:4, 86:14, 91:16, 91:19, 99:7
**observe** [2] - 70:19, 89:4
**observed** [4] - 86:3, 90:9, 92:4, 97:9
**observing** [2] - 86:15, 97:8
**obvious** [1] - 34:8
**occasion** [3] - 18:16, 91:7, 99:22
**occasions** [6] - 19:24, 87:13, 87:16, 87:17, 87:18, 90:3
**occupation** [2] - 27:12, 101:25
**occur** [2] - 30:25, 68:3
**occurred** [5] - 20:22, 21:12, 23:9, 100:21, 104:14
**October** [16] - 29:20, 30:25, 31:3, 31:4, 31:18, 32:15, 37:20, 39:5, 40:2, 40:7, 42:4, 45:6, 45:15, 47:4, 102:22, 106:11
**oddball** [1] - 34:9
**OF** [5] - 1:1, 1:3, 3:1, 119:1, 120:6
**offer** [2] - 16:21, 16:23
**Office** [1] - 53:21
**Officer** [11] - 26:22, 27:10, 39:10, 44:25, 48:25, 68:24, 76:6, 95:4, 96:25, 104:8, 104:9
**officer** [8] - 28:6, 45:23, 55:18, 55:19, 56:1, 63:18, 63:20, 99:5
**officers** [5] - 16:24, 18:16, 104:21
**OFFICIAL** [2] - 119:1, 119:18
**old** [1] - 4:14
**older** [1] - 61:20
**ON** [1] - 1:9
**once** [2] - 68:2, 104:24
**one** [54] - 7:4, 12:3, 12:4, 12:8, 12:22, 15:1, 16:11, 17:18, 19:12, 21:21, 21:22, 23:17, 38:7, 40:17, 41:11, 41:15, 41:18, 42:23, 43:11, 44:15, 49:18, 52:18, 52:19, 60:20, 61:20, 76:14, 76:23, 77:4, 77:14, 80:16, 89:7, 90:5, 90:7, 97:17, 105:5, 106:4, 108:14, 109:18, 109:20, 111:14, 111:24, 112:24, 114:16, 115:19, 115:23, 116:11, 116:12, 116:15, 116:16
**ones** [1] - 104:6
**open** [8] - 29:5, 29:10, 29:11, 33:7, 49:7, 50:4, 109:7, 117:6
**open-air** [3] - 29:5, 29:10, 49:7
**operation** [3] - 32:6, 55:7, 103:10
**operations** [2] - 29:22, 54:5

**opportunity** [2] - 24:22, 50:19
**opposed** [1] - 45:19
**ops** [1] - 27:25
**orange** [1] - 114:14
**order** [1] - 112:21
**organized** [1] - 75:9
**outside** [11] - 11:8, 11:13, 11:15, 29:14, 29:17, 105:11, 105:12, 105:15, 105:16, 110:25, 117:11
**overall** [2] - 49:17, 103:10
**overhead** [1] - 79:19
**overhear** [1] - 117:13
**overruled** [1] - 68:15
**Owings** [1] - 15:16
**own** [2] - 12:15, 89:4

# P

**P.G** [1] - 102:9
**p.m** [6] - 58:4, 66:7, 86:20, 86:22, 86:23
**P3** [2] - 30:15, 43:10
**P43** [1] - 7:24
**package** [3] - 40:24, 55:17
**packaging** [5] - 14:12, 72:22, 72:23, 73:6, 98:17
**PAGE** [2] - 120:6, 121:1
**page** [2] - 24:16, 119:10
**paid** [15] - 5:17, 5:24, 6:1, 22:16, 22:20, 22:22, 23:4, 25:4, 25:7, 25:13, 25:18, 25:20, 26:12
**Pan** [1] - 118:7
**Panas** [1] - 2:11
**pants** [1] - 58:24
**paper** [1] - 81:9
**papers** [1] - 28:12
**paperwork** [2] - 111:10, 111:11
**Paralegal** [1] - 2:11
**paraphernalia** [2] - 93:11, 93:12
**Park** [2] - 66:4, 66:18
**parked** [3] - 43:15, 43:21, 44:10
**parole** [1] - 14:17
**part** [17] - 18:15, 18:16, 21:9, 28:21, 82:17, 90:7, 93:16
**partial** [2] - 31:17, 31:24
**participants** [1] - 103:17
**participate** [3] - 6:14, 20:7, 20:8
**participated** [1] - 72:25
**participating** [1] - 99:10
**participation** [1] - 55:4
**particular** [7] - 18:15, 18:16, 21:9, 28:21, 82:17, 90:7, 93:16
**party** [2] - 22:20, 25:5
**pass** [1] - 36:20
**past** [1] - 90:6
**path** [1] - 68:21
**patrol** [4] - 27:25, 32:23, 63:21, 63:22
**Patrol** [1] - 64:10

**Pause** - 3:17, 44:17
**pay** [1] - 51:8
**payment** [3] - 14:20, 14:23, 23:1
**pen** [2] - 80:18, 81:5
**pending** [2] - 15:25, 117:1
**penny** [1] - 25:2
**people** [17] - 10:19, 11:1, 18:11, 20:25, 21:23, 21:25, 23:3, 24:4, 35:2, 49:12, 50:23, 51:1, 51:4, 86:24, 99:22, 105:17, 117:3
**perceived** [2] - 92:21, 98:7
**perfect** [1] - 60:1
**permitted** [2] - 20:17
**person** [20] - 7:24, 11:10, 19:4, 19:6, 31:7, 34:1, 36:14, 36:25, 40:7, 45:16, 48:1, 48:4, 48:9, 48:10, 48:11, 49:9, 51:10, 58:25, 59:15, 86:10
**personal** [4] - 46:21, 69:3, 69:22, 69:23
**personally** [3] - 45:6, 73:21, 74:11
**personnel** [1] - 112:6
**persons** [1] - 28:13
**phone** [7] - 10:3, 10:5, 10:15, 14:1, 59:12, 82:25, 83:4
**photo** [7] - 107:8, 107:14, 107:19, 107:22, 108:1, 108:12, 108:14, 108:16, 112:14
**photograph** [17] - 30:5, 42:1, 43:3, 44:9, 75:4, 108:22, 110:1, 110:5, 110:7, 110:11, 110:16, 110:23, 110:25, 111:2, 111:9, 114:14, 115:20
**photographs** [11] - 21:19, 21:22, 41:7, 41:9, 105:21, 106:3, 106:8, 106:10, 106:13, 107:1
**photos** [5] - 84:22, 94:24, 107:2, 108:3
**pick** [3] - 46:21, 112:24, 113:14
**picked** [2] - 6:21, 14:12
**picture** [4] - 21:17, 30:2, 30:9, 109:7
**pictures** [18] - 24:9, 24:13, 78:24, 79:2, 82:22, 82:24, 82:25, 83:6, 83:8, 83:11, 84:20, 84:24, 85:3, 85:6, 91:1, 91:5, 94:19, 106:25
**pillow** [2] - 110:17, 111:1
**pills** [26] - 34:1, 35:8, 35:17, 35:18, 35:23, 36:9, 37:1, 37:2, 37:4, 37:5, 37:15, 37:17, 37:18, 37:19, 38:23, 40:1, 40:14, 40:24, 41:1, 43:5, 45:25, 46:5, 46:6, 46:8, 46:25
**pink** [3] - 80:14, 81:7, 81:10
**place** [2] - 13:23, 21:5
**placed** [5] - 32:12, 35:18, 40:5, 108:6
**plain** [1] - 29:1
**plan** [3] - 8:9, 8:11, 8:21
**plastic** [9] - 70:21, 71:14, 72:4, 72:5, 72:6, 72:15, 73:7, 91:22, 114:3
**play** [2] - 32:14, 34:5
**plead** [1] - 15:19
**PM** [2] - 1:8
**pocket** [2] - 13:11, 18:2
**point** [25] - 8:24, 23:21, 23:22, 37:9, 45:14, 59:7, 60:25, 61:23, 69:15,

69:18, 69:19, 70:10, 72:25, 81:3, 81:14, 85:25, 86:16, 88:5, 88:7, 88:12, 88:13, 90:24, 96:19, 96:21, 114:23
**pointed** [1] - 83:20
**points** [2] - 82:10, 102:17
**Police** [7] - 7:1, 27:13, 27:21, 53:16, 63:13, 63:14, 95:19
**police** [10] - 29:3, 29:4, 36:18, 36:19, 45:23, 63:18, 63:20, 64:18, 96:23, 97:3
**portion** [6] - 32:3, 41:25, 109:13, 110:1, 114:14, 115:20
**position** [3] - 67:8, 70:9, 70:11
**positioned** [3] - 65:23, 76:23, 77:18
**positively** [1] - 94:1
**possessing** [2] - 16:14, 16:16
**possession** [4] - 4:16, 4:19, 13:10, 15:12
**possibilities** [3] - 92:20, 92:24, 93:2
**possibility** [1] - 82:5
**possible** [3] - 51:13, 86:13, 117:7
**possibly** [1] - 29:3
**potentially** [1] - 94:5
**powder** [4] - 35:12, 114:4, 114:5, 114:7
**pre** [1] - 107:1
**pre-search** [1] - 107:1
**precisely** [1] - 96:14
**preliminary** [1] - 5:3
**preparation** [1] - 96:12
**prepped** [1] - 24:12
**presence** [3] - 8:17, 8:20, 75:7
**present** [4] - 2:10, 53:19, 70:7, 73:23
**presiding** [1] - 3:3
**previous** [1] - 110:24
**previously** [2] - 55:10, 102:8
**primarily** [2] - 28:6, 28:8
**primary** [2] - 63:19, 102:20
**prison** [2] - 17:9, 17:11
**probation** [3] - 14:17, 16:2, 16:6
**Proceedings** [2] - 2:21, 118:18
**proceedings** [1] - 119:9
**PROCEEDINGS** [2] - 3:1, 121:4
**PROCEEDINGS...........................** [1] - 120:6
**processes** [2] - 56:3
**PROCTOR** [18] - 23:7, 23:11, 23:15, 23:18, 47:17, 47:19, 48:20, 52:14, 60:11, 61:9, 61:12, 61:16, 61:19, 62:4, 62:12, 99:16, 99:18, 100:6
**Proctor** [2] - 1:23, 62:2
**proctor** [2] - 24:5, 99:15
**PROCTOR....................** [2] - 120:15, 120:22
**produced** [1] - 2:21
**project** [1] - 18:13
**property** [4] - 36:12, 36:25, 56:19, 56:20
**prosecution** [1] - 21:21
**prosecutors** [1] - 53:23
**provide** [1] - 54:14

**provided** [4] - 5:22, 12:12, 12:17, 28:20
**proximity** [1] - 54:12
**Prudente** [1] - 60:14
**public** [2] - 29:11, 61:7
**Public** [1] - 1:19
**pull** [1] - 70:22
**Pulley** [1] - 2:4
**purchase** [7] - 6:14, 18:6, 31:8, 37:25, 42:17, 43:14, 45:25
**purchased** [7] - 37:19, 39:4, 40:15, 41:2, 42:3, 43:5, 55:6
**purchases** [2] - 30:22, 30:25
**purpose** [1] - 80:1
**purposes** [1] - 7:23
**pursuant** [1] - 119:8
**put** [9] - 13:11, 16:2, 25:9, 36:1, 69:12, 77:1, 96:17, 116:15, 116:16

# Q

**Quantico** [1] - 118:6
**quantity** [1] - 56:4
**questions** [12] - 22:9, 23:6, 23:25, 24:11, 26:7, 44:18, 47:16, 57:10, 57:12, 78:6, 106:5, 116:22
**quick** [1] - 37:15
**quite** [2] - 57:9, 80:11

# R

**rain** [1] - 61:22
**raise** [5] - 3:22, 26:25, 53:5, 62:25, 101:12
**Randolph** [1] - 118:5
**randomly** [1] - 50:23
**rank** [2] - 27:18, 63:17
**rather** [1] - 49:17
**razor** [1] - 91:22
**reach** [1] - 88:21
**reached** [1] - 72:4
**real** [1] - 96:11
**ready** [3] - 3:13, 62:17, 105:10
**real** [2] - 37:14, 56:4
**really** [8] - 10:12, 22:4, 28:25, 42:19, 60:13, 60:24, 61:2, 63:22
**Realtime** [1] - 119:6
**rear** [7] - 10:12, 66:2, 66:17, 70:13, 70:15, 72:13, 74:7, 74:8, 74:9, 82:12, 82:13, 82:18, 84:8, 89:10, 90:14, 90:15
**reason** [3] - 46:22, 60:19, 61:15
**recalled** [1] - 59:19
**receive** [2] - 25:4, 29:20, 29:24
**received** [5] - 14:20, 24:25, 25:2, 29:25
**Recess** [1] - 58:4
**recess** [4] - 23:22, 57:22, 58:2, 117:23
**recognize** [18] - 7:24, 30:6, 30:8, 30:9, 31:14, 41:9, 48:6, 48:9, 55:12, 55:16,

56:20, 75:1, 75:3, 106:8, 112:2, 112:11, 112:22, 115:14
**recollection** [2] - 28:23, 48:18
**record** [15] - 4:3, 16:12, 19:13, 19:16, 20:13, 24:5, 25:9, 27:3, 44:8, 53:8, 55:21, 57:20, 62:16, 63:3, 101:17
**recorded** [2] - 2:21, 32:2
**recording** [10] - 19:10, 19:16, 19:21, 20:12, 21:9, 31:5, 31:6, 31:23, 31:24, 32:11
**recordings** [2] - 31:17, 31:25
**recover** [4] - 73:19, 73:21, 74:11, 75:15
**recovered** [17] - 36:25, 73:20, 73:23, 73:25, 74:13, 74:14, 74:16, 75:6, 75:7, 76:22, 77:2, 77:3, 77:15, 77:23, 113:2, 113:4
**REDIRECT** [2] - 26:10, 100:10
**Redirect** [2] - 120:11, 120:22
**redirect** [5] - 26:2, 26:5, 26:8, 51:24, 100:9
**reentry** [1] - 61:6
**reference** [1] - 78:13
**referred** [3] - 6:7, 21:18, 25:19
**referring** [5] - 19:4, 24:8, 24:10, 24:17, 78:20
**refuse** [1] - 19:21
**Registered** [1] - 119:5
**regular** [2] - 64:15, 96:3
**regulations** [1] - 119:11
**related** [1] - 71:22
**relevant** [1] - 108:18
**relocation** [5] - 5:20, 14:23, 17:23, 22:16, 25:2
**remain** [1] - 105:12
**remaining** [1] - 11:3
**remember** [24] - 6:9, 6:11, 6:25, 7:3, 12:2, 12:4, 12:8, 12:22, 46:22, 48:2, 59:19, 61:14, 66:5, 73:25, 77:5, 80:5, 82:4, 96:8, 98:6, 104:5, 104:6, 104:13, 104:17, 104:24
**remind** [1] - 61:24
**reminder** [1] - 117:5
**remove** [3] - 23:22, 62:10, 117:14
**removed** [1] - 59:4
**rent** [1] - 18:2
**repeated** [1] - 22:15
**report** [10] - 24:8, 24:10, 24:17, 59:6, 68:9, 87:17, 95:7, 96:6, 96:11, 96:17
**reported** [1] - 119:9
**reporter** [1] - 13:1
**Reporter** [2] - 119:5, 119:6
**REPORTER** [5] - 24:23, 70:23, 97:17, 119:1, 119:18
**reporting** [2] - 25:7, 60:1
**reports** [2] - 95:13, 96:1
**represent** [2] - 45:2, 95:6
**request** [6] - 20:19, 23:22, 24:6, 29:20, 29:24, 29:25
**reserve** [1] - 116:23

**residence** [14] - 29:16, 29:18, 84:7, 87:9, 89:14, 92:6, 103:21, 105:2, 105:4, 105:6, 105:8, 105:9, 105:17, 107:11
**residents** [4] - 104:25, 105:3, 105:11
**residue** [1] - 91:23
**respect** [2] - 78:10, 89:5
**responded** [1] - 42:23
**response** [2] - 51:23, 100:8
**responsibilities** [1] - 63:19
**responsible** [1] - 103:15
**rest** [4] - 25:14, 72:5, 90:6, 105:1
**restrained** [1] - 60:22
**restraints** [3] - 23:21, 23:23, 61:1
**result** [1] - 17:8
**results** [1] - 118:10
**resume** [1] - 117:17
**resumes** [2] - 3:2, 58:5
**retrieve** [2] - 83:5, 112:9
**return** [2] - 35:24, 39:25
**returned** [2] - 83:1, 83:2
**review** [1] - 31:25
**reviewing** [1] - 106:6
**Rich** [2] - 45:2, 95:6
**Richard** [1] - 1:21
**RMR** [2] - 2:23, 119:17
**Robbery** [1] - 64:7
**Robert** [2] - 28:19, 29:25
**rock** [1] - 76:3
**rock-like** [1] - 76:3
**role** [4] - 65:4, 65:11, 102:15, 103:20
**roles** [1] - 103:9
**Romano** [1] - 1:14
**ROMANO** [12] - 23:14, 52:10, 52:18, 53:3, 53:13, 55:8, 55:9, 55:15, 57:2, 57:7, 57:9, 60:9
**ROMANO.....................** [1] - 120:18
**room** [18] - 60:14, 72:12, 72:14, 72:15, 72:16, 72:22, 105:20, 107:9, 107:10, 107:15, 107:19, 108:8, 109:16, 109:18, 109:20, 110:20
**Room** [25] - 10:1, 10:20, 10:23, 12:19, 107:8, 107:9, 107:14, 107:22, 108:1, 108:10, 108:12, 108:16, 109:1, 109:20, 109:21, 110:15, 110:18, 111:8, 111:12, 111:14, 111:15, 113:4, 116:2, 116:12
**rooms** [1] - 109:19
**rowhouse** [2] - 78:21, 103:22
**rowhouses** [1] - 49:21
**rude** [1] - 117:10
**run** [2] - 66:19, 67:5
**rush** [1] - 62:1

**S**

**Safe** [4] - 102:5, 102:7, 102:9, 104:10
**safe** [1] - 64:16
**safeguard** [1] - 54:13

**sales** [1] - 72:24
**Sandtown** [1] - 65:10
**sandwich** [2] - 70:18, 72:1
**saw** [28] - 21:25, 37:3, 42:14, 49:20, 50:6, 59:3, 62:2, 66:15, 66:16, 67:1, 67:10, 68:21, 73:5, 79:8, 81:1, 83:15, 87:12, 87:19, 88:15, 91:19, 92:5, 97:25, 98:3, 98:7, 98:21, 98:22, 99:22, 110:7
**scale** [3] - 113:21, 113:23, 113:25
**scene** [2] - 95:17, 96:24
**schedule** [1] - 100:19
**scheduling** [1] - 52:5
**school** [4] - 43:16, 44:5, 44:8, 44:10
**screen** [7] - 42:8, 42:11, 65:18, 65:22, 76:21, 77:6, 113:6
**search** [25] - 9:10, 9:12, 9:14, 45:22, 54:6, 101:1, 103:1, 103:8, 103:14, 103:17, 103:18, 104:3, 104:14, 104:19, 105:10, 105:13, 105:20, 106:13, 106:14, 107:1, 107:6, 108:18, 110:13, 112:4, 112:13
**searched** [5] - 9:16, 12:14, 19:6, 19:8, 98:12
**searching** [1] - 107:3
**seat** [1] - 61:16
**seated** [6] - 3:25, 27:2, 53:7, 61:8, 63:2, 101:14
**second** [15] - 17:20, 19:12, 24:8, 34:5, 41:15, 46:15, 47:22, 50:3, 57:18, 67:15, 84:23, 89:13, 96:20
**second-floor** [1] - 84:23
**second-story** [1] - 67:15
**seconds** [3] - 67:25, 85:25, 115:9
**Sector** [1] - 65:8
**secure** [2] - 36:12, 87:8
**secured** [2] - 105:1, 105:6
**security** [1] - 3:7
**see** [50] - 10:6, 10:12, 12:14, 19:12, 22:1, 37:2, 37:4, 37:5, 37:15, 40:24, 41:24, 46:5, 47:23, 50:20, 52:4, 57:17, 59:7, 59:23, 60:21, 60:24, 65:18, 65:19, 66:13, 67:4, 67:7, 67:20, 68:1, 68:5, 68:7, 69:15, 69:16, 69:18, 69:25, 70:15, 70:17, 70:21, 72:12, 74:2, 81:15, 81:16, 81:17, 82:3, 85:15, 88:1, 88:3, 88:5, 88:23, 89:12, 89:17, 90:10, 92:7, 92:8, 92:13, 97:12, 97:14, 97:23, 100:1, 100:15, 107:10, 117:8, 117:18, 117:21, 118:14
**seeing** [5] - 49:12, 83:18, 83:24, 84:6, 85:19
**seem** [1] - 117:9
**sees** [1] - 60:20
**seize** [2] - 93:7, 108:18
**seized** [6] - 58:24, 92:10, 110:12, 112:3, 115:16, 116:1
**seizing** [7] - 87:9, 103:1, 103:3, 103:11, 103:12, 103:13, 103:14
**sell** [2] - 109:4, 109:5

**selling** - 33:10, 38:21
**send** [1] - 36:10
**sense** [1] - 61:15
**sentence** [1] - 15:21
**separate** [1] - 25:23
**SEPTEMBER** [2] - 3:1, 120:3
**September** [1] - 1:7
**Sergeant** [7] - 29:21, 29:25, 30:1, 30:9, 68:24, 70:13, 96:25
**sergeant** [8] - 28:11, 28:12, 28:18, 28:19, 36:10, 39:24, 46:23, 65:3
**serious** [1] - 34:17
**served** [1] - 15:22
**service** [1] - 63:21
**services** [1] - 18:19
**serving** [1] - 42:22
**SESSION** [2] - 1:5, 120:3
**session** [2] - 3:3, 58:6
**set** [3] - 75:4, 80:17, 106:25
**setting** [1] - 109:18
**seven** [3] - 4:15, 17:22, 52:11
**seventeen** [1] - 53:18
**several** [5] - 37:15, 104:5, 108:2, 111:21, 118:2
**shape** [2] - 12:24, 82:18
**sheet** [1] - 81:9
**shoes** [1] - 109:5
**shootings** [1] - 34:16
**shop** [1] - 33:7
**shopping** [1] - 20:25
**ShopRite** [1] - 6:20
**short** [6] - 7:14, 7:15, 12:3, 12:7, 12:18, 57:21
**shortened** [1] - 32:3
**shorter** [1] - 7:16
**show** [18] - 7:7, 10:15, 30:5, 31:12, 37:8, 40:18, 41:7, 43:24, 55:10, 56:10, 65:22, 66:22, 105:21, 107:5, 111:21, 112:9, 112:19, 114:16
**showed** [4] - 10:8, 10:19, 11:1, 24:13
**showing** [3] - 42:10, 92:5, 115:13
**shown** [6] - 21:17, 21:19, 49:1, 84:25, 94:1, 94:3
**side** [5] - 44:11, 54:5, 72:13, 80:8, 84:9
**sifters** [3] - 114:8, 114:21, 115:4
**sight** [3] - 67:16, 88:7, 90:6
**significant** [1] - 59:24
**silver** [1] - 39:12
**similar** [1] - 82:18
**simply** [2] - 50:23, 56:10
**sit** [4] - 48:4, 48:7, 48:14, 105:19
**sitting** [5] - 60:23, 70:19, 70:21, 72:4, 100:3
**situated** [2] - 84:12, 86:2
**Sivells** [28] - 1:18, 66:12, 66:16, 66:18, 67:1, 67:3, 67:11, 68:19, 71:9, 73:9, 73:19, 79:8, 81:2, 83:9, 83:15, 83:19, 86:14, 87:12, 90:1, 90:10, 92:4, 92:22, 94:20, 100:14, 111:4, 111:5, 111:10,

116:7
**six** [29] - 10:9, 10:15, 11:1, 21:23, 21:25, 24:4, 34:23, 35:7, 35:8, 35:25, 37:1, 37:17, 38:18, 38:22, 38:23, 40:1, 40:14, 40:24, 41:1, 43:5, 45:25, 46:5, 46:8, 46:21, 46:25, 55:22, 94:24, 96:9
**skinned** [2] - 7:12, 7:13
**slang** [1] - 33:10
**slower** [2] - 70:23, 70:25
**smaller** [2] - 13:6, 13:9
**snuck** [1] - 58:20
**sock** [3] - 35:18, 36:1, 40:5
**someone** [12] - 6:7, 6:13, 7:7, 8:18, 8:21, 22:23, 33:10, 36:13, 36:20, 47:4, 59:11, 76:4
**sometime** [1] - 59:9
**sometimes** [5] - 29:17, 34:10, 34:16, 46:22
**somewhere** [5] - 6:17, 31:7, 43:16, 43:21, 95:25
**Sorry** [1] - 23:15
**sorry** [6] - 23:16, 30:15, 35:10, 75:24, 93:15, 97:17
**sort** [8] - 14:18, 18:12, 46:3, 60:2, 61:5, 75:17, 91:23, 117:14
**Sosa** [4] - 65:3, 68:24, 76:6, 96:25
**sound** [1] - 99:20
**sounds** [1] - 59:24
**south** [4] - 44:10, 77:19, 79:13, 80:9
**southerly** [2] - 83:25, 84:2
**speaking** [2] - 24:23, 81:17
**special** [1] - 102:1
**Special** [7] - 2:11, 100:25, 101:11, 101:23, 104:7, 104:8
**specific** [8] - 10:18, 56:12, 59:19, 64:13, 64:21, 65:4, 65:11, 66:11
**specifically** [8] - 6:9, 6:16, 8:15, 23:24, 28:16, 64:11, 110:16, 113:9
**spectators** [1] - 60:7
**spell** [5] - 4:3, 27:3, 53:8, 63:3, 101:16
**spend** [1] - 67:23
**spot** [1] - 77:13
**squad** [4] - 28:11, 54:2, 54:4, 54:19
**staircase** [2] - 110:2, 112:16
**stairs** [6] - 108:23, 109:11, 109:23, 110:3, 113:5, 114:12
**stand** [7] - 3:23, 23:12, 23:19, 47:22, 85:12, 108:25, 116:21
**standard** [1] - 55:7
**standing** [4] - 41:20, 42:21, 42:25, 48:4
**stands** [3] - 54:12, 58:1, 118:16
**start** [9] - 34:9, 84:6, 95:18, 101:1, 101:4, 106:22, 108:21, 111:23, 117:2
**started** [3] - 44:10, 95:19, 101:8
**stash** [2] - 91:13, 98:23
**state** [4] - 4:3, 27:3, 53:8, 118:7
**State** [1] - 118:9
**State's** [1] - 53:21
**STATES** [3] - 1:1, 1:3, 120:2

**States** [4] - 110:12, 112:3, 119:6, 119:12
**stating** [1] - 25:1
**station** [1] - 91:8
**stay** [4] - 11:8, 61:10, 105:14, 117:19
**stayed** [2] - 105:16
**stenographically** [1] - 119:9
**stenographically-reported** [1] - 119:9
**stenography** [1] - 2:21
**step** [1] - 116:25
**steps** [1] - 96:20
**stick** [2] - 60:2, 117:3
**still** [8] - 11:13, 16:6, 60:4, 60:23, 69:17, 77:9, 84:24, 97:2
**stood** [1] - 90:8
**stopped** [1] - 59:15
**store** [13] - 10:21, 11:8, 11:11, 11:17, 11:23, 12:19, 21:3, 21:6, 21:9, 21:12, 21:14, 70:18, 109:3
**stores** [1] - 20:25
**story** [2] - 49:21, 67:15
**straight** [2] - 44:3, 82:20
**Street** [15] - 2:24, 32:19, 65:24, 66:21, 68:10, 77:24, 80:12, 82:14, 84:9, 87:22, 87:24, 88:1, 88:10, 91:11, 91:16
**street** [14] - 33:7, 34:9, 34:11, 34:17, 36:25, 39:2, 49:3, 51:5, 66:23, 67:4, 68:5, 72:23, 74:7, 99:8
**street-level** [1] - 72:23
**street-type** [1] - 51:5
**Streets** [4] - 102:5, 102:7, 102:9, 104:10
**streets** [1] - 77:21
**stricken** [1] - 78:14
**strike** [2] - 71:19, 78:9
**stuck** [1] - 17:12
**stuff** [2] - 12:4, 92:22
**subject** [1] - 61:14
**submission** [1] - 55:17
**submit** [9] - 36:13, 36:16, 36:21, 36:24, 55:20, 55:25, 56:15, 76:4, 94:11
**submits** [2] - 36:14, 36:22
**submitted** [6] - 56:2, 75:5, 76:6, 93:13, 93:16, 93:17, 93:22, 93:25
**submitting** [3] - 55:18, 55:19, 56:1
**substance** [1] - 76:3
**substances** [1] - 118:11
**suggested** [1] - 85:16
**suits** [1] - 64:16
**Sun** [2] - 60:14, 60:21
**supervisor** [2] - 37:6, 40:16
**support** [1] - 110:1
**supposed** [6] - 36:18, 59:25, 62:8, 117:9, 117:10, 117:11
**surmised** [1] - 88:16
**surveillance** [14] - 72:25, 74:5, 76:24, 80:1, 80:3, 80:17, 81:21, 82:7, 82:22, 83:6, 83:8, 86:1, 91:5, 91:8
**suspect** [1] - 75:19
**suspected** [7] - 55:17, 65:14, 68:13,

72:7, 72:18, 94:5, 98:15
**sustain** [1] - 76:15
**sustained** [4] - 69:5, 75:22, 76:18, 78:12
**switch** [1] - 79:18
**SWORN** [5] - 3:24, 27:1, 53:6, 63:1, 101:13
**Sworn**.................................................. [5] - 120:9, 120:13, 120:17, 120:20, 121:2
**system** [1] - 60:2
**systems** [1] - 83:4

## T

**T-H-O-M-A-S** [1] - 63:6
**tall** [1] - 7:14
**target** [13] - 28:21, 30:11, 34:23, 35:21, 40:15, 41:12, 41:15, 41:20, 42:23, 42:24, 42:25, 43:22, 66:11
**targeted** [3] - 28:13, 48:10, 50:14
**targeting** [1] - 28:16
**targets** [1] - 28:24
**task** [1] - 16:25
**Task** [4] - 102:5, 104:8, 104:9, 104:10
**Taurus** [6] - 45:3, 66:12, 74:2, 74:4, 74:12, 74:16
**team** [23] - 36:22, 37:6, 40:17, 47:6, 54:8, 54:10, 54:11, 54:12, 54:25, 68:23, 69:9, 69:11, 69:12, 69:13, 69:15, 69:16, 69:18, 103:1, 103:3, 103:6, 103:7, 103:16, 104:3
**Telustrator** [1] - 65:21
**ten** [6] - 9:22, 10:7, 10:15, 46:6, 51:17
**tendered** [19] - 7:21, 8:4, 31:15, 31:20, 37:10, 37:23, 40:21, 41:5, 41:10, 41:22, 55:13, 74:22, 75:11, 75:12, 95:10, 95:11, 106:1, 106:19, 111:25
**tennis** [2] - 13:6, 13:9
**term** [4] - 29:10, 33:8, 35:12, 36:23
**terms** [1] - 85:9
**Terrell** [6] - 66:12, 71:9, 73:9, 94:20, 111:10, 116:7
**test** [1] - 93:12
**tested** [6] - 76:7, 76:11, 78:11, 78:13, 93:11, 118:11
**testified** [6] - 22:15, 25:3, 91:18, 95:18, 97:25, 100:12
**testimony** [4] - 59:11, 78:9, 81:1, 96:12
**testing** [5] - 56:6, 56:18, 76:5, 93:7, 94:12
**text** [1] - 36:10
**they've** [2] - 58:25, 61:25
**third** [5] - 22:20, 25:5, 50:3, 89:20, 95:22
**thirty** [2] - 67:25, 85:25
**Thomas** [4] - 62:23, 63:5, 63:12, 100:12
**THOMAS** [2] - 63:1, 120:19
**three** [14] - 17:22, 23:21, 23:22, 37:1, 49:21, 60:25, 67:12, 78:2, 80:9, 84:14,

84:16, 111:18, 111:19, 115:4
**three-point** [3] - 23:21, 23:22, 60:25
**three-story** [1] - 49:21
**Tillman** [14] - 1:20, 45:3, 47:10, 60:20, 66:12, 74:2, 74:4, 74:12, 74:16, 95:6, 97:23, 98:8, 98:15, 99:6
**tiny** [1] - 73:7
**title** [1] - 44:25
**today** [15] - 15:7, 18:19, 21:17, 25:21, 38:20, 48:5, 48:7, 48:14, 60:13, 60:15, 60:25, 64:16, 76:9, 78:25, 93:16
**together** [2] - 9:19, 46:17
**tomorrow** [4] - 116:22, 117:17, 117:18, 117:25
**took** [8] - 13:10, 21:5, 83:6, 85:3, 85:6, 87:9, 91:4, 94:19
**top** [9] - 70:20, 70:21, 72:2, 72:4, 75:16, 98:19, 110:17, 114:14
**topped** [1] - 91:22
**total** [3] - 46:17, 47:3, 55:21
**touch** [4] - 43:18, 65:22, 77:7, 92:13
**touched** [2] - 94:6, 94:9
**touching** [3] - 92:4, 94:3, 94:4
**towards** [8] - 67:19, 67:20, 68:20, 82:14, 82:15, 85:4, 88:20
**town** [1] - 65:7
**trade** [1] - 47:1
**traditional** [1] - 64:18
**trafficking** [3] - 4:21, 16:16, 92:1
**training** [1] - 118:6
**Trainor** [1] - 2:9
**transaction** [15] - 8:13, 10:1, 11:24, 11:25, 13:23, 39:22, 40:6, 40:12, 45:23, 68:18, 89:5, 89:7, 89:13, 90:6, 90:9
**transactions** [9] - 51:5, 51:15, 65:5, 65:14, 83:16, 89:17, 98:8, 99:10, 99:23
**transcript** [3] - 2:21, 119:9, 119:10
**transferring** [1] - 58:23
**transported** [1] - 73:12
**trash** [1] - 71:12
**travel** [2] - 68:22, 69:1
**trays** [2] - 113:15, 113:17
**TRIAL** [2] - 1:10, 120:3
**Trial** [1] - 1:14
**TRISTON** [3] - 53:6, 53:10, 120:17
**Triston** [1] - 53:9
**trouble** [1] - 18:3
**true** [1] - 119:8
**try** [4] - 5:3, 24:15, 77:8
**trying** [2] - 62:7, 117:9
**turn** [3] - 40:16, 87:24, 87:25
**turned** [1] - 25:10
**twenty** [1] - 4:15
**twenty-seven** [1] - 4:15
**two** [26] - 7:2, 7:3, 11:16, 12:22, 16:14, 17:20, 31:23, 32:15, 35:2, 52:19, 60:21, 78:2, 84:15, 84:16, 85:23,

95:13, 97:9, 99:22, 100:13, 111:17, 111:18, 111:19, 114:11, 114:13, 116:11, 118:7
**type** [7] - 13:1, 31:5, 51:5, 61:23, 94:12, 103:21, 104:18
**types** [1] - 28:7
**typically** [6] - 28:21, 29:7, 35:11, 103:8, 103:18, 105:19
**typing** [2] - 13:1, 70:25

## U

**U.S** [6] - 1:13, 1:14, 1:14, 2:23, 74:17
**U.S.C** [1] - 119:8
**UC1** [2] - 37:8, 37:19
**UC3** [3] - 41:8, 41:14, 41:24
**UC4** [4] - 40:19, 42:11, 55:8, 55:11
**UC5** [1] - 56:11
**UC6** [5] - 41:8, 41:17, 42:6, 42:7, 42:11
**UC7** [3] - 41:8, 41:21, 43:2
**UCs** [2] - 31:6, 54:13
**ultimately** [4] - 15:19, 36:9, 56:18, 98:10
**unable** [2] - 23:13, 23:21
**under** [5] - 108:23, 109:11, 109:23, 113:5, 114:12
**undercover** [19] - 28:1, 28:2, 28:4, 28:6, 28:7, 28:10, 29:7, 29:21, 30:11, 30:22, 31:17, 32:6, 42:17, 43:14, 45:15, 54:2, 54:3, 54:11, 54:19
**undercovers** [1] - 54:15
**underneath** [3] - 110:25, 112:16, 114:8
**understood** [1] - 49:6
**unfinished** [1] - 104:1
**uniform** [3] - 64:15, 64:19, 66:8
**Unit** [4] - 36:24, 53:20, 56:2, 56:16
**unit** [5] - 28:1, 28:2, 28:4, 28:10, 32:23
**UNITED** [3] - 1:1, 1:3, 120:2
**United** [4] - 110:12, 112:3, 119:6, 119:12
**unless** [1] - 76:15
**unmarked** [3] - 29:4, 36:8, 43:15
**up** [60] - 3:23, 6:21, 7:7, 8:12, 10:8, 10:16, 10:19, 11:1, 14:12, 15:9, 21:14, 23:12, 23:14, 23:19, 24:7, 33:5, 33:16, 35:1, 36:11, 38:21, 42:8, 42:20, 47:22, 49:24, 50:2, 50:3, 58:12, 60:6, 63:25, 66:20, 67:5, 67:15, 68:9, 68:12, 70:13, 72:4, 72:13, 74:6, 76:20, 77:10, 78:24, 80:17, 81:10, 81:12, 81:15, 84:22, 85:6, 86:8, 87:21, 88:16, 90:5, 91:12, 91:15, 98:1, 98:2, 105:14, 113:14, 117:21
**upgraded** [1] - 83:4
**upstairs** [8] - 103:24, 108:10, 108:12, 108:16, 110:15, 111:12, 111:17, 118:15
**users** [1] - 49:14
**utility** [2] - 109:16, 109:18

## V

**vacant** [26] - 65:13, 65:15, 65:24, 66:1, 66:6, 66:11, 66:17, 66:20, 66:24, 67:8, 67:11, 67:23, 70:7, 70:8, 70:9, 70:17, 71:3, 71:5, 71:7, 71:11, 74:9, 81:22, 88:12, 97:22, 100:15
**vantage** [3] - 81:3, 81:14, 82:10
**vape** [1] - 39:12
**vaping** [1] - 39:13
**various** [1] - 118:11
**vehicle** [2] - 36:8, 50:15
**vehicles** [1] - 29:4
**Velte** [5] - 28:19, 29:21, 29:25, 30:1, 30:9
**Verger** [1] - 118:8
**versus** [1] - 22:19
**vestibule** [1] - 41:25
**vials** [8] - 72:7, 72:17, 72:19, 73:7, 76:1, 76:2, 91:22, 98:19
**video** [22] - 20:13, 32:2, 32:16, 32:24, 33:13, 33:22, 34:2, 34:12, 34:18, 35:4, 35:13, 36:4, 38:5, 38:12, 38:24, 39:7, 39:18, 40:9, 43:3, 49:1, 49:20, 50:13
**view** [1] - 10:12
**viewed** [1] - 32:2
**violence** [2] - 28:15, 53:24
**visible** [1] - 85:9
**voice** [1] - 33:2
**VOL** [1] - 120:3
**Volume** [1] - 1:5

## W

**wait** [3] - 23:14, 33:18, 39:3
**waiting** [2] - 9:24, 34:1
**walk** [11] - 10:2, 29:12, 36:7, 39:2, 40:12, 50:13, 59:15, 68:20, 71:1, 86:7, 98:1
**walked** [10] - 35:1, 43:22, 43:25, 44:1, 44:3, 44:11, 71:11, 81:22, 81:23, 81:25
**walking** [12] - 11:5, 11:6, 11:9, 51:14, 59:12, 60:20, 60:25, 62:1, 74:6, 94:20, 98:21, 98:25
**wall** [6] - 70:20, 70:21, 72:3, 75:16, 108:7
**walls** [1] - 108:3
**wants** [1] - 53:1
**warrant** [5] - 103:1, 103:8, 103:17, 103:18, 112:4
**warrants** [2] - 54:6
**watching** [3] - 66:12, 66:17, 90:2
**waved** [1] - 11:21
**ways** [1] - 29:1
**wear** [3] - 19:21, 20:12, 64:16
**wearing** [1] - 64:18
**welcome** [2] - 79:22, 101:20

**west** [1] - 87:25
**West** [1] - 2:24
**Western** [4] - 64:10, 65:8, 73:13
**whichever** [1] - 112:24
**white** [7] - 12:24, 13:8, 61:20, 76:2, 114:3, 114:5, 114:7
**whole** [2] - 49:6, 61:10
**whoops** [1] - 115:2
**wicks** [1] - 100:3
**Wicks** [1] - 1:23
**wide** [1] - 50:4
**William** [1] - 104:7
**Wilson** [1] - 2:6
**Winchester** [1] - 65:10
**window** [8] - 67:16, 72:13, 82:17, 82:19, 82:20, 84:23, 86:8
**windows** [1] - 50:3
**wiretap** [1] - 45:11
**withdraw** [1] - 71:23
**witness** [22] - 3:5, 3:14, 7:21, 23:12, 23:18, 24:2, 26:18, 26:22, 37:8, 44:9, 45:20, 52:1, 52:10, 53:2, 53:4, 62:21, 100:23, 101:8, 101:9, 105:23, 111:21, 116:25
**Witness** [20] - 26:20, 31:15, 37:10, 40:21, 41:10, 52:3, 55:13, 57:16, 74:22, 95:11, 100:20, 106:1, 106:6, 111:25, 117:1, 120:12, 120:16, 120:18, 120:23, 121:3
**WITNESS** [20] - 3:24, 4:5, 27:1, 27:5, 41:11, 53:6, 53:9, 55:14, 57:3, 57:14, 63:1, 63:5, 73:17, 77:9, 94:23, 97:18, 101:13, 101:15, 101:18, 101:20
**witnesses** [3] - 57:23, 60:5, 117:24
**WITNESSES** [1] - 120:7
**wondering** [1] - 52:8
**Woodyear** [6] - 67:5, 68:10, 74:10, 81:16, 90:19, 90:21
**word** [1] - 83:12
**words** [4] - 22:22, 42:19, 59:13, 59:20
**would've** [1] - 96:25
**write** [1] - 54:6
**writing** [3] - 25:1, 25:15, 77:6
**written** [1] - 96:1

## Y

**year** [2] - 45:9, 95:22
**years** [8] - 14:20, 27:17, 28:3, 53:18, 63:15, 94:24, 96:9, 102:3
**yourself** [5] - 6:21, 31:4, 62:10, 91:15, 117:14

## Z

**Ziploc** [2] - 73:8, 113:1

## §

**§** [1] - 119:8